**United States Court of Appeals**
**For the First Circuit**

_____

No. 23-1626

SANDRA RODRÍGUEZ-COTTO; RAFELLI GONZÁLEZ-COTTO,

Plaintiffs - Appellees,

v.

JENNIFFER A. GONZÁLEZ-COLÓN, Governor of Puerto Rico; JANET PARRA
MERCADO, Secretary of Department of Justice; ARTURO GARFFER, Secretary of
Puerto Rico Department of Public Safety; JOSEPH GONZÁLEZ FALCÓN,
Commissioner of the Puerto Rico Police Bureau,

Defendants - Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernandez, U.S. District Judge]

_____

**BRIEF FOR DEFENDANTS-APPELLANTS**

_____

**OMAR ANDINO FIGUEROA**
Solicitor General of Puerto Rico
USCA. No. USCA No. 1197240
PO Box 9020192
San Juan, Puerto Rico 00902-0192
Telephone: (787) 721-2900
E-mail: omar.andino@justicia.pr.gov

**FRANCISCO J. GONZÁLEZ-MAGAZ**
USCA No. 111101
Francisco González P.S.C.
1519 Ponce de León
First Federal Suite 805
San Juan, Puerto Rico 00909
Telephone: (787) 504-5880
Email: gonzalezmagaz@gmail.com

Dated: July 9, 2025

**Table of Contents**

**Page(s)**

I.     INTRODUCTION ........................................................................ 2

II.    JURISDICTIONAL STATEMENT………………………………………...5

III.   STATEMENT OF THE ISSUE .......................................................... 6

IV.    STATEMENT OF THE CASE ........................................................... 6

V.     SUMMARY OF THE ARGUMENT ................................................10

V.     ARGUMENT.....................................................................................11

A. Appellants' position on jurisdictional issues………………………………...11

i. Whether any portion of the Complaint was filed in violation of the automatic stay…………………………………………………………………..11

ii. Whether any monetary relief exists that could substitute the requested equitable relief…………………………………………………………………15

iii. Whether definition of claim in POA does not require request for equitable relief to have alternative monetary remedy…………………………………..17

iv. Whether Confirmation Order applies to Appellee' requests for equitable relief……………………………………………………………………………19

B. The district court erred in declaring Article 5.14(a) to be unconstitutional and issuing a permanent injunction prohibiting its enforcement……………..19

i. Standard of review……………………………………………………………19

ii.  Freedom of Expression under the First Amendment .................................20

iii. Law 20 is constitutionally valid ………………………………………………22

iv. Law 20 is not content-based ………………………………………………28

**v. Law 20 meets the criteria necessary to overcome intermediate and strict scrutiny**………………………………………………………………29

**VI.    CONCLUSION**...............................................................................31

**CERTIFICATE OF FILING AND SERVICE**............................................................33

**CERTIFICATE OF COMPLIANCE WITH RULE 32(G)** ......................................34

# Table of Authorities

**Page(s)**

**Laws (Federal):**

Stolen Valor Act, 18 U. S. C. 704 (b),(c)…………………………………………..2

28 U.S.C. §§ 1331……………………………………………………..……5

28 U.S.C. §§ 1343……………………………………………………………5

**Laws (State)**

No. 20 of 2017, P.R. Laws Ann. tit. 25, §§ 3501, et seq.
Article 5.14(a)…………………………………………………………………..2

**Cases (Federal):**

*Butner v. United States*, 440 U.S. 48, 54 (1979)…………………………………………5

*Cablevision of Bos., Inc. v. Pub. Improvement Comm'n,* 184 F.3d 88, 96
(1st Cir. 1999)…………………………………………………………………20

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,* 142 S. Ct. 1464, 1472 (2022)…..28

*City of Chicago v. Fulton*, 592 U.S. 154, 158 (2021)……………………………………5

*Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021)………………………………………20

*Frese v. Formella*, 53 F.4th 1 (1st Cir. 2022)……………………………………………2

*Garrison v. Louisiana*, 379 U.S. 64 (1964)………………………………………………2

*Haig v. Agee*, 453 U.S. 280, 307 (1981)…………………………………………………29

*In re Fin. Oversight & Mgmt. Bd. for P.R.*, 636 B.R. 1, 38-39 (D.P.R. 2022)……………5

*In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17-bk-03283-LTS, 2022
WL 17413011, at *4 n.6 (D.P.R. Feb. 7, 2022)……………………………….……5

*In re G-I Holdings, Inc.*, 514 B.R. 720, 757-58, 75860 (Bankr. D.N.J. 2014)..............5

*Mangual v. Rutger-Sabat*, 317 F. 3d 45, 59 (1st Cir 2003)...................................21

*McCullen v. Coakley*, 573 U.S. 464, 495 (2014)...................................................29

*Mills v. Alabama, 384,* U.S. 214, 218 (1966)........................................................21

*New York Times v. Sullivan*, 376 U.S. 254, 375 (1964)........................................21

*Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000)......................................5

*Rederford v. U.S. Airways, Inc.*, 589 F.3d 30, 37 (1st Cir. 2009)..........................5

*Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015)..............................................28

*Rideout v. Gardner*, 838 F.3d 65, 72 (1st Cir. 2016).............................................28

*Roth v. United States,* 354 U.S. 476, 484 (1957)...................................................21

*Stromberg v. California*, 283 U.S. 359, 369 (1931)...............................................21

*Together Employees et al v. Massachusetts General Brigham Inc.*,
573 F.Supp.3d 412 (1st Cir. 2021)....................................................................20

*U.S. v. Alvarez*, 567 U.S. 709 (2012)....................................................................2

*Water Keeper All. v. Dep't of Def.*, 271 F.3d 21, 30 (1st Cir. 2001).......................20

*Zucht v. King*, 260 U.S. 174, 176 (1922)..............................................................30

**United States Court of Appeals
For the First Circuit**

_____

No. 23-1626

SANDRA RODRÍGUEZ-COTTO; RAFELLI GONZÁLEZ-COTTO,

Plaintiffs - Appellees,

v.

JENNIFFER A. GONZÁLEZ-COLÓN, Governor of Puerto Rico; JANET PARRA
MERCADO, Secretary of Department of Justice; ARTURO GARFFER, Secretary of
Puerto Rico Department of Public Safety; JOSEPH GONZÁLEZ FALCÓN,
Commissioner of the Puerto Rico Police Bureau,

Defendants - Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernandez, U.S. District Judge]

_____

**BRIEF FOR DEFENDANTS-APPELLANTS**

_____

**AMENDED APPELLANTS' BRIEF**

**TO THE HONORABLE COURT:**

**COME NOW** Defendants-Appellants, Jenniffer González-Colón, Governor of

Puerto Rico; Janet Parra-Mercado, Secretary of the Puerto Rico Department of Justice;

Arturo Garffer, Secretary of the Department of Public Safety; and Joseph González,

Commissioner of the Puerto Rico Police Bureau ("Government" or "Appellants"), through

the undersigned counsel, and respectfully state and pray as follows:

# I.  INTRODUCTION

On May 20, 2020, Sandra Rodríguez-Cotto and Rafelli González-Cotto ("Appellees"), filed a Complaint for Declaratory and Injunctive Relief challenging the constitutionality of Article 5.14(a)[1] of the Law of the Puerto Rico Department of Public Safety, Law No. 20 of 2017, P.R. Laws Ann. tit. 25, §§ 3501, et seq. ("Law 20"). (*See* Appendix, at pages 1-16.) Following the passing of a bill amending Law 20, on July 29, 2020, Appellees filed an Amended Complaint, a Renewed Motion for Preliminary Injunction, and a Memorandum of Law in Support of the Renewed Motion for Preliminary Injunction. (*See* Appendix, at pages 25-39, 40-41, 42-71.)

As previously stated, Law 20 bans false warnings made knowingly or recklessly regarding imminent disasters or false statements made that result in risk to the safety of a person or the citizenry when there is a state of emergency decreed by the Governor of Puerto Rico. To be clear, the Law, as amended, does not ban all false statements or a topic of discussion. In fact, the Law does not even refer to specific content as the references to disasters or a state of emergency limit not the content but the scope of the statute.

The district court's opinion and order omits any discussion of *Garrison v. Louisiana*, 379 U.S. 64, 67 (1964) or *Frese v. Formella*, 53 F.4th 1 (1st Cir. 2022). The district court instead focused on *U.S. v. Alvarez*, 567 U.S. 709 (2012), a case easily distinguishable from the one at bar. In *Alvarez*, the Supreme Court reviewed the constitutionality of the Stolen Valor Act, a law that criminalized any false claim of receipt of military decorations or

---

[1] As explained in the District Court's Opinion and Order, Law No. 135 of 2020 amended Law 20, and renumbered Article 6.14 to 5.14. To maintain uniformity with the District Court and avoid confusion, we refer to Article 5.14, not to Article 6.14.

medals and provided an enhanced penalty if the Congressional Medal of Honor is involved. 18 U. S. C. 704 (b), (c). The Stolen Valor Act is a content-based ban on speech because it is "about", as the law expressly states, the receipt of military decorations. However, that is not the case with Law 20, where reference to disasters and states of emergencies do not point to content of the banned speech but to the limits of the prohibition. The statement subject to Law 20 could be about hurricanes, government actions, even the sighting of unidentified flying objects. What makes this speech actionable is whether it is made during a duly declared state of emergency and serves as a knowingly false or recklessly false warning of a disaster or a knowingly or recklessly false statement that leads to risk to the security of the people. Law 20 bans only those false statements that are made with full knowledge or complete disregard of their falsehood.

Another notable difference between *Alvarez* and this case is the analysis employed by the Supreme Court to determine its validity. The Court determined that strict scrutiny was the proper framework in *Alvarez* because it was a content-based limit on speech. In this case, as mentioned, the limit is not content based. And, even if the strictest scrutiny were applied to this case, the conclusion should not be different from that of *Garrison* or *Frese*. Even more, Law 20 is necessary to achieve the interest of the Government of Puerto Rico. Succinctly, Article 5.14's purpose is to limit the propagation of false information during times of emergencies or disasters, such as hurricanes, earthquakes or global pandemics. It is evident that at such times, uncertainty and distress among the people heighten. On many occasions such as this, accurate information and a quick response may very well mean the

difference between life and death. The most effective and direct way to limit statements made with the intent to spread false information is to place a sanction significant enough to serve as a deterrent. None of these factors are discussed in the opinion and order under review.

To add to the issues of this case, on May 3, 2017, the Financial Oversight and Management Board for Puerto Rico ("FOMB"), on behalf of the Government of Puerto Rico, filed a petition for relief under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. §§ 2161, *et seq*. At that time, an automatic stay came into effect for many if not most active claims against the Commonwealth of Puerto Rico. 48 U.S.C. § 2164(a); 11 U.S.C. §§ 362, 922; and 48 U.S.C. § 2161(a). The effective date for the Commonwealth's Plan of Adjustment ("POA"), was March 15, 2022, at which time the automatic stay gave way to a discharge of claims and an injunction to that effect. On April 5, 2024, this Honorable Court ordered the parties to show cause as to whether any filings in this case were subject to the automatic stay and whether any aspect of this case could proceed in light of the POA and its Confirmation Order. Both parties submitted their respective motions on May 15, 2024. In their motion, Appellants held that "neither the automatic stay provisions nor the Commonwealth's Title III Plan's discharge injunction provisions have any bearing on this case or any aspect of this appeal." (See Appellants' Motion in Compliance with Court Order, at page 3.) On October 3, 2024, this Honorable Court ordered the parties to address jurisdictional issues in their

briefs.[2] Given that the jurisdictional questions posed by this Honorable Court are bedrock

issues, this brief addresses them first followed by the merits of the appeal.

## II. JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and 1343 because the action

arises under the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §

---

[2] The order of October 3, 2024, ordered further discussion as to the following questions:

- Whether any portion of the complaint was filed in violation of the automatic stay in 11 U.S.C. § 362(a)(3), which stays "any act . . . to exercise control over property of the [Title III debtor]," including (1) whether the fines in Article 5.14(a) are Commonwealth revenue under Puerto Rico law and, hence, property of the Title III debtor, (2) whether the declaratory and injunctive reliefs are an exercise of control of the property of the Title III debtor, and (3) whether the definitions of "claim" in 11 U.S.C. § 101(5) and in Plan § 1.135 apply to a § 362(a)(3) analysis. 48 U.S.C. § 2161(c)(5) (stating "property of the estate" under Title 11 means "property of the debtor"); see also City of Chicago v. Fulton, 592 U.S. 154, 158 (2021) (reading "stay," "act," and "exercise control" in § 362(a)(3) to mean "362(a)(3) prohibits affirmative acts that would disturb the status quo of [a debtor's] property"); In re Fin. Oversight & Mgmt. Bd. for P.R., No. 17-bk-03283-LTS, 2022 WL 17413011, at *4 n.6 (D.P.R. Feb. 7, 2022) (determining the § 362(a)(1) provision for prepetition proceedings "is wholly inapplicable" to post-petition claims that involve an attempt to control the debtor's property that is subject to § 362(a)(3)).

- Whether any form of monetary relief exists that could be substituted for the requested equitable relief under federal or Puerto Rico law by which the automatic stay in 11 U.S.C. § 922(a)(1) would apply. See Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000) (stating that "[t]he 'basic federal rule' in bankruptcy is that state law governs the substance of claims") (quoting Butner v. United States, 440 U.S. 48, 54 (1979)); see also Rederford v. U.S. Airways, Inc., 589 F.3d 30, 37 (1st Cir. 2009) (determining an alternative monetary remedy of front pay exists for reinstatement under federal law).

- Whether the definition of "Claim" in Plan § 1.135 does not require requests for equitable relief to have an alternative monetary remedy or to give rise to a right to payment for discharge purposes. See 11 U.S.C. § 944(a) (stating "provisions of a confirmed plan bind the debtor and any creditor"); see also In re G-I Holdings, Inc., 514 B.R. 720, 757-58, 75860 (Bankr. D.N.J. 2014) (determining injunctive relief was barred by the confirmed plan that defined "claim" to include the definition in § 101(5) and "any rights to any equitable remedy").

- Whether Confirmation Order ¶ 56(b) applies to plaintiffs' requests for equitable relief due to that provision's express inclusion of "employees" and "officials," if the fines contemplated by Article 5.14(a) amount to Commonwealth property for the § 362(a)(3) analysis and/or if the Plan's definition of "claim" includes the requests for equitable relief at issue in this appeal. In re Fin. Oversight & Mgmt. Bd. for P.R., 636 B.R. 1, 38-39 (D.P.R. 2022) (Confirmation Order ¶ 56(b)); id. at 89-90 (Plan § 1.135 defining "Claim"). (See Order of the Court of October 3, 2024.) (See order of October 3, 2024, at pages 1-2.)

1983. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331. On March 31, 2023, the District Court issued an opinion and order finding for Appellees, granting their request for preliminary and permanent injunction and prohibiting enforcement of Article 5.14(a) of Law 20. (*See* Addendum, at pages 1-45.) On that same day, the district court entered judgment in favor of Appellees, and permanently enjoined Appellants from enforcing Article 5.14(a) of Law 20. (*See* Addendum, at page 50.) On April 28, 2023, Appellants filed a Motion for Reconsideration. (*See* Appendix, at page 197-217.) On May 12, 2023, Appellees filed their Plaintiffs' Response to Motion for Reconsideration. (*See* Appendix, at page 218-229.) On June 14, 2023, at the close of an argumentative hearing, the district court denied Appellants' Motion for Reconsideration. (*See* Appendix, at page 230-231.) Appellants filed a notice of appeal. (*See* Appendix, at page 232-233.) Accordingly, Appellants' appeal is timely under Federal Rule of Appellate Procedure 4(a). This Court has jurisdiction to review the district court's order and judgment of March 31, 2023, because it is a final decision under 28 U.S.C. § 1291.

## III.    STATEMENT OF THE ISSUE

The question before this Honorable Court is whether the district court erred in its review of the constitutional questions presented in this case by finding for the Appellees, ruling that Article 5.14(a) of Law 20 unconstitutional, and issuing a permanent injunction against its enforcement.

## IV.    STATEMENT OF THE CASE

On April 10, 2017, the Government of Puerto Rico enacted Law 20. At that time, then Section 6.14 provided, in relevant part, that "[a]ny person who commits any of the following acts shall be punished by a term of imprisonment not to exceed six (6) months or by a fine not to exceed five thousand (5,000) dollars or both penalties at the discretion of the court: (a) Raising a false alarm with respect to the imminent occurrence of a catastrophe in Puerto Rico, or spreading rumors or raising a false alarm regarding nonexisting abnormalities." P.R. Laws Ann. tit. 25 § 3654(a).

Three years later, Law 20 was amended by Law No. 35 of April 5, 2020. Law 35 added a new section (f) of Article 6.14 to prohibit to "[t]ransmit or allow [another person] to transmit, by any means, through any social network or mass media, false information with the intention of creating confusion, panic or collective public hysteria, regarding any proclamation or executive order decreeing a state of emergency or disaster or curfew." The provision further states that the offense may be charged as a felony in the fourth degree "[i]n the event that the dissemination of false information results in damages to the public treasury, or to third parties, or public or private property, that exceed ten thousand (10,000) dollars, or when the conduct results in physical injury or damage." P.R. Laws Ann. tit. 25 § 3654(f).

Appellees filed a Complaint for Declaratory and Injunctive Relief on May 20, 2020. (*See* Appendix, at page 1-16.) In summary, Appellees argued against the constitutionality of Article 5.14(a) of Law 20 for the following reasons:

First, the Challenged Provisions violate the First Amendment because they are substantially overbroad. For instance, they do not require the government to

establish that the defendant knew the information was false or acted with reckless disregard as to falsity. Second, the Challenged Provisions violate the First Amendment because they impose an impermissible content-based restriction on speech about emergency conditions in Puerto Rico. Finally, the Challenged Provisions violate the Fourteenth Amendment's Due Process Clause because they are unconstitutionally vague. Terms like "non-existing abnormalities" and "confusion" are so vague that they provide inadequate notice about what speech is prohibited and give law enforcement officials largely untethered discretion to prosecute the government's critics and opponents. (*See* Appendix, at pages 2-3.)

On June 19, 2020, the parties in the instant case filed Joint Factual Stipulations. (*See* Appendix, at pages 17-24.) Ordinary procedural incidents followed which bear little to no bearing on this case given that on July 13, 2020, Law 66 came into effect. Law 66 amended Law 20 to significantly modify the text of Article 5.14(a) and eliminate Article 5.14(f). The new, and for our purposes relevant, text of Article 5.14(a) of Law 20 reads:

Article 5.14.- Violations and Penalties

Any person, natural or legal, who shall perform any of the following acts on purpose, knowingly or recklessly after the Governor of Puerto Rico has decreed by Executive Order an emergency or disaster, shall be punished with a penalty of imprisonment not exceeding six (6) months or a fine not exceeding five thousand dollars ($5,000) or both sentences at the discretion of the court:

(a) Gives a warning or false alarm, knowing that the information is false, in relation to the imminent occurrence of a catastrophe in Puerto Rico, or disseminates, publishes, transmits, transfers or circulates through any means of communication, including the media, social networks, or any other means of dissemination, publication or distribution of information, a notice or a false alarm, knowing that the information is false, when as a result of its conduct it puts the life, health, bodily integrity or safety of one or more persons at imminent risk, or endangers public or private property.

In the event that the notice or false alarm results in damage to the public purse, to third parties, or public or private property exceeding ten thousand dollars ($10,000), or where the conduct results in injury or physical harm of another,

8

that person shall have committed a felony with a penalty of imprisonment for a fixed term of three (3) years. P.R. Laws Ann. tit. 25 § 3654.

Considering the new language of Article 5.14(a), an Amended Complaint for Declaratory and Injunctive Relief was filed on July 29, 2020. (*See* Appendix, at pages 25-39.) Regardless of the new language, and the fact that one of the reasons Appellees originally questioned Law 20 was that it did not require a finding of knowledge of falsehood, Appellees maintained that Article 5.14(a) was still constitutionally flawed because there is often a substantial risk that honest speakers will be wrongly prosecuted under laws that prohibit knowingly false speech on specified topics. That same day, a Renewed Motion for Preliminary Injunction and a Memorandum in Support of Plaintiffs' Renewed Motion for Preliminary Injunction were filed. (*See* Appendix, at pages 40-41, 42-71.) Appellees argued that all threshold elements of a preliminary injunction were met. Of particular importance now is that Appellees averred that Article 5.14(a) is both content and viewpoint based because it calls for an examination of the content of the message to determine whether a violation has occurred, and as such is subject to strict scrutiny. Thus, the government is required to demonstrate that the restriction is both necessary to serve a compelling state interest and narrowly drawn to achieve that end.

On August 21, 2020, Appellants filed their Response in Opposition to Renewed Motion for Preliminary Injunction. (*See* Appendix, at pages 72-110.) On August 28, 2020, Appellees filed a Reply Memorandum in Support of Plaintiffs' Renewed Motion for Preliminary Injunction. (*See* Appendix, at pages 111-129.) On September 9, 2020,

Appellants filed their Surreply to Plaintiffs' "Reply Memorandum in Support of Plaintiffs' Renewed Motion for Preliminary Injunction." (*See* Appendix, at pages 130-146.)

On July 5, 2022, the district court stated that it intended to consolidate the preliminary and permanent injunction proceedings and directed the parties to inform whether special measures should be considered. Both parties promptly filed their respective motions regarding consolidation.

On March 31, 2023, the district court entered an Opinion and Order. (*See* Addendum, at pages 1-45.) The district court concluded that Law 20 was a content-based prohibition and was therefore subject to strict scrutiny. With a focus on *Alvarez*, and omitting *Garrison* and *Frese*, the district court determined that the state had not met the burden of demonstrating that Law 20 was necessary to serve a compelling state interest and narrowly drawn to achieve that end. Judgment was entered on the same day. (*See* Addendum, at pages 50.) Reconsideration was requested, opposed and ultimately denied. (*See* Appendix, at pages 197-217.)

## V. SUMMARY OF THE ARGUMENT

Appellants' legal arguments on appeal are three-pronged. First, that the district court failed to take into consideration precedent established by the Supreme Court in *Garrison*, and by this Honorable Court in *Frese*. In both cases, statutes banning knowingly or recklessly false statements were upheld. Also, Law 20 is not a content-based prohibition, and therefore should not be held to strict scrutiny. Law 20 does not aim to ban expression on a certain topic or position. The factors included in Law 20, such as being made under a

state of emergency and resulting in risk to public safety, are not content but extrinsic considerations designed to limit the scope of the statute. Lastly, even if this Honorable Court concludes that Law 20 is content based and applies a strict scrutiny framework, it is evident that Law 20 is necessary to serve a compelling state interest and narrowly drawn to achieve that end.

## VI.     ARGUMENT

### A. Appellants' position on jurisdictional issues

#### i.   Whether any portion of the Complaint was filed in violation of the automatic stay

Section 362 (a)(1) of the Bankruptcy Code, which was incorporated into Title III by Section 301(a) of PROMESA,[3] holds that a petition triggers an automatic stay of "the commencement or continuation…of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement" of the ban, or "to recover a claim against the debtor that arose before the commencement" of the petition. 11 U.S.C. § 362 (a)(1).

The Complaint in the case in caption was filed under 42 U.S.C. § 1983 against Appellants in their official capacities and prayed for relief in the form of declaratory and prospective injunctive relief. Pursuant to *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n. 10 (1989), official capacity actions for prospective relief are not treated as actions

---

[3] Section 301 (a) of PROMESA, 48 U.S.C § 2161 (a), expressly makes applicable to cases under Title III the provisions of Sections 362 and 922 of the Bankruptcy Code, 11 U.S.C. §§ 362 and 922.

against the state, and thus Appellants are persons under 42 U.S.C. § 1983 because official-capacity actions for prospective relief are not treated as actions against the State.[4]

In any case, any reading of the Bankruptcy Code or PROMESA must find that unlevied fines cannot be property. In *City of Chicago v. Fulton*, 592 U.S. 154, 155 (2021), the Supreme Court explained that "…a petition 'creates an estate' that, with some exceptions, comprises 'all legal or equitable interests of the debtor in property as of the commencement of the case.' §541(a)(1)." The "estate" encompassing all property, including real property and equitable interests, is created upon filing of the petition. Section 541 of the Bankruptcy Code outlines what comprises the estate as follows in pertinent part:

> (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.
>
> (2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—
>
> […]
>
> (3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.
>
> (4) Any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title.
>
> (5) Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the

---

[4] As a general rule, neither a State nor its officials acting in their official capacities are "persons" under § 1983. Although state officials are literally persons, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will*, 491 U.S. at 71. As such, "it is no different from a suit against the State itself." *Id.* Nonetheless, the Supreme Court has held that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." *Id.* n. 10 (citations omitted).

petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date—

[…]

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

[…] 11 U.S.C. § 541.

Possible fines from prosecution of a law, the constitutionality of which is under review, does not fall under even the broadest of definitions of "property" found in the Bankruptcy Code. To be clear, no fines have ever been levied under Law 20. It must follow that fines under Law 20 were not part of the Commonwealth's property at the time the Title III proceedings were initiated or 180 days thereafter. Neither can it be said that fines are considered proceeds or profits. A fine is a monetary penalty imposed by a competent court or government official for incompliance with a law or regulation. The imposition of fines under Law 20 is speculative because as of this date no fine has even been imposed. Moreover, to hold that fines are proceeds defeats the purpose of a fine for it no longer will serve to coax abidance with laws and regulations, but to fill the coffers of the state, particularly one with fiscal woes.

This Honorable Court also asks whether declaratory and injunctive relief, in and of itself, is an exercise of control over the property of the Commonwealth. Potential fines are, Appellants contend, not property of the estate and therefore not susceptible to control by Appellees in this case. The Bankruptcy Code defines "claim" as a "right to payment,

13

whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" or as a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11. U.S.C. § 101. As will be further discussed in the context of whether declaratory and injunctive relief constitutes a claim, Appellants find that were all declaratory and injunctive relief to be considered control over property, the Bankruptcy Code would have included all declaratory and injunctive actions as "claims". It did not. The Code provides that only the equitable remedy for breach of performance that gives rise to a right to payment is a claim. In the case at hand, no right of payment has been alleged and none exists.

Lastly, this Honorable Court questions whether the POA's and the Code's definition of claims applies to a 362(a)(3) analysis. Section 362(a)(3) of the Code states that a petition operates as a stay applicable to, among others, "…any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The definition of "claim" found in the Code does not contemplate actions such as the one in caption, where there is no hindering of the debtor's ability to control its assets, but a legal review of a law. This is a distinguishing feature between this case and *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17-bk-03283-LTS, 2022 WL 17413011, at *4 n.6 (D.P.R. Feb. 7, 2022), where the District Court stated that all "[a]ll of the relief sought in the Complaint, even the requested declaratory relief, would invalidate,

14

nullify, and prevent any attempt to protect the O&M Agreement…" Id. The same applies for the definition of "claim" found in the POA. Also, as explained in *Lex Claims, LLC v. Fin. Oversight & Mgmt. Bd.*, 853 F.3d 548, 552 (1st Cir. 2017), "the stay applies to litigation seeking declaratory and injunctive relief at least where, as here, the express purpose of the lawsuit is to preclude the [debtor] from using its own funds as it sees fit." No such endgame is present here.

Finding that Appellees' claims are not "claims" under the meaning of the POA discharge, and because potential fines under Law 20 are not property of the estate, Appellants respectfully offer that neither the Complaint nor this appeal have been filed in violation of the automatic stay triggered by the initiation of the Commonwealth's Title III proceedings.

### ii. Whether any monetary relief exists that could substitute the requested equitable relief

This appeal arises from a pre-enforcement action brought under 42 U.S.C. § 1983 against Appellants in their official capacities for declaratory and injunctive prospective relief. It does not involve any monetary claims and is not an action against the Commonwealth itself. As such, the POA's discharge (§ 92.2) and discharge injunction (§ 92.3) provisions have no bearing on this appeal.

This Honorable Court's holding in *Rederford v. U.S. Airways, Inc.*, 589 F.3d 30 (1st Cir. 2009), is a good starting point for this issue's analysis. In *Rederford*, plaintiff sued for events occurring a year before the defendant filed for bankruptcy. Eventually, plaintiff argued that because her complaint sought the equitable remedy of reinstatement, it did not

involve a claim for payment and thus was not dischargeable. This Honorable Court found that "[u]nder § 101(5)(B), a right to an equitable remedy, whether or not fixed, disputed, or reduced to judgment, is a 'claim' within the meaning of the Bankruptcy Code, and subject to bankruptcy proceedings, if 'a monetary payment is an alternative for the equitable remedy.'" *Id.* at 37. In that case, because her equitable relief was reinstatement and there was an alternative monetary remedy available, her claims were disallowed and discharged. Here, however, there is no alternative monetary remedy available. The relief sought aims to bar the application of a law which Appellees sustain is unconstitutional. While Appellants hold to the contrary on the merits of the case, there are no monetary damages claimed or available in this case.

This conclusion is consistent with the purposes of a discharge of claims that can be reduced to monetary terms as described in *Rederford*. First, it avoids distinctions between creditors. All creditors have the same access to raise their claims on equal terms. In this case, there is no need to consider this since Appellees do not have a monetary claim to raise. Second, it represents an evenhanded approach to the distribution of assets of the estate. This purpose is not served here since Appellees are not making a claim that could be satisfied with a monetary settlement. Lastly, finality is not affected because this case will not impact the distribution of assets. On the other hand, as illustrated in *Rederford*, "[w]hen the equitable relief sought cannot give rise to a payment, but requires non-monetary action by a debtor, different considerations come into play." *Id.* at 35. If no monetary value exists, as is the case here, then no liquidation or assignment of priority

16

can be made. Likewise, "if the equitable remedy involves the abatement of ongoing conduct that is causing harm, rather than the remediation of past harms, the remedy is not a 'repackaged claim for damages' and does not threaten the finality of the proceedings." *Id*. That is precisely the case here.

This analysis is consistent with Section 922(a)(1), which establishes a stay, additional to that of Section 362, for "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against an officer or inhabitant of the debtor that seeks to enforce a claim against the debtor…" 11 U.S.C. § 922. Insofar as the present action is not seeking the enforcement of a previous claim, Section 922 does not apply either.

### iii. Whether definition of claim in POA does not require request for equitable relief to have alternative monetary remedy

Section 1.135 of the POA states:

> **Claim**: Any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise. (Emphasis ours.) (*See* ECF 19813-1 in Case No. 17-3283 (D.P.R.) at 18.)

The POA's definition of "claims" includes "equitable remedy", however, the definition also limits that "equitable remedy" to that directed at correcting a "breach or enforcement of performance." In other words, the right to equitable remedy that would be

17

discharged under the POA is that which is aimed at forcing the Commonwealth to do or not do something in compliance with a previous ruling or directive. That is not the case here. Appellees filed suit to question the constitutionality of a particular law. The remedy sought is an order establishing that the challenged law is unconstitutional. This is not an equitable remedy for breach or enforcement of performance. Were the Commonwealth to continue to implement a law even after it had been declared unconstitutional and were a party to file suit seeking equitable remedy to force the state to cease such action, then that action would fall under the POA's definition of "claim."

This Honorable Court cited *In re G-I Holdings, Inc.*, 514 B.R. 720, 757-58, 75860 (Bankr. D.N.J. 2014), in its October 3, 2024, underlining its finding that "injunctive relief was barred by the confirmed plan that defined 'claim' to include the definition in § 101(5) and 'any rights to any equitable remedy.'" *G-I Holdings* is not only easily distinguishable from this case but if taken analogously can serve to support Appellants' belief. The Court in *G-I Holdings* goes to great lengths to clarify that the claim involved was environmental and thus required great sensitivity and special considerations. Supra, at 745. In this case, there are no environmental factors or considerations. Also, the Court discussed multiple decisions and concluded that a determination on whether an equitable remedy is considered a "claim" for bankruptcy purposes relied heavily on the role the plaintiff was assuming. The Court explained:

> As discussed by this Court at length, some courts considering the issue of injunctions in environmental cases have found such injunctions to constitute a claim within the meaning of § 101(5) of the Bankruptcy Code while others have found such injunctions do not depending on the factual context.

18

According to this Court's reading of those cases, the cases are not in conflict with one another. Rather, the courts agree that the obligation to address an ongoing and continuing threat imposed by a governmental agency with police or regulatory power is not a claim while other obligations *may* give rise to a claim, such as when the governmental agency is acting as a creditor rather than as a regulator.

Applying the *G-I Holdings*, it is necessary to conclude that Appellees are not acting as creditors as they have not moved for damages or any other type of monetary claim. The question raised in the suit is whether Law 20 is constitutional or not. By process of elimination, if Appellees are not acting as creditors, then under *G-I Holdings* the equitable remedy is not a "claim".

### iv. Whether Confirmation Order applies to Appellees' requests for equitable relief

Appellants respectfully aver that the Confirmation Order does not apply to Appellees requests for equitable relief. Also, while the Confirmation Order covers the Commonwealth's "employees" and "officials", official capacity actions for prospective relief are not treated as actions against the state. *Will*, 491 U.S. at 71 n. 10. The fines contemplated in Law 20 are not the property of the estate as they were not part of the Commonwealth's coffers nor have they been levied at any point, which means they are not proceeds or profits under the meaning of the Confirmation Order. Based on this, the equitable relief sought is not a "claim" as defined by the POA or the Bankruptcy Code.

### B. The district court erred in declaring Article 5.14(a) to be unconstitutional and issuing a permanent injunction prohibiting its enforcement.

### i. Standard of review

The applicable standard of review to consider an appeal on the entry of an injunction is abuse of discretion. *Water Keeper All. v. Dep't of Def.*, 271 F.3d 21, 30 (1st Cir. 2001); see also *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021); and *Together Employees et al v. Massachusetts General Brigham Inc.*, 573 F.Supp.3d 412 (1st Cir. 2021). However, this standard applies to issues of judgment and balancing conflicting factors. Matters concerning abstract legal issues are reviewed de novo and findings of fact for clear error. *Cablevision of Bos., Inc. v. Pub. Improvement Comm'n*, 184 F.3d 88, 96 (1st Cir. 1999). This Court "…consequently review[s] the district court's legal findings under the 'likelihood of success' prong de novo" and "the district court's judgment calls, applying appropriate standards, under the remaining three prongs for abuse of discretion." *Water Keeper All*, at 30–31.

### ii.  Freedom of Expression under the First Amendment

The First Amendment of the Constitution establishes that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const., 1st Am. Protection of free speech from hindrance by the federal government under the First Amendment extends to state governments by virtue of the Fourteenth Amendment, which states that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., Amend. 14th.

In highlighting the significance and the breadth of the First Amendment protection of free speech, the Supreme Court has stated that the safeguard "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). In fact, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384, U.S. 214, 218 (1966).

Moreover, "[t]he maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg v. California*, 283 U.S. 359, 369 (1931). "The skepticism of government and the importance of the right to freely criticize it are concepts with both deep roots in American history and continuing importance." *Mangual v. Rutger-Sabat*, 317 F. 3d 45, 59 (1st Cir 2003).

It is in this context, cognizant of the fundamental role freedom of speech plays in our cultural and social fabric, that a challenge and a defense to a statute touching on it must be made. See *New York Times v. Sullivan*, 376 U.S. 254, 375 (1964) ("Thus, we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.")

### iii. Law 20 is constitutionally valid

To be clear, the legal provision under constitutional review in the case in caption is

Article 5.14(a) of Law 20, as amended by Law 66, and which now reads:

Article 5.14.- Violations and Penalties

Any person, natural or legal, who shall perform any of the following acts on purpose, **knowingly or recklessly after the Governor of Puerto Rico has decreed by Executive Order an emergency or disaster**, shall be punished with a penalty of imprisonment not exceeding six (6) months or a fine not exceeding five thousand dollars ($5,000) or both sentences at the discretion of the court:

(a) **Gives a warning or false alarm**, **knowing that the information is false**, in relation to the **imminent occurrence of a catastrophe in Puerto Rico**, or disseminates, publishes, transmits, transfers or circulates through any means of communication, including the media, social networks, or any other means of dissemination, publication or distribution of information, **a notice or a false alarm, knowing that the information is false, when as a result of its conduct it puts the life, health, bodily integrity or safety of one or more persons at imminent risk, or endangers public or private property**.

In the event that the notice or false alarm results in damage to the public purse, to third parties, or public or private property exceeding ten thousand dollars ($10,000), or where the conduct results in injury or physical harm of another, that person shall have committed a felony with a penalty of imprisonment for a fixed term of three (3) years. P.R. Laws Ann. tit. 25 § 3654. (Emphasis added)[5]

Notably, Article 5.14(a) of Law 20 prohibits false warnings/alarms or statements

which result in a risk to the safety of a person or group of people, which are knowingly or

recklessly false, and made during a duly mandated state of emergency. Three conditions

must be met for Article 5.14(a) to be enforced: (1) a state of emergency must be declared;

---

[5] Article 5.14(a) of Law 20 is based and significantly similar to Section 250.3 of the American Law Institute's Model Penal Code, which reads "[a] person is guilty of a misdemeanor if he initiates or circulates a report or warning of an impending bombing or other crime or catastrophe, knowing that the report or warning is false or baseless and that it is likely to cause evacuation of a building, place of assembly, or facility of public transport, or to cause public inconvenience or alarm." See, MODEL PENAL CODE § 250.3 (AM. LAW INST. 1980). Presumably, the American Law Institute does not include language in its model codes that it would deem unconstitutional.

(2) the statement or warning must be false and have been made with knowledge that it was false or reckless disregard for its veracity, and (3) it must be in the form of a warning/alarm or result in a risk to public safety.

The Supreme Court has explained that "the Constitution limits state power, in a civil action brought by a public official for criticism of his official conduct, to an award of damages for a false statement made with actual malice -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Garrison v. Louisiana*, 379 U.S. 64, 67 (1964) (citing *New York Times Co. v. Sullivan*, supra). In reviewing the constitutionality of a criminal defamation statute, the Supreme Court held:

> Moreover, even where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood. Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth. Under a rule like the Louisiana rule, permitting a finding of malice based on an intent merely to inflict harm, rather than an intent to inflict harm through falsehood, it becomes a hazardous matter to speak out against a popular politician, with the result that the dishonest and incompetent will be shielded." (Internal citations omitted.) *Garrison*, at 73.

In defining its position regarding the constitutionality of banning knowingly or recklessly false statements, the Supreme Court reiterated:

> The use of **calculated falsehood, however, would put a different cast on the constitutional question**. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that **the lie, knowingly and deliberately published about a public official, should enjoy a like immunity**. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the

23

public servant or even topple an administration. That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . . **Hence, the knowingly false statement and the false statement made with reckless disregard of the truth do not enjoy constitutional protection**. (Internal citations omitted.) (Emphasis added). *Garrison*, at 75.

In *Garrison*, supra, the reason the Louisiana prosecution statute was declared to be unconstitutional was that it did not allow for a finding of reckless disregard for the truth. In explaining their reasoning, the Supreme Court wrote:

This is not a holding applying the *New York Times* test. The "reasonable belief" standard applied by the trial judge is not the same as the "reckless disregard of truth" standard. According to the trial court's opinion, a reasonable belief is one which "an ordinarily prudent man might be able to assign a just and fair reason for"; the suggestion is that, under this test, the immunity from criminal responsibility in the absence of ill-will disappears on proof that the exercise of ordinary care would have revealed that the statement was false. The test which we laid down in *New York Times* is not keyed to ordinary care; defeasance of the privilege is conditioned, not on mere negligence, but on reckless disregard for the truth. *Garrison*, at 79.

In *Garrison*, the Supreme Court held that knowingly or recklessly false speech was not protected by the First Amendment. It also specifically conditioned the constitutionality of a law intervening with speech on whether it is limited to knowingly or recklessly false information. Law 20, as previously noted, applies only to speech that is knowingly or recklessly false.

Even more, this Honorable Court has held that a statute similar to Law 20 is constitutional. In reviewing a criminal defamation law of New Hampshire, this Honorable Court was "[m]indful of the Supreme Court's guidance that the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection [and] conclude[d] that Frese's allegations fall short of asserting viable constitutional claims." *Frese v. Formella*, supra. In addressing plaintiff's constitutional challenge in *Freese*, this Honorable Court held:

> Frese argues that section 644:11 violates the First Amendment because criminal defamation laws should be per se unconstitutional. The Supreme Court, however, has upheld the criminalizing of false speech, explaining that deliberate and recklessly false speech does not enjoy constitutional protection. Thus, the state can impose criminal sanctions for criticism of the official conduct of public officials so long as the statements were made with actual malice -- that is, with knowledge that they were false or with reckless disregard of whether they were false or not.

> Frese concedes that Garrison forecloses his First Amendment claim but argues that the time has come to revisit that decision. But, as Frese acknowledges, we do not have the power to revisit Supreme Court decisions. Accordingly, we must find that *Garrison* precludes Frese's First Amendment attack on section 644:11. (Internal citations omitted.) *Frese*, at 6.

Given that Law 20 applies only to statements made "with knowledge that they were false or with reckless disregard of whether they were false or not", it is only fair that Law 20 enjoy the same treatment as *Frese* and that this Honorable Court find that its First Amendment attack be equally precluded by *Garrison*.

In its opinion and order, the district court makes no mention of *Garrison* and only mentions *Frese* in the context of standing. In its stead, the district court focused on *Alvarez* to conclude that Law 20 was constitutionally flawed. (*See* Addendum, at pages 23.) ("To

understand why and what level of judicial scrutiny must be applied, the court turns to *Alvarez*.") The problem with this conclusion is that *Alvarez* is easily distinguishable from the case at hand.

In *Alvarez*, the Supreme Court reviewed the constitutionality of the Stolen Valor Act ("SVA"). In short, the SVA made it a crime to falsely claim receipt of military decorations. As will be further discussed in the next section, Law 20 is not content-based. The speech limited under Law 20 could be on any subject or topic, as long as it is knowingly or recklessly false, made during a state of emergency, and takes the form of a warning or results in a risk to public safety. The SVA, on the other hand, applied only to instances where a person made a false statement regarding the military decorations awarded. The speech limited by the SVA was constrained to false claims of military commendations. The SVA itself titled the section in question as "False Claims **About** Receipt of Military Decorations or Medals." (Emphasis added.) 18 U. S. C. §704(b).

In *Alvarez*, the challenged legal provision punished false statements generally. The Supreme Court highlighted that it "has never endorsed the categorical rule the Government advances: that false statements receive no First Amendment protection". *Alvarez*, at 715. In quoting *Sullivan*, the Supreme Court explained that "[e]ven when considering some instances of defamation and fraud, moreover, the Court has been careful to instruct that falsity alone may not suffice to bring the speech outside the First Amendment. The statement must be a knowing or reckless falsehood." Id. The Supreme Court found constitutional shortcomings in *Alvarez* precisely because it punished all false statements. That is not the

26

case with Law 20 where enforcement requires that the party make the warning or statement with knowledge or reckless disregard that it is false and that it must be in the form of a warning/alarm or result in a risk to public safety. Even more, the Supreme Court advised against across-the-board reviews of constitutional sustainability and the need to make distinctions in saying that "[a]s our law and tradition show, then, there are instances in which the falsity of speech bears upon whether it is protected. Some false speech may be prohibited even if analogous true speech could not be. This opinion does not imply that any of these targeted prohibitions are somehow vulnerable. But it also rejects the notion that false speech should be in a general category that is presumptively unprotected." Id.

The Supreme Court also considered it important in *Alvarez* that the SVA was far-reaching in its scope. "The Act by its plain terms applies to a false statement made at any time, in any place, to any person… Still, the sweeping, quite unprecedented reach of the statute puts it in conflict with the First Amendment." *Alvarez*, at 718.  There "the lie was made in a public meeting, but the statute would apply with equal force to personal, whispered conversations within a home." Id. Law 20 only applies to warnings or statements that result in a risk to public safety. Surely, for a statement to constitute a warning or an alarm, or for it to cause a risk to public safety, it could not be made in whispered conversations within a home. By the same token, Law 20 only applies when there is a state of emergency declared through an executive order.

Taken together, Appellants have clearly demonstrated that the speech affected by Law 20 is not constitutionally protected.

### iv.  Law 20 is not content based

In the alternative, should this Honorable Court find that the speech referred to in Law 20 is protected by the First Amendment, and it being a general and not a content-based ban, it is still legitimate if the Appellants can demonstrate that Law 20 is "narrowly tailored" to serve an important or substantial governmental interest. *Rideout v. Gardner*, 838 F.3d 65, 72 (1st Cir. 2016).

A law is facially content based if its text applies to speech based on the subject matter, topic, or viewpoint of that speech. In facially content-based laws, the law's application turns on the "substantive message" conveyed by the regulated speech rather than a content neutral factor such as the speech's location. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 71 (2022). Even if a law is content neutral on its face, it might be considered content based if it reflects a discriminatory purpose—that is, if it "cannot be justified without reference to the content of the regulated speech" or was "adopted by the government because of disagreement with the message" conveyed. *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015). In *Alvarez*, the SVA was content based because the subject matter of the speech was the determining factor in enforcing the legal prohibition. If the speech was not about fake military decorations, then the SVA contemplated no limits on the speech.

In the case of Law 20, the text does not apply to speech based on the subject matter, topic, or viewpoint of the speech. Law 20 bans warnings or alerts, or statements that result in a risk to public safety, that are knowingly or recklessly false and made during a state of emergency decreed by the Governor through an executive order. None of these

considerations are content based. The content of the speech can range from statements regarding the imminent arrival of a hurricane, to information concerning individual actions, to availability of provisions, to class schedules in schools and universities, to even incredible assertions. The determining factor is not the content of the speech, but whether it takes the form of a warning or an alert, or if it results in a risk to public safety. And of course, it must be knowingly or recklessly false and take place during a state of emergency.

### v. Law 20 meets the criteria necessary to overcome intermediate and strict scrutiny

Should this Honorable Court find that the constitutional question is not precluded by *Garrison* and *Frese*, it must determine whether Law 20 is content based. As previously argued, Law 20 is not content based and must therefore be subject to an intermediate analysis whereby Appellants must show that the statute is "narrowly tailored" to serve an important or substantial governmental interest. Otherwise, should this Honorable Court find that Law 20 is content based, the strictest framework must be applied. That is, that the limits on speech are narrowly tailored to serve compelling state interests. *Reed*, at 163. This test also calls upon the government to prove that alternate measures imposing lesser burdens on speech would fail to achieve the government's interests, "not simply that the chosen route was easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

Law 20 centers on the security apparatus in Puerto Rico, from the Department of Public Safety to the Emergency Management Bureau. The security of the citizenry is, indubitably, a compelling state interest. See *Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is 'obvious and unarguable' that no governmental interest is more compelling than the security

of the Nation."); see also *Zucht v. King*, 260 U.S. 174, 176 (1922). More to the point, by definition, a state of emergency is only warranted when circumstances have put the wellbeing of the citizenry in some peril. That is not to say that public safety is always at risk during a state of emergency, but that some hardship has befallen the people or a group of people that requires immediate attention. There may be little risk to a community in the aftermath of a hurricane, but that does not negate the peril or hardship that community is undergoing as a result of that hurricane. At times of emergencies, vulnerability and uncertainty heighten. The best counter to that uncertainty is information. It is a compelling state interest for the Government and for the people to be well informed, particularly in times of emergencies. It follows, then, that it is a compelling state interest to limit the diffusion of knowingly or recklessly false information that result in a risk to public safety.

There is an evident link with between the compelling state interest, to limit the diffusion of knowingly or recklessly false information during an emergency, and the action taken by Law 20. There is an evident link between the need to ensure the exchange of truthful information and placing limits on the exchange of false information that could result in a risk to public safety.

Law 20 is narrowly tailored to promote a compelling state interest while at the same time placing no burden on speech that would not affect the general wellbeing during times of emergency. To wit, Law 20 carefully qualifies the affected speech as that which is knowingly or recklessly false, made during a state of emergency, and takes the form or a warning or alert or results in a risk to public safety.

Likewise, Article 5.14(a) of Law 20 is the least restrictive means to ensure the free and trusting exchange of information during an emergency. In *Alvarez*, an available alternative was the creation of a database with accurate information regarding military decorations. Since false information on military awards would not conceivably provoke a risk in public safety, let alone an immediate one, a viable option was to refute the speech using a database with the correct information. But this only works under normal circumstances. Article 5.14(a) of Law 20 is not designed for normal circumstances. In the time it would take to refute the information in question, a state of emergency having been activated, the situation could have deteriorated to the point where the compelling state interest is moot. Once the false information is released, the damage is done. Only a prohibition, under specific and limited circumstances, can truly serve the compelling state interest to protect public safety.

Having established that Law 20 meets the criteria under a strict scrutiny paradigm, it only tracks that it also meets the intermediary analysis.

## VII.   CONCLUSION

Appellants respectfully affirm that the district court erred in finding for Appellees, declaring Article 5.14 of Law 20 to be unconstitutional, and issuing a permanent injunction against its enforcement. The Supreme Court held in *Garrison* and this Honorable Court reiterated in *Frese* that knowingly or recklessly false statements are not protected under First Amendment.  This precludes any constitutional challenge against Law 20. And were that not enough, Law 20 meets the criteria necessary to be upheld.

**WHEREFORE**, Appellants respectfully request that this Honorable Court revoke the district court's opinion and order of March 31, 2023, deny Appellees request for injunction, and dismiss the Amended Complaint for failure to state a claim.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 9th day of July, 2025.

*s/Omar Andino-Figueroa*
**OMAR ANDINO-FIGUEROA**
Solicitor General of Puerto Rico

*s/Francisco J. González-Magaz*
**FRANCISCO J. GONZÁLEZ-MAGAZ**

## CERTIFICATE OF FILING AND SERVICE

**I HEREBY CERTIFY** that on this same date I electronically filed the foregoing and the appendix to this brief with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

In San Juan, Puerto Rico, this 9th day of July, 2025.

*s/Francisco J. González-Magaz*
**FRANCISCO J. GONZÁLEZ-MAGAZ**
USDC No. 223907
USCA No. 111101
1519 Ponce de León Ave., Suite 802
San Juan, P.R. 00909
Tel. (787) 504-5880
gonzalezmagaz@gmail.com

**CERTIFICATE OF COMPLIANCE WITH RULE 32(G)**
**Certificate of Compliance with Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B):

[X] This brief contains <u>10506</u> words in compliance with Fed. R. App. P. 32(a)(7)(B), excluding the parts of the brief excluded by F. R. App. P. 32(f).

[ ] This brief uses a monospaced typeface and contains ___ lines of text.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] This brief has been prepared in a proportionally spaced typeface using Times New Roman, Size 14.

[ ] This document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of characters per inch and name of type style].

*s/Francisco González-Magaz*
**FRANCISCO GONZÁLEZ-MAGAZ**
Counsel for Appearing Appellees

Dated: July 9, 2025

34

## Addendum - Table of Contents

**Document**                                                              **Page(s)**

**Opinion and Order (Dkt. 92)**……………………………………………1-45

**Opinion and Order Appendix (Dkt. 92-1)**………………...…………….46-49

**Judgment (Dkt. 93)**……………………………………….……………50

**Errata Sheet (Dkt. 94)**…………………………………...…….…………51

**Opinion and Order Corrected Nunc Pro Tunc (Dkt. 94-1)**……………..52-96

**Minute Entry for Proceedings (Dkt. 103)** ………………………..……97-98

Dated: 9th of July, 2025

*s/Francisco J. González-Magaz*
**FRANCISCO J. GONZÁLEZ-MAGAZ**
USDC No. 223907
USCA No. 111101
1519 Ponce de León Ave., Suite 802
San Juan, P.R. 00909
Tel. (787) 504-5880
gonzalezmagaz@gmail.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

SANDRA RODRÍGUEZ-COTTO, <u>ET AL.</u>,

      **Plaintiffs,**

      **v.**

PEDRO R. PIERLUISI-URRUTIA, <u>ET AL.</u>,

      **Defendants.**

**CIVIL NO. 20-1235 (PAD)**

## OPINION AND ORDER

Delgado-Hernández, District Judge

This is a pre-enforcement action by journalists Sandra Rodríguez-Cotto and Rafelli González-Cotto to enjoin, under the First Amendment, Article 5.14(a) of the Law of the Puerto Rico Department of Public Safety, Law No. 20 of 2017, P.R. Laws Ann. tit. 25, §§ 3501, <u>et seq.</u> ("Law 20"), which criminalizes some types of speech after the Governor has decreed a state of emergency or disaster in the Commonwealth.[1] For the reasons explained below, the challenged provision cannot be enforced. As drafted, it does not pass muster under the First Amendment.

## I.     BACKGROUND

Law 20 creates the Puerto Rico Department of Public Safety. <u>See</u>, P.R. Laws Ann. tit., 25 § 3503. It addresses various organizational and functional aspects of the Department's operation and includes a proviso related to states of emergency, catastrophes, and disasters. <u>Id.</u> at § 3654. To this end, as originally enacted as part of Law 20, Article 5.14(a) made it a crime to

---

[1] The "Amended Complaint for Declaratory and Injunctive Relief" ("Amended Complaint") refers to Article 6.14 of Law 20 (Docket No. 47). After plaintiffs initiated the action, Law No. 135 of 2020 amended Law 20, re-enumerating Chapters 5 to 9 of that statute. <u>See</u>, P.R. Laws Ann. tit. 25, § 3654. As a result, Article 6.14 was renumbered as Article 5.14. To avoid confusion, the court refers to Article 5.14, not to Article 6.14.

raise a false alarm in relation to the imminent occurrence of a catastrophe in Puerto Rico or, if there was a declared state of emergency or disaster, to spread rumors or raise a false alarm regarding non-existing abnormalities.  See, Docket No. 24-1.  On April 6, 2020, the Legislature amended Article 5.14 to add paragraph (f), which made it a crime to transmit or allow another person to transmit by any means, through any social network or mass media, false information with the intention of creating confusion, panic or collective public hysteria, regarding any proclamation or executive order decreeing a state of emergency, disaster or curfew.  Id.  Plaintiffs challenged these provisions, essentially alleging that they were overbroad and imposed an impermissible content-based restriction on speech.  See, Docket No. 47.

While the challenge was pending, in July 2020, the Legislature amended Article 5.14 to eliminate paragraph (f) and amend paragraph (a) to make it a criminal offense for any person, natural or legal, who, after the Governor of Puerto Rico has decreed by executive order a state of emergency or disaster, to purposely, knowingly or recklessly: (1) give a warning or false alarm, knowing that the information is false, in relation to the imminent occurrence of a catastrophe in Puerto Rico; or (2) disseminate, publish, transmit, transfer or circulate through any means of communication, including the media, social networks, or any other means of dissemination, publication or distribution of information, a notice or a false alarm, knowing that the information is false, when as a result of such conduct, the life, health, bodily integrity or safety of one or more persons are put at imminent risk or public or private property are endangered.  See, Law No. 66 of 2020 ("Law 66") (Docket No. 45-1, p. 2).  A person found guilty of violating this provision commits a misdemeanor with a penalty of up to six months of imprisonment, a fine of not more than $5,000.00 dollars, or both penalties, at the discretion of the court.  Id.  Nonetheless, the speech is considered a felony, carrying an imprisonment term of three years, if

2

the notice or false alarm results in damages exceeding $10,000.00 to the public purse, third parties, or public or private property, or the conduct results in injury or physical harm to another person. Id.

Article 5.14(a) derives from Article 20 of the Commonwealth of Puerto Rico Emergency Management and Disaster Administration Act, Law No. 211 of 1999, P.R. Laws Ann. tit. 25, § 172r ("Law 211"), which in turn originated in Article 26 of the Law for Civil Defense of Puerto Rico, Law No. 22 of 1976, P.R. Laws Ann. tit. 25, § 171 ("Law 22"). Law 20 repealed Law 211, and Law 211 repealed Law 22. See, P.R. Laws Ann. tit. 25, §§ 171-172 (2022 Supp.). Among other things, Article 20 of Law 211 made it a misdemeanor to raise "a false alarm with respect to the imminent occurrence of a catastrophe in Puerto Rico or spreading rumors or raising a false alarm regarding non-existing abnormalities under a state of emergency or disaster." P.R. Laws Ann. tit. 25, § 172r(b). As for Article 26 of Law 22, it penalized as a misdemeanor giving a "false alarm with regard to the imminent occurrence of a catastrophe in Puerto Rico, or there existing already a state of emergency or disaster, spreads rumors or gives false alarms on nonexisting abnormalities." P.R. Laws Ann. tit. 25, § 171y (1976).

These types of provisions, generally known as false reporting statutes, are not unique to Puerto Rico. See, Louis W. Tompros, et al., *The Constitutionality of Criminalizing False Speech Made on Social Networking Sites in a Post-Alvarez, Social Media-Obsessed World*, 31 Harv. J. L. & Tech. 65, 69 (2017)("Many states have false reporting statutes that impose criminal liability on those who engage in false speech related to emergencies or natural catastrophes, regardless of the medium used to communicate that speech"). Most of those statutes derive "in part" from Section 250.3 of the American Law Institute's Model Penal Code. Tompros, supra. That Section, adopted in 1962, states:

3

> A person is guilty of a misdemeanor if he initiates or circulates a report or warning of an impending bombing or other crime or catastrophe, knowing that the report or warning is false or baseless and that it is likely to cause evacuation of a building, place of assembly, or facility of public transport, or to cause public inconvenience or alarm.

See, MODEL PENAL CODE § 250.3 (AM. LAW INST. 1980).[2]

## II. **PROCEDURAL EVENTS**

On May 20, 2020, plaintiffs filed a "Complaint for Declaratory and Injunctive Relief" against the Governor, the Secretary of Justice, the Secretary of Public Safety, and the Police Commissioner of Puerto Rico (collectively, the "Government"), challenging under the First Amendment Articles 5.14(a) and (f) of Law 20, as amended by Law 66 (Docket No. 1). On May 22, 2020, plaintiffs moved for preliminary injunctive relief (Docket No. 4). On June 5, 2020, the Government opposed the motion (Docket No. 13). On June 10, 2020, plaintiffs replied (Docket No. 16). On June 15, 2020, the Government sur-replied (Docket No. 19).

On June 16, 22 and 23, and July 1, 2020, the court conducted teleconferences to discuss various litigation-related issues with counsel (Docket Nos. 21, 25, 28, and 30). On June 16, 2020, it ordered the parties to submit briefs on whether the anticipated amendments to Article 5.14 would moot the action (Docket No. 21). On June 23, 2020, plaintiffs filed a supplemental memorandum regarding the legislative bill, arguing that the contemplated changes would be unconstitutional (Docket No. 29). The same day, the Government presented its brief, asserting in

---

[2] A previous version read: "A person commits a misdemeanor if he initiates or circulates a report or warning of an impending bombing or other crime or catastrophe, if the actor knows that the report or warning is false or baseless and that it its likely to cause evacuation of a building, place of assembly, or facility of public transport, or to cause other serious inconvenience." MODEL PENAL CODE § 250.8 (AM. LAW INST., Tentative Draft No. 13, 1961). The last two words in the current version, "or alarm," were added to make sure that the offense includes false alarms in situations where evacuation is not possible, as in a false bomb scare in a "mid-Atlantic flight." MODEL PENAL CODE § 250.3 cmt. 2 (AM. LAW INST. 1980).

4

the main that the proposed modifications would be substantial enough to moot the case (Docket No. 30).

On July 13, 2020, the legislative bill was enacted as Law 66 (Docket Nos. 35, p. 2; 45-1). On July 29, 2020, plaintiffs filed the Amended Complaint for declaratory and injunctive relief, challenging the constitutionality of Article 5.14(a), as amended by Law 66 (Docket No. 47), and renewed their request for a preliminary injunction (Docket No. 48). On August 13, 2020, PEN America Center, Inc., and the University of Georgia School of Law's First Amendment Clinic, moved for leave to file a brief as *amici curiae* in support of plaintiffs' renewed motion for preliminary injunction (Docket No. 53), which the court granted over the Government's opposition (Dockets Nos. 56, 59, and 60). On August 21, 2020, the Government opposed plaintiff's renewed motion for preliminary injunction (Docket No. 62). On August 28, 2020, plaintiffs replied to the Government's opposition (Docket No. 70). On September 9, 2020, the Government sur-replied to plaintiffs' reply (Docket No. 74).

Given that a renewed motion for preliminary injunction had been filed, on February 12, 2021, the court denied without prejudice plaintiffs' initial motion for preliminary injunction, (Docket No. 84). After reviewing the record, on July 5, 2022, the court expressed it was persuaded that the preliminary injunction phase should be consolidated with the request for permanent injunctive relief; ordered the parties to inform by July 19, 2022, if the court should consider special measures for consolidation; and provided that by that same date, the parties could supplement their brief on issues awaiting disposition (Docket No. 86). In response, the parties indicated that no special measures were needed for consolidation (Docket Nos. 87 and 88). Accordingly, on July 21, 2022, the court consolidated the preliminary and permanent relief

5

phases for disposition (Docket No. 91).  Given that no supplemental briefs were filed, the case is ripe for disposition.

### III.    FACTUAL CONTEXT[3]

On September 18, 2017, then-Governor Rosselló-Nevares declared a state of emergency due to the devastation caused by Hurricane María (Docket No. 23, p. 1).  On January 7, 2020, then-Governor Vázquez-Garced declared a state of emergency due to the devastation caused by an earthquake.  Id.  On March 12, 2020, she declared a state of emergency due to the COVID-19 pandemic.  Id. at p. 2.  In late March 2020, the Commonwealth charged Pastor José Luis Rivera-Santiago under Article 5.14 of Law 20, in effect at that time, for allegedly creating a false alarm over the WhatsApp messaging platform.  Id.  On May 7, 2020, the charges were dismissed.  Id. at p. 3.

Throughout their journalism career, plaintiffs have published numerous articles or participated in panels discussing states of emergencies in Puerto Rico.  Id. at pp. 3-5.  Ms. Rodríguez-Cotto is an independent journalist with over 30 years of experience in the media industry in Puerto Rico, the United States and Latin America (Docket No. 4-1, p. 1).  She currently hosts a radio program and has a blog where she features her own reporting and political analysis.  Id. at pp. 1-2.[4]  She has averred a continuing intent to engage in investigative reporting, which often focuses on emergencies in Puerto Rico.  Id. at p. 6.  Her current reporting focuses on the public health emergency caused by COVID-19, as well as the government's response to that crisis (Docket No. 48-1, p. 1).

---

[3] This Section is based on the parties' factual stipulations (Docket No. 55-1) and plaintiffs' verified statements under penalty of perjury (Docket Nos. 4-1 and 4-2).

[4] The blog is online at https://enblancoynegromedia.blogspot.com/.

6

Ms. Rodríguez-Cotto has expressed a serious concern of being targeted for prosecution under Article 5.14(a) (Docket No. 4-1, p. 6). While she makes every effort to confirm the veracity of her reporting, she is worried of sometimes inadvertently publishing a story with inaccuracies, particularly when working on fast-developing stories about public emergencies. Id. She points out that the government might dispute the accuracy of her reporting even when she might not have reported falsities, as it occurred to her in the past while reporting on the death toll caused by Hurricane Maria. Id. Moreover, Ms. Rodríguez-Cotto has asserted that the fear of prosecution has chilled her own reporting and commentary, and her sources have refrained from sharing information with her due to the same fear. Id. at pp. 6-7.

Mr. González-Cotto is an independent journalist with over 10 years of experience in the media industry in Puerto Rico (Docket No. 4-2, p. 1). He has also reported about government actions and, more recently, about the COVID-19 pandemic and the government's response to it. Id. at p. 2; Docket No. 48-2, p. 1. He has expressed fear of prosecution under Article 5.14(a) of Law 20 due to his continuing reporting about emergency conditions in Puerto Rico (Docket Nos. 4-2, p. 3; 48-2, pp. 1-2). Like Ms. Rodríguez-Cotto, Mr. González-Cotto has acknowledged the possibility of inadvertently publishing stories with inaccurate information, or with facts that could be disputed by the government (Docket Nos. 4-2, p. 4; 48-2, p. 3). He has stated that his fear of prosecution has chilled his own reporting, as well as his sources. Id.

## IV.   DISCUSSION

### A. Introduction.

The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits laws that abridge freedom of speech and of the press.  U.S. Const., amend. 1.[5]  Even though Puerto Rico is not a state, the prohibition applies here.  See, Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico, 478 U.S. 328, 331 & n. 1 (1986)(so recognizing); Pérez-Guzmán v. Gracia, 346 F.3d 229, 232 n. 1 (1st Cir. 2003)(considering Puerto Rico the functional equivalent of a state for First Amendment purposes).  Along this line, freedom of speech serves and promotes various values and objectives, including self-government; the discovery and dissemination of truth; and individual autonomy, self-expression and self-fulfillment.  See, KATHLEEN M. SULLIVAN & GERALD GUNTHER, CONSTITUTIONAL LAW 744 (16th ed. 2007)(discussing topic); Steven G. Gey, *The First Amendment and the Dissemination of Socially Worthless Untruths*, 36 Fla. St. U. L. Rev. 1, 6 (2008)(similar); Thomas I. Emerson, *Toward a General Theory of the First Amendment*, 72 Yale L.J. 877, 878-879 (1963)(same).[6]

Given the First Amendment's importance to the polity, the protection that it accords is not limited to spoken, written, and printed words.  Rather, it extends to other categories of expression like: (1) pictures; films; drawings; paintings; engravings; and music (see, Bery v. City of New York, 97 F.3d 689, 694 (2nd Cir. 1996)(listing categories)); (2) symbolic speech, specifically, conduct intended to be communicative and that, in context, would reasonably be

---

[5] The court assumes that freedom of speech and freedom of the press lead to the same result in this case.

[6] For additional discussion of the same subject matter, see, ERWIN CHEMERINSKY, CONSTITUTIONAL LAW PRINCIPLES AND POLICIES 954-958 (4th ed. 2011); JOHN E. NOWAK & RONALD D. ROTUNDA, CONSTITUTIONAL LAW 1147-1149 (7th ed. 2004); LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 785-789 (2nd ed. 1988).

understood by the viewer to be communicative (see, e.g., Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 568-569 (1995)(parades); Texas v. Johnson, 491 U.S. 397, 399, 420 (1987)(burning United States flag as a means of political protest); Tinker v. Des Moines Indep. Community Sch. District, 393 U.S. 503, 505 (1969)(wearing armband to protest against United States' involvement in Vietnam War); Muchmore's Cafe, LLC v. City of New York, 2016 WL 11469539, *12 (E.D.N.Y. Sept. 29, 2016)(ballet and other expressions of performance dancing)); (3) "contribution and expenditure" of money to finance campaigns for political office, Buckley v. Valeo, 424 U.S. 1, 13-23 (1976); (4) "video games," Brown v. Ent. Merchants Ass'n, 564 U.S. 786, 790 (2011); and (5) "posting of information online." State v. Bishop, 787 S.E.2d 814, 818 (N.C. 2016).[7]  Despite its vast and privileged sphere, the First Amendment does not give "absolute protection to every individual to speak whenever or wherever he pleases or to use any form of addresses in any circumstances that he chooses." Cohen v. California, 403 U.S. 15, 19 (1971).  As discussed below, it permits governmental regulation of speech subject to different degrees of judicial scrutiny.

**B. Standing.**

The Government claims plaintiffs lack standing to bring this action (Docket No. 62, pp. 5-15 and 37).  Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const., art. III, § 2.  The standing doctrine "gives meaning to these constitutional limits."  Susan B. Anthony List v. Driehaus ("SBA List"), 573 U.S. 149, 157 (2014).  The doctrine was developed "to ensure that federal courts do not exceed their authority as it has been traditionally understood," restricting the category of litigants empowered to

---

[7] As well, "[c]omputer code and computer programs constructed from code can constitute speech warranting First Amendment protection."  CDK Global LLC v. Brnovich, 461 F.Supp.3d 906, 925 (D. Ariz. 2020).  Robert Plotkin, *Fighting Keywords: Translating the First Amendment to Protect Software Speech*, 2003 U. Ill. J.L. Tech & Pol'y 329 (2003), discusses a number of issues raised by these means of communication.

maintain a lawsuit in federal court to seek redress for a legal wrong.  Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  As applied, it has "constitutional" and "prudential" dimensions.  Mangual v. Rotger-Sabat, 317 F.3d 45, 56 (1st Cir. 2003).

    1.  Constitutional Dimension.

To establish Article III standing a plaintiff must show: (1) an "injury in fact," (2) fairly traceable to the challenged conduct, and (3) likely to be redressed by a favorable judicial decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992).  The party invoking federal jurisdiction "bears the burden of establishing these elements."  FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990).  The only debatable question regarding plaintiffs' Article III standing involves the first element of the equation, that is, whether they have suffered an injury in fact, for there is a causal link between the alleged injury and the challenged statute, and a favorable court decision would redress that injury.

As for that element, an injury-in-fact consists of "an invasion of a legally protected interest that is concrete and particularized, and actual or imminent, not conjectural or hypothetical."  Lujan, 504 U.S. at 560.  For an injury to be particularized, "it must affect the plaintiff in a personal and individual way."  Spokeo, Inc., 578 U.S. at 339.  A plaintiff satisfies the injury-in-fact requirement showing "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder."  Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979).  A plaintiff's "subjective and irrational fear of prosecution" is not enough to confer standing under Article III.  Mangual, 317 F.3d at 57.  An allegation of future injury may suffice "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will

occur." SBA List, 573 U.S. at 158 (quoting Clapper v. Amnesty Int'l. USA, 568 U.S. 398, 409 & 414 n. 5 (2013)).

### a. Constitutional Interest.

Plaintiffs' intended speech is affected with a legitimate constitutional interest, for reporting on emergency conditions, including about the COVID-19 pandemic, constitutes speech on matters of public concern directly implicating the First Amendment. See, Chappel v. Montgomery County Fire Protection District No. 1, 131 F.3d 564, 578 (6th Cir. 1997)("Speech "on matters directly affecting the health and safety of the public is obviously a matter of public concern"). And as the Supreme Court recognized in Snyder v. Phelps, 562 U.S. 443 (2011), speech on public issues "occupies the highest rung of the hierarchy of First Amendment values" entitled to special protection. Id. at 452.

### b. Statutory Proscription.

The intended speech is arguably proscribed by the challenged statute. Article 5.14(a) makes it a crime to, after the Governor of Puerto Rico has decreed an emergency or disaster by executive order, knowingly, purposely, or recklessly: (1) give a warning or false alarm, knowing that the information is false, in relation to the imminent occurrence of a catastrophe in Puerto Rico; or (2) disseminate, publish, transmit, transfer or circulate through any means of communication, including the media, social networks, or any other means of dissemination, publication or distribution of information, a notice or a false alarm, knowing that the information is false, when as a result of that conduct, it puts the life, health, bodily integrity or safety of one or more persons at imminent risk, or endangers public or private property (Docket No. 45-1, p. 2). Article 5.14(a) expressly applies to speech distributed through the media and social networks (id.), where the plaintiffs routinely broadcast their reports (Docket Nos. 4-1 and 4-2). It does not

11

carve out exceptions.  And, while plaintiffs have indicated that they do not intend to utter false statements, they do not have to assert otherwise to establish standing.

To illustrate, in <u>SBA List</u>, 573 U.S. 149, an advocacy group filed a pre-enforcement First Amendment challenge to a state statute that made it a crime to utter certain false statements about political candidates or public officials.  The Sixth Circuit held that the plaintiff's fear of enforcement did not engender an Article III injury because it had not alleged that it planned to lie or recklessly disregard the veracity of its speech in the future, but rather maintained that the statements it intended to make were factually true.  <u>Id</u>. at 156-157.  The Supreme Court reversed, observing that a plaintiff who wishes to challenge the constitutionality of a law does not have to confess that he will in fact violate that law.  <u>Id</u>. at 163.

As well, in <u>Babbitt</u>, 442 U.S. 289, the Supreme Court considered a pre-enforcement challenge to a statute that made it an unfair labor practice to encourage consumers to boycott an "agricultural product . . . by the use of dishonest, untruthful and deceptive publicity."  <u>Id</u>. at 301 (quotations and citation omitted).  The plaintiffs contended that the law unconstitutionally penalized inaccuracies inadvertently uttered in the course of consumer appeals.  <u>Id</u>.  The Court noted that the law on its face proscribed dishonest, untruthful, and deceptive publicity, and although plaintiffs did not plan to propagate untruths, erroneous statements were inevitable in free debate.  <u>Id</u>.  On this account, it concluded that plaintiffs had standing to pursue their challenge to the misrepresentation provision in question even though they had disavowed any intent to propagate untruths.  <u>Id</u>.

Likewise, in <u>Speech First, Inc.</u> v. <u>Fenves</u>, 979 F.3d 319 (5th Cir. 2020), an organization advocating for free speech rights brought an action on behalf of state university students alleging that the university's policies concerning speech on its campus chilled free speech in violation of

the First Amendment. Id. at 322-323, 326-327, and 330. The District Court dismissed the case for lack of standing, ruling that plaintiff had failed to present specific evidence of the speech in which the students wished to engage, leaving the court unable to determine whether the students had an intention to engage in speech prohibited or arguably prohibited by the challenged policies. Id. at 327. Further, it discerned no evidence that any student had been disciplined, sanctioned, or investigated for his speech, and, thus, no credible threat of enforcement. Id.

The Fifth Circuit reversed, noting that plaintiff's members declared that they wanted to engage in open and robust intellectual debate with fellow students on a wide array of sensitive and controversial topics involving free speech- a matter affected with a constitutional interest – but were afraid to voice their views out of fear that their speech may violate the university's policies. Id. at 331-332. Moreover, the Fifth Circuit observed that such constitutionally protected intended speech was arguably proscribed or at least arguably regulated by the university's speech policies, and even though a plaintiff did not intend to violate the policies, the intended speech could still be claimed to fall within the policies' regulation, e.g., of "false" statements, hence satisfying the standing inquiry. Id. at 332 n. 10.

Similarly, in 281 Care Committee v. Arneson, 638 F.3d 621 (8th Cir. 2011), plaintiffs challenged a statue that made it a crime to knowingly or with reckless disregard for the truth make a false statement about a proposed ballot initiative. Id. at 624. The District Court dismissed the complaint in part because plaintiffs did not allege that they wished to engage in any conduct that would actually violate the statute. Id. at 627-628. The Eighth Circuit reversed, indicating that even though plaintiffs had not so alleged, they did allege that they wished to engage in conduct that could be interpreted as making false statements with reckless disregard for the truth of the statements, and that, therefore, they were reasonably concerned that state

13

officials would interpret their actions as violating the statute.  Id. at 628-630.  Thus, it concluded that plaintiffs had alleged injury in fact sufficient to support standing.  Id. at 631.

Following the same line, reasonable speakers can accidentally engage in false speech and legitimately fear prosecution for an inadvertent inaccuracy based on an accusation that the false reporting was intentional.  See, Frese v. MacDonald, 425 F.Supp.3d 64, 76 (D.N.H. 2019)("Even if Frese does not plan in the future to lie or recklessly disregard the veracity of his speech, his complaint sufficiently alleges that the State's prosecutorial arms . . . retain overly broad discretion to determine whether an individual knew his speech to be true or false").  A speaker can be concerned about being prosecuted for a careless false statement "even if he does not have the intent required to render him liable."  U.S. v. Alvarez, 567 U.S. 709, 736 (2012)(Breyer, J., concurring).

People "may refrain from making statements that they *believe* to be true, for fear that the statement will turn out to be false and they will be unable to refute the government's claim that they *knew* it was false."  Tompros, supra, at 107 (emphasis in original).  And as most people "are frightened of violating criminal statutes," plaintiffs, as noted above, need only allege they wish to engage in activity that the challenged statute arguably covers.  Majors v. Abell, 317 F.3d 719, 721 (7th Cir. 2003). [8]  Plaintiffs have so shown.

---

[8] Medical, public health, and scientific knowledge rapidly evolves in times of crisis, as most recently seen in governments' response to COVID-19.  During such times, there may be conflicting information about what constitutes the objective facts of a situation.  Such in-flux, crisis circumstances, the setting where Article 5.14(a) applies, heighten the risk that a speaker, journalist, publisher or source will be accused of having known information to be false at the time it was communicated, even though the individual or entity did not know or made an honest mistake, or reasonable people could disagree about whether the information was actually false based on conflicting information.  Although the prosecution may ultimately fail, the stressful experience of facing criminal charges and undergoing the risk, or worse, the reality of a wrongful conviction, by no means dispels the chilling effect on protected expression.

14

c. *Risk of Prosecution.*

Plaintiffs face a credible threat of prosecution. In "assessing the risk of prosecution as to particular facts," weight must be given to various elements, including: (1) whether the government has disavowed any intention to prosecute; (2) the statute's history of enforcement; (3) the extent to which it contains explicit rules of construction protecting First Amendment rights; and (4) the universe of potential complainants. Blum v. Holder, 744 F.3d 790, 798 (1st Cir. 2014). Standing follows from these parameters.

First, the Government has not explicitly disavowed enforcing Article 5.14(a) in the future. See, Davison v. Randall, 912 F.3d 666, 677-679 (4th Cir. 2019)(standing found given that defendant had not disavowed future enforcement action); Green Party of Tennessee v. Hargett, 791 F.3d 684, 695-696 (6th Cir. 2015)(standing demonstrated because even though defendants had not enforced or threatened to enforce the statute, they had not explicitly disavowed enforcing it in the future). And, in the instant case, it is actively defending the constitutionality of the statute. See, Aptive Envtl., LLC v. Town of Castle Rock, Colorado, 959 F.3d 961, 976 (10th Cir. 2020)(standing shown in part by the town's efforts to uphold the ordinance at issue during pendency of litigation); New Hampshire Right to Life Pol. Action Committee v. Gardner, 99 F.3d 8, 15 (1st Cir. 1996)(similar).[9]

Second, Article 5.14(a) is of recent vintage, having been enacted in 2020. As mentioned earlier, its predecessor was enacted in 2017, reproducing a prohibition legislated in 1999 that first appeared in a 1976 statute. Still, Article 5.14(a) is broader in scope than the 2017, 1999, and 1976 provisions that preceded it. A finding of no threat of prosecution under a criminal

---

[9] This is not meant as criticism, but as part of the explanation of why plaintiffs have standing.

statute requires a long institutional history of disuse, "bordering on desuetude." Mangual, 317 F.3d at 57. That is not the case here, as a pastor faced criminal charges in 2020 under the 2017 provision for sharing information on WhatsApp about a rumored government curfew order related to the COVID-19 pandemic (Docket No. 23). Compare, Mangual, 317 F.3d at 57 (citing Poe v. Ullman, 367 U.S. 497, 501 & 507 (1961)(denying standing based on an eighty-year-old tacit agreement by the state not to prosecute)), with, R.I. Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 32 (1st Cir. 1999)(finding a credible threat of prosecution under a statute that had never been enforced in part because it was enacted "only twenty years" earlier).

Third, "the universe of potential complainants is not restricted to state officials constrained by explicit guidelines or ethical obligations." SBA List, 573 U.S. at 164. In Puerto Rico, a criminal action begins with a judicial determination of probable cause for arrest. See, Pueblo v. Rivera Martell, 173 D.P.R. 601, 622 (2008)(discussing topic); Pueblo v. Jiménez Cruz, 145 D.P.R. 803, 809-810 (1998)(similar). This determination is made when it appears from a sworn complaint, statements filed with the complaint, or the examination under oath of the complainant or witnesses, if any, that there is probable cause to believe that an offense has been committed by the person or the persons against whom the complaint is addressed. See, Rule 6 of Puerto Rico Rules of Criminal Procedure, P.R. Laws Ann. tit. 34, App. II, R. 6. That determination may even be grounded totally or partially on a statement made upon information or belief with sufficient circumstantial guarantee of reliability. Id.

A criminal complaint consists of a signed and sworn written statement charging one or several persons with the commission of an offense. See, Rule 5 of Puerto Rico Rules of Criminal Procedure, P.R. Laws Ann. tit. 34, App. II, R. 5. Any person having personal knowledge of the facts that constitute the offense charged in the complaint has standing to

16

present it.  Id.  Prosecutors and police officers in all cases, and other officers and public

employees in cases related to the performance of their duties and functions, may sign and swear

to complaints when the facts constituting the offense are known to them by information and

belief.  Id.  Within these boundaries, virtually any person may file a criminal complaint with the

police, or pro se, and hail another into court to face potential criminal charges.  Furthermore,

Article 5.14(a) lacks explicit rules of construction protecting First Amendment rights.

The Government maintains that plaintiffs have not come about with "a single fact" that

any of the defendants or any other public official threatened to prosecute them or any other

journalist or that a prosecutorial process against them or a journalist has been initiated pursuant

to the challenged provision (Docket No. 62, p. 10).  True enough.  But an actual or threatened

prosecution is not a prerequisite to challenge the legality of a statute.  As the Supreme Court

observed in SBA List, 573 U.S. 149, it is not necessary that a party first expose herself to actual

arrest or prosecution to be entitled to challenge a statute that she claims deters the exercise of

constitutional rights.  Id. at 158.  A plaintiff in a pre-enforcement challenge of a law's

constitutionality "need not confess that he or she will in fact violate that law before filing suit."

Frese, 425 F. Supp. 3d 64, 73.  And the court cannot overlook that another individual, the pastor,

was prosecuted under the predecessor statute.

The Government posits that plaintiffs cannot rely on that supposed "unconnected event"

because it is dissimilar to plaintiffs' claims in that it did not involve the prosecution of a

journalist, specifically, for publishing articles adverse to the government and, the prosecution of

the pastor was based on the now defunct language of the preceding iteration of Article 5.14(a)

(Docket No. 62, p. 10).  Article 5.14(a) does not, however, carve out exceptions for journalists,

and the version in effect when the pastor was prosecuted made it a crime to raise a false alarm

17

with respect to the imminent occurrences of catastrophes in Puerto Rico or spreading rumors or raising a false alarm regarding non-existing abnormalities under a state of emergency or disaster. On this account, while that version is defunct, it nonetheless shares important elements with the current version, such as false alarms, catastrophes, and states of emergency or disasters. Past enforcement of Article 5.14(a)'s statutory predecessor cuts in favor of a conclusion that the threat of enforcement of its current version "is specific and credible." California Trucking Ass'n. v. Bonta, 996 F.3d 644, 650, 652-654 (9th Cir. 2021)(so recognizing in context of past application of judicially created rule later codified, as expanded upon by state lawmakers, into statute).

There is more than enough in this record to support standing. As in Babbitt, 442 U.S. at 301-302, plaintiffs have in the past engaged, and intend in the future to engage, in speech that may run afoul of the challenged statute. As in Gardner, 99 F.3d at 17, the statute in question is not a dead letter; the Government has not disclaimed any intention to enforce it and is actively vouchsafing for its constitutionality. As in Mangual, 317 F.3d at 58, plaintiffs must either risk criminal prosecution or engage in self-censorship. There have not been prosecutions under the current version of the statute. Still, as in Doe v. Bolton, 410 U.S. 179, 188 (1973), the lack of prosecutions is largely irrelevant given the statute's recent origin. Further, contrary to Blum, 744 F.3d at 798, the provision lacks explicit rules of construction protecting First Amendment rights, and like in SBA List, 573 U.S. at 164, the universe of potential complainants is not restricted to state officials constrained by explicit guidelines or ethical obligations.

*d. Result.*

In the end, when a party launches a pre-enforcement challenge to a statute that provides for criminal penalties and claims that the statute on its face abridges the First Amendment, two

18

potential injuries must be considered.  First, the injury which "attends the threat of enforcement." Gardner, 99 F.3d at 13.  Second, when the plaintiff is chilled from exercising her right to free expression in order to avoid enforcement consequences.  In such situations, the vice of the statute is its pull toward self-censorship.  Id. at 14.  Both types of injury are present in this case, conferring standing on plaintiffs to mount a pre-enforcement challenge to the facial constitutionality of the statute "on the basis that [their] First Amendment rights arguably are being trammelled."  Id. at 14.

    2.  Prudential Standing.

Prudential aspects of standing lead to the same result.  Those aspects include the requirement that "a plaintiff's complaint fall within the zone of interests protected by the law invoked;" the general prohibition on a litigant's raising another person's legal rights;" and "the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches."  Osediacz v. City of Cranston, 414 F.3d 136, 139 (1st Cir. 2005).  A credible threat of future exposure to a challenged policy is "sufficient to satisfy" prudential as well as constitutional standing concerns.  Mangual, 317 F.3d at 59.  To boot, the operative complaint falls comfortably within the zone of interests protected by the First Amendment; asserts plaintiffs' own rights; and presents a sufficiently particularized grievance instead of a generalized grievance pervasively shared and most appropriately addressed in the representative branches.  See, Gardner, 99 F.3d at 15-16 (applying those criteria to conclude that the dispute satisfied prudential prerequisites for a grant of standing).[10]  Having confirmed plaintiffs' standing to maintain the action, the court turns to the merits of the case.

---

[10] The Government refers to a comment the court made during a status conference, to the effect that it had read all cases plaintiffs cited in support of standing, confirmed that mere subjective fears are not enough, there must be a

C. **Merits of Claim.**

1. Basic Framework.

In general, the First Amendment precludes the State from restricting expression because of its "content." Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015).[11] The proscription extends to restrictions of entire topics and particular viewpoints. Id. at 169.[12] Those restrictions are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. Id. This is the "most demanding test known to constitutional law." City of Boerne v. Flores, 521 U.S. 507, 534 (1997)(superseded by statute). It calls upon the government to prove that alternate measures imposing lesser burdens on speech would fail to achieve the government's interests, "not simply that the chosen route was easier." McCullen v. Coakley, 573 U.S. 464, 495 (2014). This burden "is not satisfied by mere speculation and conjecture." Edenfield v. Fane, 507 U.S. 761, 770 (1993). A restriction that is content-neutral on its face is nevertheless content-based if it cannot be justified without reference to the content of the regulated speech or were adopted by the government because of disagreement with the speech's message. Id.

By exception, content-based restrictions of speech are permitted in case of a "few historic and traditional categories of expression long familiar to the bar." Alvarez, 567 U.S. at 717 (plurality opinion)(internal quotations omitted). Those categories include advocacy intended,

---

credible threat of prosecution, and the stipulations here do not reflect factual settings similar to the cases that plaintiffs cited (Docket No. 62, pp. 14-15). In the process of studying authorities to issue a ruling, however, the court revisited relevant caselaw, and is persuaded that plaintiffs have standing to maintain this action.

[11] A comprehensive treatment of First Amendment doctrine is beyond the scope of this Opinion and Order. The purpose of the discussion that follows is to provide a baseline for the analysis of the issue *sub judice*. For a thorough discussion of modern free speech doctrine, see, R. Randall Kelso, *The Structure of Modern Free Speech Doctrine: Strict Scrutiny, Intermediate Review, and "Reasonableness" Balancing*, 8 Elon L. Rev. 291 (2016).

[12] In those latter cases, the government "targets not particular subject matter but particular views taken by speakers on a subject." Rosenburger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 828 (1995).

and likely, to incite imminent lawless action; obscenity; child pornography; defamation; insulting or fighting words; fraud; and speech presenting some grave and imminent threat that the government has the power to prevent, although a restriction under the last category is most difficult to sustain.  Id.

When speech restrictions are content-neutral, they are tested by what has been variously called intermediate scrutiny, proportionality review, and fit examination.  See, Alvarez, 567 U.S. at 730-731 (Breyer, J. concurring)(identifying varying nomenclature for content-neutral scrutiny).  To survive this type of scrutiny, the law must be "narrowly tailored" to serve an important or substantial governmental interest.  Rideout v. Gardner, 838 F.3d 65, 72 (1st Cir. 2016).  While the required tailoring need not be the least restrictive or least intrusive means of serving the government's interests, it demands a "close fit" between ends and means.  McCullen, 573 U.S. at 486.  The requirement prevents the government from too readily sacrificing speech for efficiency.  Id.

When speech and nonspeech elements are combined in the same course of conduct, "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."  Barnes v. Glen Theatre, Inc., 501 U.S. 560, 567 (1991).  In that case, a content-neutral government regulation is valid if "'it furthers an important or substantial governmental interest; if the interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'"  Turner Broad. System, Inc. v. F.C.C., 512 U.S. 622, 662 (1994)(quoting U.S. v. O'Brien, 391 U.S. 367, 377 (1968)).

In public fora such as streets, the government may impose reasonable content-neutral restrictions on the time, place, or manner of protected speech provided they satisfy the criteria

referred to above and leave open ample "alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). The purpose of this latter requirement is "to ensure that government does not disguise what, in effect is a complete ban on speech as a mere time, place and matter restriction." Ass'n. of Community Organizations for Reform Now v. Town of East Greenwich, 453 F.Supp.2d 394, 407 (D.R.I. 2006). The mere fact that a regulation diminishes in some measure the total quantity of speech and simultaneously curtails a speaker's opportunity to communicate with some potential listeners does not, however, show absence of alternative channels of communication. Id. at 407-408. The critical inquiry is whether other modes of communication remain open through which the speaker can adequately convey his message. Id. at 408.

At the lower end of the scrutiny ladder are speech limitations in non-public fora and on inmates and school students. Those in a non-public forum are upheld if "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Perry Educ. Ass'n v. Perry Loc. Educators' Asss'n, 460 U.S. 37, 46 (1983). Similarly, speech restrictions on school students and inmates have also been subjected to minimum rational-based review in some circumstances. See, Hazelwood Sch. District v. Kuhlmeier, 484 U.S. 260, 273 (1988)(pointing out that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns); Turner v. Safley, 482 U.S. 78 (1987)(observing that prison regulations that impinge on inmates' constitutional rights are valid under the First Amendment if they are reasonably related to legitimate penological objectives).

22

2. <u>False Statements</u>.

Lies are considered speech not categorically excluded from First Amendment protection. <u>See</u>, <u>Alvarez</u>, 567 U.S. at 719 (plurality)("The Court has never endorsed the categorial rule . . . that false statements receive no First Amendment protection").  To understand why and what level of judicial scrutiny must be applied, the court turns to <u>Alvarez</u>.  There, the Supreme Court considered the constitutionality of the Stolen Valor Act, a federal statute that made it a crime for any person to state falsely that he or she had received a military decoration or medal.  Xavier Alvarez was convicted under that statute after he intentionally and falsely claimed to have received the Congressional Medal of Honor while introducing himself at a meeting as a newly elected water district board member.  He challenged the statute, and a divided Court struck it down under the First Amendment.  In three separate opinions, all of the Justices agreed that the First Amendment permits the government to punish at least some lies, but no majority approach emerged for determining specifically which lies can be prohibited.

In his plurality opinion, Justice Kennedy (joined by Chief Justice Roberts and Justices Ginsburg and Sotomayor) considered the statute a content-based restriction on speech calling on exacting scrutiny and concluded that the statute failed this test.  <u>See</u>, <u>Alvarez</u>, 567 U.S. at 715. He explained that the defendant's claim to hold the Congressional Medal of Honor was false, with no room to argue about interpretation or shades of meaning.  <u>Id</u>. at 715.  He surveyed examples of regulations on false speech that courts have found permissible, such as criminal prohibitions of false statements made to a government officer; laws punishing perjury; prohibitions on the false representation that one is speaking as a government official or on behalf of the government; and fraud.  <u>Id</u>. at 720 & 723.  He dismissed various quotations from prior Supreme Court opinions seeming to indicate that false statements do not deserve constitutional

23

protection, arguing that they were not properly understood as creating a First Amendment exemption for false statements, and found no historical foundation in the Supreme Court's free-speech tradition of excluding false statements from the protection of the First Amendment. Id. at 717-719.

Justice Kennedy observed that the prohibition on false statements made to Government officials in communications concerning official matters do not lead to the broader proposition that false statements are unprotected when made to any person, at any time, in any context. Id. at 720. He pointed out that perjury undermines the function and province of the law and threatens the integrity of judgments that are the basis of the legal system. Id. at 720-721. He described statutes prohibiting a speaker from falsely representing himself to be a government official as punishing lies that inflict harms to the integrity of government processes and to the good repute and dignity of government service. Id. at 721. He indicated that when false claims are made for the purpose of effecting a fraud or other valuable considerations, the Government may restrict that speech without affronting the First Amendment. Id. at 723.[13] Having evaluated the treatment that falsehood had received in these varying settings, he concluded that the Stolen Valor Act was not similarly limited in its reach, and therefore, was invalid under the First Amendment. Id.

In this light, Justice Kennedy explained that the government's chosen restriction on the speech at issue must be actually necessary to achieve its interests (id., p. 725); there must be a

---

[13] In addition, Justice Kennedy referred to the prohibition on recovery of damages for a defamatory falsehood made about a public official "unless the statement was made with knowledge that it was false or with reckless disregard of whether it was false or not," rejecting the proposition that it provided support to the government's attempt to criminalize speech by way of the Stolen Valor Act. Alvarez, 567 U.S. at 719-720. In his view, the requirements of knowing falsehood or reckless disregard for the truth as the condition for recovery exists to allow more speech, not less, and that a rule designed to tolerate certain speech ought not blossom to become a rationale for a rule restricting it. Id. at 720.

direct causal link between the restriction imposed and the injury to be prevented (id.); the restriction must be the least restrictive means among available, effective alternatives (id., p. 729), and, yet, the government had not shown why counter-speech would not suffice as a viable alternative to achieve its interest.  Id. at 727.  Further, even though freedom of speech and thought flows not from the beneficence of the state, but from the inalienable rights of the person, suppression of false speech by the government could make exposure of its falsity more difficult, not less so.  Id. at 728.  As there was no clear showing of the necessity of the statute, as required by exacting scrutiny, Justice Kennedy concluded that the Stolen Valor Act infringed upon speech protected by the First Amendment.  Id. at 730.  In his words, truth needed "neither handcuffs nor a badge for its vindication."  Id. at 729.

Justice Breyer (joined by Justice Kagan) concurred in the judgment that the Stolen Valor Act violated the First Amendment.  Id. at 730.  He expressed that the case involved a false statement of an easily verifiable fact (id. at 732), but that false factual statements can serve useful human objectives.  Id. at 733.  As examples, he mentioned false factual statements in social contexts, where they may prevent embarrassment, protect privacy, shield a person from prejudice, provide the sick with comfort, or preserve a child's innocence; in public contexts, where they may stop a panic or otherwise preserve calm in the fact of danger; and in technical, philosophical, and scientific contexts, where (as Socrates' methods suggest) examination of a false statement (even if made deliberately to mislead) can promote a form of thought that ultimately helps realize the truth.  Id., at 735.[14]

---

[14] Consider also, government undercover operations and journalistic investigations.  For an introduction to those manifestations of falsehood, see, Dianne Leenheer Zimmerman, *I Spy: The Newsgatherer Under Cover*, 33 U. Rich. L. Rev. 1185(2000); Bernard W. Bell, *Secrets and Lies: News Media and Law Enforcement Use of Deception as an Investigative Tool*, 60 U. Pitt. L. Rev. 745 (1999); and Randall P. Bezanson, *Means and Ends and Food Lion: The Tension Between Exemption and Independence in Newsgathering by the Press*, 47 Emory L. J. 895 (1998).  As

From this recognition, Justice Breyer examined statutes and common-law doctrines that made the utterance of certain false statements unlawful, observing that prohibitions such as those found in fraud statutes, defamation statutes, perjury statutes, statutes forbidding lying to a government official (not under oath), statutes prohibiting false claims of terrorist attacks or other lies about the commission of crimes or catastrophes, statutes prohibiting trademark infringement, and statutes forbidding impersonation of a public official, all tended to be narrower than the Stolen Valor Act. Id. at 734-735. He explained that in determining whether a statute violates the First Amendment, the Supreme Court has often found it appropriate to examine the fit between statutory ends and means, and in so doing, has examined speech-related harms, justifications, and potential alternatives. Id. at 730. Applying what he referred to as intermediate scrutiny, he concluded that while the Stolen Valor Act had substantial justification, it was possible to achieve the government's objective in less burdensome ways by enacting a similar but more finely tailored statute. Id. at 739.

---

Professors Alan K. Chen & Justin Marceau, *High Value Lies, Ugly Truths, and the First Amendment*, 68 Vand. L. Rev. 1435 (2015) remind the reader, perhaps the most iconic example of using deception to uncover wrongdoing is Upton Sinclair's investigation of the Chicago meatpacking industry, which became the source and inspiration for his path-breaking novel, *The Jungle*. Id. at 1456-1457. To gather information for his work, which he hoped would expose the many unfortunate ways in which meatpacking companies treated their employees, Sinclair gained access to the facilities by disguising himself as a worker. Id. at 1457. Along the same line, see, U.S. v. Hugs, 109 F.3d 1375, 1377 (9th Cir. 1997)(involving an agent posing as a semiretired contractor interested in hunting, fishing, and purchasing trophy big game heads, who brought beer and participated in an illegal hunt in order to gain the evidence necessary for an arrest based on violations of hunting related laws); and Animal Legal Def. Fund v. Otter, 878 F.3d 1184, 1189-1190 (9th Cir. 2018)(undercover journalist's investigation of animal abuse in agricultural facilities). In all, "[n]ot all falsehoods are equal." Chen, supra, at 1443 & n. 40. This recognition comes not out of contemporary experience. Professor Helen Norton, *Lies and the Constitution*, 2012 Sup. Ct. Rev. 161 (2012), calls to mind that St. Augustine identified a hierarchy of lies, and St. Thomas Aquinas generated a taxonomy of lies according to their varying moral severity. Id. at 168 & n. 27 (quoting Charles Lewis Cornish, Henry Browne, and Charles Marriot, trans. St. Augustine, *On Lying* (Oxford, 1847) ¶ 25 (describing eight types of lies that vary in moral severity, including lies in religious teaching; lies that harm others and help no one; lies that harm others and help someone; lies told for the pleasure of lying; lies told to please others in smooth discourse; lies that harm no one and that help someone; lies that harm no one and that save someone's life; and lies that harm no one and that save someone's purity); and St. Thomas Aquinas, in Fathers of the English Dominican Province, trans, *The Summa Theoligica* 89-90 (Benzinger Bros, 1922)("Now it is evident that the greater the good intended, the more is the sin of lying diminished in gravity)).

Justice Alito (joined by Justices Scalia and Thomas) dissented.  Id.  He stated that false factual statements possess no intrinsic First Amendment value and that many kinds of false factual statements have been proscribed without raising any constitutional problem.  Id. at 746-747.  He acknowledged that it is sometimes necessary to extend a measure of strategic protection to these statements in order to ensure sufficient breathing space for protected speech.  Id. at 750.  He recognized that there are circumstances in which false factual statements enjoy a degree of instrumental constitutional protection.  Id. at 751.  He explained that there are broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech, presenting as example laws restricting false statements about philosophy, religion, the social sciences, the arts, history and other matters of public concern.  Id.  Like Justice Breyer, he accepted that in those contexts, even a false factual statement may be deemed to make a valuable contribution to public debate by bringing about the clearer perception and livelier impression of truth produced by its collision with error.  Id. at 752.  As well, he voiced concern that allowing the state to proscribe false statements in these areas open the door for the state to use its power for political ends.  Id.

However, for Justice Alito, in contrast to laws prohibiting false statements about history, science and other matters, the Stolen Valor Act presented no risk that valuable speech would be suppressed.  Id.  He remarked that the statute applied to only a narrow category of false representations about objective facts that can be always be proved or disproved with near certainty; it concerned facts that are squarely within the speaker's personal knowledge; it applied only to statements that could reasonably be interpreted as actual facts, hence did not apply to dramatic performances, satire, parody, hyperbole and the like; it was viewpoint neutral; it was highly unlikely to be tied to any particular political or ideological message, and in the rare cases

27

where that were not so, it applied equally to all false statements, whether they tend to disparage or commend the government, the military, or the system of military honors.  Id. at 740.[15]

    3.   Article 5.14(a).

As stated earlier, Article 5.14(a) criminalizes, after the Governor of Puerto Rico has decreed by executive order an emergency or disaster, to knowingly, purposely or recklessly: (1) give a warning or false alarm, knowing that the information is false, in relation to the imminent occurrence of a catastrophe in Puerto Rico; or (2) disseminate, publish, transmit, transfers or circulate through any means of communication, including the media, social networks, or any other means of dissemination, publication or distribution of information, a notice or a false alarm, knowing that the information is false, when as a result of that conduct it puts the life, health, bodily integrity or safety of one or more persons at imminent risk, or endangers public or private property (Docket No. 45-1, p. 2).  Properly read, Article 5.14(a) does not survive strict or intermediate scrutiny.[16]

---

[15] For a discussion of Alvarez, see, Norton, supra; Rodney A. Smolla, *Categories, Tiers of Review, and the Rolling Sea of Free Speech Doctrine and Principle: A Methodological Critique of United States v. Alvarez*, 76 Alb. L. Rev. 499 (2012-2013); and Erwin Chemerinsky, *The First Amendment and the Right to Lie*, ABA Journal (Sept. 5, 2012, 1:57 PM), https://www.abajournal.com/news/article/the_first_amendment_and_the_right_to_lie.  For their part, Tompros, supra, discuss the application of Alvarez in various settings, including social media.

[16] When a majority of a fragmented Supreme Court agrees on a result but no majority consensus exists on the rationale for the result, the Court's holding is typically that of "those members who concurred in the judgment on the narrowest grounds."  Marks v. U.S., 430 U.S. 188, 193 (1977); U.S. v. Manubolu, 13 F.4th 57, 67 & n. 20 (1st Cir. 2021)(applying narrowest ground rule).  Yet, narrowness may be difficult to determine, especially where, as here, "the disagreement among Justices is one of kind –whether to apply strict or proportional scrutiny– not of breadth."  Animal Legal Def. Fund, 263 F.Supp.3d at 1210.  In these circumstances, the Supreme Court has historically deferred to interpretation by lower courts.  Id.  And, "in the wake of Alvarez, lower courts have generally applied strict scrutiny to laws implicating lies."  Id.; Chen, supra, at 1482 ("Notably, since Alvarez, a number of lower courts have held that strict scrutiny is the proper level of scrutiny for government actions prohibiting lies").  This said, to cover all material aspects of the issue, the court gauges the validity of Article 5.14(a) by reference to both Justice Kennedy's plurality opinion and Justice Breyer's concurrent opinion.  For a discussion of different aspects of the narrowest ground rule, see, Richard M. Re, *Beyond the Marks Rule*, 132 Harv. L. Rev. 1942 (2019); Justin Marceau, *Plurality Decisions: Upward-Flowing Precedent and Acoustic Separation*, 45 Conn. L. Rev. 933 (2013); and Linda Novak, *The Precedential Value of Supreme Court Plurality Decisions*, 80 Colum. L. Rev. 756 (1980).

> a. *Level of Scrutiny.*

The first clause of Article 5.14(a) focuses on the content of speech, whereas the second clause focuses on the content of speech and the effect such speech has on persons and property. As the Supreme Court has previously noted, that is the quintessential hallmark of a "content-based regulation." U.S. v. Playboy Ent. Group, Inc., 529 U.S. 803, 811-812 (2000)(considering regulation content-based, because it focused on the content of speech and its impact on persons or property); Boos v. Barry, 485 U.S. 312, 321 (1988)(restriction deemed content-based, for it was justified by the content of speech and the direct impact that speech had on its listeners). In consequence, Article 5.14(a) triggers strict scrutiny.

The Government disputes that Article 5.14(a) contains content-based restrictions on speech (Docket No. 62, pp. 26-27). It argues that it has the constitutional power to prohibit the dissemination of false representations; that its interest here is concerned solely with the act of disseminating a false alarm knowing that it is untrue regardless of its content; and because the challenged provision does not prevent the expression of any particular message or viewpoint, its interest in prohibiting dissemination of false information is unrelated to the suppression of free expression. Id. at 27.

That the Government has the constitutional power to prohibit dissemination of false representations under certain circumstances does not mean it may exercise that power without regard to constitutional restrictions, particularly those found in the First Amendment. Further, stating the obvious, the provision punishes false speech, not truthful speech. And for the law to distinguish between truthful and untrue speech "is to favor one form of content over another." Chen, supra at p. 1483. Consequently, there is no reasonable basis to claim that Article 5.14(a) is anything but a content-based restriction on speech. See, Citizens United v. Fed. Election

29

Commission, 558 U.S. 310, 340 (2010)(content-based restrictions include "restrictions distinguishing among different speakers, allowing speech by some but not others); Turner Broad. Sys., Inc., 512 U.S. at 658 (speaker-based laws are content-based when they reflect the government's preference for the substance of what the favored speakers have to say or aversion to what the disfavored speakers have to say).[17]

The Government argues that Article 5.14(a) is valid because it aims to protect people's lives, health, and private and public property during government-declared emergencies (Docket No. 62, p. 28). That interest may be compelling but does not save the statute. A law that is content-based on its face "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." Reed, 576 U.S. at 164 (internal quotations omitted).[18] So, the "mere assertion of a content-neutral purpose [is not] enough to save a law which, on its face, discriminates based on its content." Turner Broad. Sys., Inc., 512 U.S. at 642-643. The Government needs more than to show that its ends are "compelling." Sable Comm. of Cal., Inc. v. F.C.C., 492 U.S. 115, 126 (1989). It must demonstrate that the prohibition is "narrowly drawn" to serve those ends. Ent. Merch. Ass'n., 564 U.S. at 799. And, to succeed, it must identify an actual problem in need of solving and establish that the curtailment on speech is actually necessary to the solution. Id.

---

[17] Compare, Reed, 576 U.S. at 164 (town sign measure considered content based on its face because application of relevant restrictions depended entirely on the corresponding sign's communicative content), with, March v. Mills, 867 F.3d 46, 56 (1st Cir. 2017)(noise provision not content-based because it did not on its face give license to punish anyone because of what they were saying).

[18] See also, Aptive Envtl., LLC, 959 F.3d at 988 (the fact that the government's asserted interests are substantial in the abstract does not mean that a restriction on speech purporting to effectuate those interests is permissible).

For a statute to survive this degree of scrutiny, the record must present a "direct causal link" between the restriction imposed and the injury to be prevented. Alvarez, 567 U.S. at 725. This is a heavy burden, one calling for more than a rational connection between the restriction on speech and the wrong to which that restriction is purportedly addressed. For example, in Alvarez, Justice Kennedy recognized that when a pretender claims the Medal of Honor to be his own, the lie might harm the government by demeaning the high purpose of the award, diminishing the honor it confirms, and creating the appearance that the Medal is awarded more often than is true. Id. at 725-26. Furthermore, Justice Kennedy noted that the lie may offend the true holders of the Medal, insulting their bravery and high principles when falsehood puts them in the unworthy company of a pretender. Id. at 726. And yet, notwithstanding the rational link between the Stolen Valor Act and the harms that Justice Kennedy identified, the statute did not survive exacting scrutiny. Why not? Because at bottom, the government pointed to no evidence that the public's general perception of military awards was diluted by false claims such as those that Alvarez made. Id. at 726.

Likewise, the Government here did not present evidence of a direct causal link connecting Article 5.14(a)'s prohibitions to the harm the Article attempts to assuage. According to the provision's Statement of Purpose, it was enacted to address "the need to prohibit people from using social media or mass media to disseminate false information, with the intention of creating confusion, panic or collective public hysteria . . . while a state of emergency, disaster, or curfew is in force." See, Statement of Purpose (Docket No. 45-1, p. 1). Assuming this was an actual problem in need of solving, what the Statement of Purpose reflects is not what Article 5.14(a) states. Even more, the Government did not present evidence to support the affirmation that a criminal prohibition against false warnings and alarms about the imminent occurrence of a

31

catastrophe in Puerto Rico is necessary to advance the Government's asserted interest. The connection may be rational, but is devoid of evidentiary support. And conjecture does not suffice to fill this gap.

On top of that, like in <u>Alvarez</u>, the lack of a direct causal link between the Government's stated interest and the proscription is not the only reason for why the prohibition falls short of qualifying as one actually necessary to achieve the Government's stated interest. This is so because the Government did not prove why counter-speech in the form of increased transparency, would fail to accomplish its interests. The Government states that during the state of emergency, a person caused disruption in the food supply chain by falsely announcing that the government would close the food markets, and that although the Government clarified that this was false, the damage was done. <u>Id</u>. (Docket No. 62, p. 35). But the Government did not submit evidence on who, when and how it sought to address the false message to which it has referred in order to allow the court to gauge the effectiveness of the response. Inversely, plaintiffs submitted clippings of articles about a message regarding closure of supermarkets on the island due to coronavirus, showing the Government has failed to demonstrate that increased transparency would not accomplish its objectives (Docket No. 10-3).

One of these articles states that on Friday (March 20, 2020), a person who identified himself as an active member of the church "Casa de Restauración," claimed that Governor Vázquez was preparing to announce a total closure of all businesses, as well as ports; and on March 21, thousands of people filled commercial outlets to buy supplies (Exhibit 3, p. 2).[19] The article quotes the Secretary of State of Puerto Rico as denying that supermarkets would close

---

[19] The story appears related to the Pastor incident mentioned earlier.

("Of course not.  How are we going to do that?")(Exhibit 3, p. 1).  Additionally, it quotes the Secretary of the Department of Public Safety as saying, among other things, "as for the WhatsAp message, we do not deny or confirm," and that the government kept an active page to report and evaluate complaints of people who used the media to commit crimes.  Id.  at 2.

If that is how events unfolded, rather than qualifying as transparent, the information originating in government sources was contradictory, e.g. denying, while at the same time, neither denying nor confirming.[20]  And the purpose of the page that the Secretary mentioned was to report and evaluate complaints, not to place accurate and reliable information before the public.[21]  The Government counters that when falseness travels fast, the truth will never be able to reach it on time (Docket No. 62, p. 28).  However, as Tompros, supra, point out, in the wake of the Boston Marathon bombing there was a good deal of false information spreading on various social media platforms, but using those very same platforms, the Boston Police Department ("BPD") quickly refuted and corrected the misinformation.  Id. at 106.  The BPD tweeted an accurate casualty number in response to inflated reports, refuted rumors that a fire at the John F. Kennedy Presidential Library was related to the bombing and corrected another rumor that a Saudi man had been arrested.  Id.[22]

---

[20] It bears noting that on March 30, 2020, among other things, the Governor limited food purchases between 5:00 a.m. and 7:00 p.m.; ordered that supermarkets and small grocery stores be closed on Sundays; and that the Department of Natural and Environmental Resources issue orders, guidelines, and circular letters for the closure of all marinas in Puerto Rico.  See, Executive Order 2020-029.  An article dated April 6, 2020, titled "Puerto Ricans crowd supermarkets as government ramps up restrictions," relates that Puerto Ricans flocked to grocery stores the morning of April 6th, after the Governor announced the previous night stricter regulations for the island's coronavirus lockdown during Holy Week, ordering almost all business including supermarkets and banks to close from Friday to Sunday (Docket No. 4-3, p. 12, n. 8).

[21] The use of a government web page to report and evaluate complaints is not illegal per se.  Properly used, it may be an effective tool to serve the public.

[22] See also, Jessica Stone-Erdman, Just The (Alternative) Facts, Ma'am: The Status of Fake News under the First Amendment, 16 First Amend. L. Rev. 410, 431 (2017)("[I]n the context of fake news, counterspeech can –and in fact

From this perspective, instead of criminalizing speech, the Legislature could simply have required the Government to use its multiple communications platforms to present a complete and accurate description of the facts.[23]  As Justice Kennedy pointed out in <u>Alvarez</u>, "[t]he remedy for speech that is false is speech that is true . . . [t]he response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth."  <u>Id</u>. at 727.  Justice Breyer agreed with Justice Kennedy that in this realm, "more accurate information will normally counteract the lie."  <u>Id</u>.  For Justice Breyer, it was likely that a more narrowly tailored statute combined with information-disseminating devices would effectively serve the statute's end.  <u>Id</u>.  So too with Article 5.14(a).  The dynamics of free speech, counter-speech, and refutation can effectively overcome lies.  Under these circumstances, there was no clear showing that Article 5.14(a) is necessary to accomplish its stated purpose.

    b. *Contrast.*

This is not the end of this matter.  Like the Stolen Valor Act in <u>Alvarez</u>, Article 5.14(a) must be compared to the falsehood statutes that the Supreme Court considered acceptable.  To this end, as mentioned earlier, Justice Kennedy looked into 18 U.S.C. § 1001 (the criminal prohibition of a false statement made to a government official in communications concerning official matters); 18 U.S.C. § 1623 (the criminal prohibition against perjury); and 18 U.S.C. § 912 (the criminal prohibition against falsely representing that one is speaking on behalf of the government or impersonating a government officer), explaining these provisions' prohibitions.  <u>See</u>, <u>Alvarez</u>, 567 U.S. at 720, 723 (plurality)(listing statutes).  Justice Breyer's concurrence

does– play a crucial role in combatting the false statements coming from both social media and political figures themselves.  Journalists and netizens alike continuously call out lies, challenge false or questionable statements purported to be the truth, and make corrections where needed").

[23] A sample of the Government's communications platforms is included in Appendix I.

agreed with this line of thought. Id. at 734-736. Furthermore, he contrasted the Stolen Valor Act to trademark infringement statutes such as 15 U.S.C. § 1114(1)(a); fraud and defamation; and false claims of terrorist attacks or other lies about the commission of crimes or catastrophes in light of 18 U.S.C. § 1038(a)(1); and 47 C.F.R. § 73.1217 (2011)(the Federal Communications Commission's ("F.C.C.'s") broadcast hoaxes rule). See, Alvarez, 567 U.S. at 734-736 (Breyer, J., concurring).

From this survey, Justice Breyer concluded that these prohibitions limit the scope of their application, by requiring proof of specific harm to identifiable victims; specifying that the lies must be made in contexts in which a tangible harm to others is especially likely to occur; or limiting the prohibited lies to those that are particularly likely to produce harm. Id. at 734. Altogether, they are narrower and more focused than the Stolen Valor Act. These features set them apart from that statute. But Article 5.14(a) is not similarly circumscribed.

To begin, the first clause 's prohibition on giving a "warning or false alarm knowing that the information is false in relation to the imminent occurrence of a catastrophe in Puerto Rico" applies to speech made at any time during the period covered by an executive order, in any place, not just in public, including in whispered conversations within a home. Much like the Stolen Valor Act, this broad sweep is at odds with the First Amendment. Besides, it fails as being impermissibly underinclusive.

On its face, the first clause prohibits stating that a catastrophe is about to occur but not falsely reassuring the public that a situation is under control (Docket No. 50, p. 20). The distinction is unsustainable, considering that it exempts speech that potentially creates just as much of a threat to public safety as false alarms, and the Government did not show that restricting false speech as to catastrophes was necessary to support its interests but that allowing

35

false assurances on the same topic was not.  See, Reed, 576 U.S. at 171-172 (ruling distinctions in sign code underinclusive, because defendant could not claim that placing strict limits on temporary directional signs was necessary to beautify the town while at the same time allowing unlimited numbers of other types of signs that created the same problems; and town did not show that limiting temporary directional signs was necessary to eliminate threats to traffic safety but that limiting other types of signs was not); Ent. Merch. Ass'n, 564 U.S. at 802 (finding regulation underinclusive when judged against its asserted justification, which in the Court's view, was alone enough to defeat it.  To that end, "California … singled out the purveyors of video games for disfavored treatment- at least when compared to booksellers, cartoonists, and move producers – and has given no persuasive reason why).[24]

The second clause is more focused than the first, albeit not enough, for it is not bound by the limits that Justices Kennedy and Breyer identified in the falsehood statutes referred to above or by the common law doctrines and statutes that Justice Breyer mentioned but that Justice Kennedy did not.  In this review, Justice Breyer found in trademark infringement the closest analogy to the Stolen Valor Act.[25]  See, Alvarez, 567 U.S. at 735 (Justice Breyer, concurring). The closest analogies to Article 5.14(a) may be found in 18 U.S.C. § 1038(a) and in the F.C.C.'s broadcast hoaxes rule.

---

[24] Underinclusiveness "raises serious doubts about whether the government is in fact pursuing the interest it invokes."  Ent. Merch. Ass'n., 564 U.S. at 802, and suggests or confirms that the government "has not met its burden to prove" that the restriction is narrowly tailored to further a compelling interest under the First Amendment. Reed, 576 U.S. at 172.

[25] Justice Breyer observed that trademarks identify the source of a good, and infringement causes harm by causing confusion among potential customers about the source, thereby diluting the value of the mark to its owner, to customers and to the economy, and by the same token, a false claim of possession of a medal or other honor creates confusion about who is entitled to wear it, thus diluting its value to those who have earned it.  See, Alvarez, 567 U.S. at 735 (Breyer, J., concurring)(discussing topic).

Section 1038 prohibits engaging in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and the information indicates that an activity has taken, is taking, or will take place that would constitute a violation of certain enumerated statutes dealing with, among other things, destruction of aircraft and motor vehicles, biological and chemical weapons, improper use of explosives, improper use of firearms, destruction of shipping vessels, acts of terrorism, sabotage of nuclear facilities, and aircraft piracy. See, 18 U.S.C. § 1038(a). Such hoaxes are designed to instill fear in the public or other target and pose a serious threat to the public's safety. See, H.R. Rep. 108-505 on "Anti-Hoax Terrorism Act of 2003," at 3-4, 7 (2004)(summarizing anti-hoax prohibitions and describing how the hoaxes threaten public safety). In this context, the false statements "are very likely to bring about" the harm to be prevented. Alvarez, 567 U.S. at 735 (Justice Breyer, concurring).

The F.C.C.'s broadcast hoaxes rule provides that no licensee or permittee of any broadcast station shall broadcast false information concerning a crime or a catastrophe if: (1) the licensee knows this information is false; (2) it is foreseeable that broadcast of the information will cause substantial public harm; and (3) broadcast of the information does in fact directly cause substantial public harm. See, 47 C.F.R. § 73.1217 (so providing). For purposes of this rule, "public harm" must begin immediately, and cause direct and actual damage to property or to the health and safety of the general public, or diversion of law enforcement or other public health and safety authorities from their duties. Id. The public harm will be deemed foreseeable if the licensee could expect with a significant degree of certainty that public harm would occur. Meanwhile, a "catastrophe" is a disaster or imminent disaster involving a violent or sudden event affecting the public. Id.

Contrary to Section 1038(a) and the F.C.C.'s broadcast hoaxes rule, which identify the events to which the false report must refer, the second clause is open-ended, prohibiting dissemination in a variety of ways of a notice or a false alarm knowing that the information is false if it puts life, health, bodily or safety of one or more person(s) at imminent risk or endangers public or private property.  But it is silent as to the content of the alarm or notice.  In other words, it leaves people wondering, a notice or false alarm of what?  Furthermore, it does not require that speech be likely to result in injury or damages and that such harm be imminent, that is, begin immediately after the speech.[26]  The Government did not show why a narrower statute would be insufficient to protect its interests.  The level of generality hinders Article 5.14(a)'s ability to fall into one of the historical categories in which false speech has been held unprotected by the First Amendment.

The Government alleges that Article 5.14(a) is more narrowly tailored than the Stolen Valor Act because it proscribes the deceit of unscrupulous persons that knowingly disseminate false alarms of the imminent occurrence of a catastrophe in Puerto Rico during states of emergency with the intention to wreak chaos among the population (Docket No. 62, p. 26). Whatever else may be said about the Government's characterization of the provision, the

---

[26] On the last point, consider the scenario where: (1) Person A writes on social media that contrary to what the government announced, it is safe to swim on a beach; (2) Person B reads the message, decides to go to that beach, eventually gets there, and upon arrival dives into the ocean to swim.  So doing, he has put his life at imminent risk of harm.  That risk, however, has not come about immediately after the speech, for imminence does not simply mean "a tendency to lead to."  Hess v. Indiana, 414 U.S. 105, 109 (1973).  Instead, as the F.C.C.'s broadcast hoaxes rule states, it calls for an immediate result, not that at some point that result has come about.  See, WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH (3rd ed.)(defining imminent as likely to happen without delay); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed.)(defining imminent as about to occur).  Imminence of harm is not unknown in the realm of the First Amendment.  See, Brandenburg v. Ohio, 395 U.S. 444, 447 (1969)(speech advocating use of force or illegal act can only be proscribed if: (1) it is "directed to inciting or producing imminent lawless action" –a requirement of intent; and (2) the statement is "likely to incite or produce such action.").  Correspondingly, the requirement is found in, among other provisions, Section 250.3 of the Model Penal Code, which proscribes false reports or warnings of impending bombings or other crimes or catastrophes.

Legislature did not write the statute that way, and the court will not "revisit that choice." Consumer Data Indus. Ass'n v. Frey, 26 F.4th 1, 9 (1st Cir. 2022).[27]  As noted above, the only intent that Article 5.14(a) requires is in uttering a falsehood.  In that scenario, knowledge of falsehood alone would subject the speaker to criminal liability even though there was no likelihood that harm would result from the speech or that such harm be imminent.  As Tompros, supra at 103, have noted, such broad criminal liability "flies in the face of Alvarez."

The Government invokes Justice Holmes' observation in Schenck v. U.S., 249 U.S. 47, 52 (1919), to the effect that "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic" (Docket No. 62, p. 21).  It suggests the same formulation applies here because Article 5.14(a) deals with falsehoods and the power of the government to punish such speech involves careful consideration of proximity and degree of the harm.  Id. at 21-22.  The falsehood that Justice Holmes has in mind connects very closely, directly, and foreseeably to a highly particularized material harm.  But as discussed earlier, that is not the case with Article 5.14(a)

The Government argues that Article 5.14(a) is constitutional because the plurality in Alvarez noted that statutes that prohibit false speech in order to protect the integrity of Government processes and maintain the general good repute and dignity of government service itself were permissible (Docket No. 62, pp. 25-26).  While Justice Breyer's concurring opinion noted that those kinds of statutes were a constitutional restriction on speech, all things considered, the argument is not persuasive.

---

[27] A court should not rewrite a law to conform it to constitutional requirements, for doing so "would constitute a serious invasion of the legislative domain." U.S. v. Stevens, 559 U.S. 460, 481 (2010).

First, the plurality and Justice Breyer were referring to the criminal prohibition against impersonating a government officer.  See, Alvarez, 567 U.S. at 721 (plurality) & 735 (Justice Breyer, concurring).  Nowhere does Article 5.14(a) include or is limited to that modality of falsehood, even though the Legislature could easily have inserted it in the statute.  When legislators do not adopt obvious alternative language, "the natural implication is that they did not intend the alternative."  Consumer Data Indus. Ass'n, 26 F.4th at 8 (quoting Advoc. Health Care Network v. Stapleton, 581 U.S. 468, 477 (2017)).

Second, the plurality and Justice Breyer referred to the prohibition on false impersonation to explain why, in contrast to the Stolen Valor Act, it operated as a constitutionally permissible restriction.  In that sense, the prohibition was both narrower and more pointed than the Stolen Valor Act.  See, Alvarez, 567 U.S. at 721 (plurality)(describing the prohibitions under evaluation, including the one on false impersonation, as targeted prohibitions) & 734 (Justice Breyer, concurring)(noting that those prohibitions tended to be narrower that the Stolen Valor Act).  For that reason, the rationale the Justices put forward to explain the validity of the false impersonation statute does not have standalone relevance.  It cannot be dissociated from the prohibition to which it refers.[28]

---

[28] Professor Norton, supra, makes the point that prohibitions on falsely representing that one speaks on behalf of the government or from falsely impersonating a government official address the harms that those lies generate in creating "doubt in the public's mind about who speaks for the government and thus whether purported government officials can be trusted."  Id. at 195.  Similarly, Professors Chen and Marceau (Chen, supra), observe that "because government actors have the imprimatur of official authority, misrepresenting oneself as having such authority presents special dangers to third parties, who believe they are dealing with, and may yield to, one who has the backing and authority of the State."  Id. at 1446.  These are harms directly tied to those prohibitions, not harms isolated from them.  Beyond this, contrary to what the Government has asserted, it could not, consistently with the First Amendment, mandate or require expression from the public to, inter alia, maintain the general good repute of government.  While the State may at times prescribe what shall be orthodox in commercial advertising by requiring the dissemination of purely factual and uncontroversial information, outside that context "it may not compel affirmance of a belief with which the speaker disagrees."  Hurley, 515 U.S. at 573.  Government action "that stifles speech on account of its message, or that requires an utterance of a particular message favored by the Government," contravenes the First Amendment.  Turner Broad. Sys., Inc., 512 U.S. at 641.  As Justice Jackson stated in W. Va

Third, as Justice Kennedy remarked in the plurality, "a rule designed to tolerate certain speech ought not blossom to become a rationale for a rule restricting it." Alvarez, 567 U.S. at 720. Yet, that is what the Government attempts to do here, turning the explanation for the prohibition on false impersonation into a tool to criminalize, and hence, to restrict speech. And as Justice Breyer expressed, "forbidding impersonation of a public official typically focus on *acts* of impersonation, not mere speech." Id. at 735 (emphasis in original). Unlike with false impersonation, Article 5.14(a) focuses not on acts, but on speech. It does not criminalize the act of intentionally putting life, health, bodily integrity, or safety at imminent risk or of endangering private or public property after the Governor has decreed an emergency or disaster by executive order. Thus, the false impersonation statute does not serve to sustain the Article's restriction but to confirm that it is constitutionally untenable.

The Government posits that Article 5.14(a) proscribes conduct with an expressive element as distinct from pure speech, and therefore, the correct standard is intermediate scrutiny, under which, based on O'Brien, 391 U.S. at 367, the Government contends that the Article is valid (Docket No. 62, p. 26). The Government is wrong, for on its face, the provision directly targets and criminalizes speech; speech with which it disagrees. Compare this case with Turner Broad. Sys., Inc., 512 U.S. at 647, where the Supreme Court held that cable television must-carry rules were not content-based because they did not require or prohibit the carriage of particular ideas or points of view and did not penalize cable operators or programmers because of the

State Bd. of Educ. v. Barnette, 319 U.S. 624 (1943), "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by work of act their faith therein." Id. at 642. The Government's interest in promoting state pride falls under that category. See, Wooley v. Maynard, 430 U.S. 705, 716 (1977)(state cannot require people to display state motto on license plates even though part of its interest was to promote state pride, as it had other ways of serving that interest).

content of their programming, exactly the opposite of what Article 5.14(a) does with speakers subject to it. And a content-based restriction on speech is "outside of O'Brien's test altogether." Johnson, 491 U.S. at 410.[29]

Even so, the Government's reference to intermediate scrutiny is unavailing. As discussed earlier, Article 5.14(a) fails not only strict or exacting scrutiny but what Justice Breyer referred to as intermediate scrutiny. Justice Breyer's remark about the Stolen Valor Act is apt here: "the statute as written risks significant First Amendment harm." Alvarez, 567 U.S. at 737 (Breyer, J., concurring). As drafted, it "fails intermediate scrutiny, and so violates the First Amendment." Id. at 739.

### c. *Finishing Remarks.*

The three opinions in Alvarez essentially construed the Stolen Valor Act as applying only to false statements of fact. See, Alvarez, 567 U.S. at 715 (plurality)("Respondent's claim to hold the Congressional Medal of Honor was false. There is no room to argue about interpretation or shades of meaning"); at 732 ("I would read the statute favorably to the Government as criminalizing only false factual statements made with knowledge of their falsity and with the intent that they be taken as true")(Justice Breyer, concurring); and at 740 ("First, the [Stolen Valor] Act applies to only a narrow category of false representations about objective facts that can almost always be proved or disproved with near certainty. Second, the Act concerns facts that are squarely within the speaker's personal knowledge. Third . . . a conviction under the Act requires proof beyond a reasonable doubt that the speaker actually knew that the representation

---

[29] See also, Reno v. American Civil Liberties Union, 521 U.S. 844, 870 (1997)(a "time, place and manner" analysis would be inapplicable to evaluate statute that regulates speech on the basis of its content).

was false.  Fourth, the Act applies only to statements that could reasonably be interpreted as communicating actual facts")(Justice Alito, dissenting).

The Justices' views underpin an important principle.  As Professor Norton, <u>supra</u>, has noted, objectivity of information "makes it subject to official review without fear of partisan overreaching by the state."  <u>Id</u>. at p. 183 n. 99 (<u>citing</u> Nat Stern, *Implications of Libel Doctrine for Nondefamatory Falsehoods under the First Amendment,* 10 First Amend. L. Rev. 465, 503 (2012)).  Thus, limiting the prohibition to what is factually false lessens "the risk of erroneous liability findings, and thus, ameliorates chilling-effect concerns as well as the danger that the government will engage in partisan abuse or selective enforcement."  <u>Id</u>. at 183.[30]  Conversely, there is no such limitation in Article 5.14(a), and the court will not read one into it.  Courts must be vigilant to ensure the First Amendment is not weakened during periods of declared emergencies.  The watchdog function of speech is never more vital than during a large-scale crisis.

Lastly, Justice Kennedy and Justice Alito pointed out in <u>Alvarez</u> that the prohibition set in the Stolen Valor Act does not apply to theatrical or dramatic performances.  <u>See</u>, <u>Alvarez</u>, 567 U.S. at 722 (plurality); 740 & n. 2 (Justice Alito, dissenting).  Article 5.14(a) does not exempt these performances.  For the same reason the court does not construe the statute to include a factual falsehood requirement, it will not read into it an exemption for dramatic performances.

---

[30] Identifying a fact responds to a practical, not an abstract, metaphysical, or normative judgment.  As Justice Kennedy pointed out, there should be no room to argue about interpretations or shades of meaning.  And as Justice Alito expressed, the statute should only apply to a narrow category of false representations about objective facts that can almost always be proved or disproved with near certainty.  These standards may be difficult to meet in rapidly evolving scenarios where there may be conflicting information about what constitutes the objective facts of a situation.

43

>    d. *Facial Attack.*

Plaintiffs challenge Article 5.14(a) on its face.  To succeed on a typical facial attack, they must establish "that no set of circumstances exists" under which the statute would be valid; that the statute "lacks any plainly legitimate sweep;" or that "a substantial number of its applications are unconstitutional judged in relation to the statute's plainly legitimate sweep."  <u>Stevens</u>, 559 U.S. at 472-473 (internal citations omitted).  By all of these parameters, plaintiffs have succeeded.  As discussed above, Article 5.14(a) cannot be enforced consistently with the First Amendment.

>    e. *Effect of Ruling.*

This ruling does not affect the remaining provisions of Law 20 of 2017 and of Law 66 of 2020, which as stated earlier, amended Article 5.14(a).  To this effect, Section 2 of Law 66 of 2020 provides that if any cause, paragraph, sentence, word, letter, article, layout, section, subsection, title, in their collective "a part" of that law be annulled or declared unconstitutional, the decision, opinion or judgment given to that effect shall not affect, prejudice or invalidate the rest of the law, the effect of the judgment being limited only to the part which has thus been annulled or declared unconstitutional (Docket No. 45-1, p. 3).  The remaining provisions stand on their own.  In consequence, this ruling is limited to Article 5.14(a).

## V.    <u>CONCLUSION</u>

For the reasons stated, plaintiffs are entitled to prevail as a matter of law.  Therefore, judgment shall issue prohibiting enforcement of Article 5.14(a) of Law 20.[31]

---

[31] The Clerk shall withdraw Inés del C. Carrau-Martínez as party and substitute current Commissioner of the Puerto Rico Police Department Antonio López-Figueroa for Henry Escalera.

44

**SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2023.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge

# Appendix I

P.R. Government Websites and Social Media Accounts[1]:

1. Puerto Rico Emergency Portal System
   a. preps.pr.gov
2. Governor's Mansion
   a. Website (fortaleza.pr.gov)
      i. fortaleza.pr.gov/ordenes-ejecutivas
   b. Facebook (facebook.com/LaFortalezadePR)
   c. Instagram (@fortalezapr)
3. Governor Pedro Pierluisi
   a. Facebook (facebook.com/govpierluisi)
   b. Official Twitter Account of the Governor (@GovPierluisi)
   c. Instagram (@pedropierluisi)
4. Department of Public Safety
   a. Website (https://www.dsp.pr.gov/)
   b. Facebook (https://www.facebook.com/DSPnoticias/)
   c. Twitter (@DSPnoticias)
5. Bureau for Emergency and Disaster Management
   a. Website (manejodeemergencias.pr.gov/)
   b. Facebook (facebook.com/NMEADpr/)
   c. Twitter (@nmeadpr)
6. Puerto Rico Police Department
   a. Website (policia.pr.gov)
   b. Facebook (facebook.com/prpdgov/)
   c. Twitter (@PRPDNoticias)
   d. YouTube (@prpdgov)
7. Department of Consumer Affairs
   a. Website (daco.pr.gov)
   b. Facebook (facebook.com/DACOATUFAVOR)
   c. Twitter (@dacoatufavor)
8. Puerto Rico Ports Authority
   a. Website (prpa.pr.gov)
   b. Facebook (facebook.com/Autoridaddepuertos/)
   c. Twitter (@PuertosPR)
9. Puerto Rico Aqueduct and Sewer Authority
   a. Website (acueductospr.com)
   b. Facebook (facebook.com/Acueductospr)
   c. Twitter (@ACUEDUCTOSPR)
   d. Instagram (@acueductospr)

---

[1] This list only includes government accounts that are verified, or which are directly embedded to official government websites.

47

10. Highway and Transportation Authority
    a. Website (act.dtop.pr.gov)
11. Public Broadcasting Corp.
    a. Website (wipr.pr)
    b. Facebook (facebook.com/wiprtv)
    c. Twitter (@WIPRTV_Oficial)
    d. Instagram (@wiprtv)
12. Department of Transportation and Public Works
    a. Website (dtop.pr.gov)
    b. Facebook (facebook.com/dtop)
    c. Twitter (@DTOP)
    d. YouTube (@DTOPOFICIAL)
13. Department of Health
    a. Website (salud.gov.pr)
    b. Facebook (facebook.com/desaludpr]
    c. Twitter (@desaludpr)
    d. Instagram (@desaludpr)
    e. YouTube: (@DeptSaludPR)
14. Bureau of the Puerto Rico Medical Emergency Corps
    a. Website (cempr.pr.gov)
    b. Facebook (facebook.com/Negociado-del-Cuerpo-de-Emergencias-Médicas-662707940436708)
    c. Twitter (@CEMPRESTATAL)
15. Puerto Rico Firefighters Corps
    a. Website (bomberos.pr.gov)
    b. Facebook (facebook.com/BomberosdePR)
16. Department of Natural and Environmental Resources
    a. Website (drna.pr.gov)
    b. Facebook (facebook.com/drnapr)
    c. Twitter (@DRNAGPR)
17. Puerto Rico Electric Power Authority
    a. Website (aeepr.com)
    b. Facebook (facebook.com/aeepronline/)
    c. Twitter (@AEEONLINE)
    d. Instagram (@aeeonline)
18. Department of Agriculture
    a. Website (agricultura.pr)
    b. Facebook (facebook.com/agriculturapr)
    c. Twitter (@DptoAgricultura)
    d. Instagram (@dptoagricultura)
19. Department of Education
    a. Website (de.pr.gov)

48

    b. Facebook (facebook.com/EDUCACIONPR)

    c. Twitter (@EDUCACIONPR)

20. Puerto Rico Seismic Network

    a. Website (redsismica.uprm.edu)

    b. Facebook (facebook.com/redsismicadepuertorico)

    c. Twitter (@redsismica)

    d. YouTube (@redsismicapr)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

SANDRA RODRÍGUEZ-COTTO, **ET AL.**,

      **Plaintiffs,**

      **v.**

                  **CIVIL NO. 20-1235 (PAD)**

PEDRO R. PIERLUISI-URRUTIA, **ET AL.**,

      **Defendants.**

## JUDGMENT

In accordance with the Opinion and Order issued today (Docket No. 92), judgment is entered as follows.

Pedro R. Pierluisi-Urrutia, in his capacity as governor of the Commonwealth of Puerto Rico; Domingo Emanuelli-Hernández, in his capacity as Secretary of the Department of Justice of Puerto Rico; Alexis Torres, in his capacity as Secretary of the Department of Public Safety of Puerto Rico; and Antonio López-Figueroa, in his capacity as Commissioner of the Puerto Rico Police Department, are permanently enjoined from enforcing Article 5.14(a) of the Law of the Puerto Rico Department of Public Safety, Law No. 20 of 2017, P.R. Laws Ann. Tit. 25 §§ 3501, et seq.

This case is now closed for statistical purposes.

**SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2023.

                             s/Pedro A. Delgado-Hernández
                             PEDRO A. DELGADO-HERNÁNDEZ
                             United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

SANDRA RODRÍGUEZ-COTTO, <u>ET
AL.</u>,

      Plaintiffs,

          v.

PEDRO R. PIERLUISI-URRUTIA, <u>ET
AL.</u>,

      Defendants.

**CIVIL NO. 20-1235 (PAD)**

## ERRATA SHEET

The Opinion and Order issued on March 31st, 2023, at Docket No. 92, is amended *nunc pro tunc*, as follows:

- Page 18, last paragraph: Replace "In the end," with "As Judge Selya observed in <u>Gardner</u>." And, add beginning double quotation mark after the word "when."

- Page 19, first line: Add ending double quotation mark after the word "considered." Add "99 F.3d at 13" after the word "considered." And, delete the beginning and ending double quotation marks from the phrase "attends the threat of enforcement."

- Page 19, second line: Replace "<u>Gardner</u>, 99 F.3d at 13." with "<u>Id</u>."

- Page 19, fourth line: Replace "<u>Id</u>. at 14." with "<u>Id</u>. at 13-14."

- Page 34, second line: Add "and other means of communication" after the word "platforms."

A revised Opinion and Order incorporating these changes is attached.

51

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

SANDRA RODRÍGUEZ-COTTO, <u>ET AL.</u>,

      **Plaintiffs,**

      **v.**

PEDRO R. PIERLUISI-URRUTIA, <u>ET AL.</u>,

      **Defendants.**

               **CIVIL NO. 20-1235 (PAD)**

## OPINION AND ORDER

Delgado-Hernández, District Judge

This is a pre-enforcement action by journalists Sandra Rodríguez-Cotto and Rafelli González-Cotto to enjoin, under the First Amendment, Article 5.14(a) of the Law of the Puerto Rico Department of Public Safety, Law No. 20 of 2017, P.R. Laws Ann. tit. 25, §§ 3501, <u>et seq.</u> ("Law 20"), which criminalizes some types of speech after the Governor has decreed a state of emergency or disaster in the Commonwealth.[1] For the reasons explained below, the challenged provision cannot be enforced. As drafted, it does not pass muster under the First Amendment.

## I.     <u>BACKGROUND</u>

Law 20 creates the Puerto Rico Department of Public Safety. <u>See</u>, P.R. Laws Ann. tit., 25 § 3503. It addresses various organizational and functional aspects of the Department's operation and includes a proviso related to states of emergency, catastrophes, and disasters. <u>Id</u>. at § 3654. To this end, as originally enacted as part of Law 20, Article 5.14(a) made it a crime to

---

[1] The "Amended Complaint for Declaratory and Injunctive Relief" ("Amended Complaint") refers to Article 6.14 of Law 20 (Docket No. 47). After plaintiffs initiated the action, Law No. 135 of 2020 amended Law 20, re-enumerating Chapters 5 to 9 of that statute. <u>See</u>, P.R. Laws Ann. tit. 25, § 3654. As a result, Article 6.14 was renumbered as Article 5.14. To avoid confusion, the court refers to Article 5.14, not to Article 6.14.

raise a false alarm in relation to the imminent occurrence of a catastrophe in Puerto Rico or, if there was a declared state of emergency or disaster, to spread rumors or raise a false alarm regarding non-existing abnormalities. See, Docket No. 24-1.  On April 6, 2020, the Legislature amended Article 5.14 to add paragraph (f), which made it a crime to transmit or allow another person to transmit by any means, through any social network or mass media, false information with the intention of creating confusion, panic or collective public hysteria, regarding any proclamation or executive order decreeing a state of emergency, disaster or curfew.  Id. Plaintiffs challenged these provisions, essentially alleging that they were overbroad and imposed an impermissible content-based restriction on speech. See, Docket No. 47.

While the challenge was pending, in July 2020, the Legislature amended Article 5.14 to eliminate paragraph (f) and amend paragraph (a) to make it a criminal offense for any person, natural or legal, who, after the Governor of Puerto Rico has decreed by executive order a state of emergency or disaster, to purposely, knowingly or recklessly: (1) give a warning or false alarm, knowing that the information is false, in relation to the imminent occurrence of a catastrophe in Puerto Rico; or (2) disseminate, publish, transmit, transfer or circulate through any means of communication, including the media, social networks, or any other means of dissemination, publication or distribution of information, a notice or a false alarm, knowing that the information is false, when as a result of such conduct, the life, health, bodily integrity or safety of one or more persons are put at imminent risk or public or private property are endangered. See, Law No. 66 of 2020 ("Law 66") (Docket No. 45-1, p. 2).  A person found guilty of violating this provision commits a misdemeanor with a penalty of up to six months of imprisonment, a fine of not more than $5,000.00 dollars, or both penalties, at the discretion of the court.  Id. Nonetheless, the speech is considered a felony, carrying an imprisonment term of three years, if

the notice or false alarm results in damages exceeding $10,000.00 to the public purse, third parties, or public or private property, or the conduct results in injury or physical harm to another person. Id.

Article 5.14(a) derives from Article 20 of the Commonwealth of Puerto Rico Emergency Management and Disaster Administration Act, Law No. 211 of 1999, P.R. Laws Ann. tit. 25, § 172r ("Law 211"), which in turn originated in Article 26 of the Law for Civil Defense of Puerto Rico, Law No. 22 of 1976, P.R. Laws Ann. tit. 25, § 171 ("Law 22"). Law 20 repealed Law 211, and Law 211 repealed Law 22. See, P.R. Laws Ann. tit. 25, §§ 171-172 (2022 Supp.). Among other things, Article 20 of Law 211 made it a misdemeanor to raise "a false alarm with respect to the imminent occurrence of a catastrophe in Puerto Rico or spreading rumors or raising a false alarm regarding non-existing abnormalities under a state of emergency or disaster." P.R. Laws Ann. tit. 25, § 172r(b). As for Article 26 of Law 22, it penalized as a misdemeanor giving a "false alarm with regard to the imminent occurrence of a catastrophe in Puerto Rico, or there existing already a state of emergency or disaster, spreads rumors or gives false alarms on nonexisting abnormalities." P.R. Laws Ann. tit. 25, § 171y (1976).

These types of provisions, generally known as false reporting statutes, are not unique to Puerto Rico. See, Louis W. Tompros, et al., *The Constitutionality of Criminalizing False Speech Made on Social Networking Sites in a Post-Alvarez, Social Media-Obsessed World*, 31 Harv. J. L. & Tech. 65, 69 (2017)("Many states have false reporting statutes that impose criminal liability on those who engage in false speech related to emergencies or natural catastrophes, regardless of the medium used to communicate that speech"). Most of those statutes derive "in part" from Section 250.3 of the American Law Institute's Model Penal Code. Tompros, supra. That Section, adopted in 1962, states:

54

> A person is guilty of a misdemeanor if he initiates or circulates a report or warning of an impending bombing or other crime or catastrophe, knowing that the report or warning is false or baseless and that it is likely to cause evacuation of a building, place of assembly, or facility of public transport, or to cause public inconvenience or alarm.

See, MODEL PENAL CODE § 250.3 (AM. LAW INST. 1980).[2]

## II.   PROCEDURAL EVENTS

On May 20, 2020, plaintiffs filed a "Complaint for Declaratory and Injunctive Relief" against the Governor, the Secretary of Justice, the Secretary of Public Safety, and the Police Commissioner of Puerto Rico (collectively, the "Government"), challenging under the First Amendment Articles 5.14(a) and (f) of Law 20, as amended by Law 66 (Docket No. 1).  On May 22, 2020, plaintiffs moved for preliminary injunctive relief (Docket No. 4).  On June 5, 2020, the Government opposed the motion (Docket No. 13).  On June 10, 2020, plaintiffs replied (Docket No. 16).  On June 15, 2020, the Government sur-replied (Docket No. 19).

On June 16, 22 and 23, and July 1, 2020, the court conducted teleconferences to discuss various litigation-related issues with counsel (Docket Nos. 21, 25, 28, and 30).  On June 16, 2020, it ordered the parties to submit briefs on whether the anticipated amendments to Article 5.14 would moot the action (Docket No. 21).  On June 23, 2020, plaintiffs filed a supplemental memorandum regarding the legislative bill, arguing that the contemplated changes would be unconstitutional (Docket No. 29).  The same day, the Government presented its brief, asserting in

---

[2] A previous version read: "A person commits a misdemeanor if he initiates or circulates a report or warning of an impending bombing or other crime or catastrophe, if the actor knows that the report or warning is false or baseless and that it its likely to cause evacuation of a building, place of assembly, or facility of public transport, or to cause other serious inconvenience."  MODEL PENAL CODE § 250.8 (AM. LAW INST., Tentative Draft No. 13, 1961).  The last two words in the current version, "or alarm," were added to make sure that the offense includes false alarms in situations where evacuation is not possible, as in a false bomb scare in a "mid-Atlantic flight."  MODEL PENAL CODE § 250.3 cmt. 2 (AM. LAW INST. 1980).

the main that the proposed modifications would be substantial enough to moot the case (Docket No. 30).

On July 13, 2020, the legislative bill was enacted as Law 66 (Docket Nos. 35, p. 2; 45-1). On July 29, 2020, plaintiffs filed the Amended Complaint for declaratory and injunctive relief, challenging the constitutionality of Article 5.14(a), as amended by Law 66 (Docket No. 47), and renewed their request for a preliminary injunction (Docket No. 48). On August 13, 2020, PEN America Center, Inc., and the University of Georgia School of Law's First Amendment Clinic, moved for leave to file a brief as *amici curiae* in support of plaintiffs' renewed motion for preliminary injunction (Docket No. 53), which the court granted over the Government's opposition (Dockets Nos. 56, 59, and 60). On August 21, 2020, the Government opposed plaintiff's renewed motion for preliminary injunction (Docket No. 62). On August 28, 2020, plaintiffs replied to the Government's opposition (Docket No. 70). On September 9, 2020, the Government sur-replied to plaintiffs' reply (Docket No. 74).

Given that a renewed motion for preliminary injunction had been filed, on February 12, 2021, the court denied without prejudice plaintiffs' initial motion for preliminary injunction, (Docket No. 84). After reviewing the record, on July 5, 2022, the court expressed it was persuaded that the preliminary injunction phase should be consolidated with the request for permanent injunctive relief; ordered the parties to inform by July 19, 2022, if the court should consider special measures for consolidation; and provided that by that same date, the parties could supplement their brief on issues awaiting disposition (Docket No. 86). In response, the parties indicated that no special measures were needed for consolidation (Docket Nos. 87 and 88). Accordingly, on July 21, 2022, the court consolidated the preliminary and permanent relief

56

phases for disposition (Docket No. 91).  Given that no supplemental briefs were filed, the case is ripe for disposition.

### III.   FACTUAL CONTEXT[3]

On September 18, 2017, then-Governor Rosselló-Nevares declared a state of emergency due to the devastation caused by Hurricane María (Docket No. 23, p. 1).  On January 7, 2020, then-Governor Vázquez-Garced declared a state of emergency due to the devastation caused by an earthquake.  Id.  On March 12, 2020, she declared a state of emergency due to the COVID-19 pandemic.  Id. at p. 2.  In late March 2020, the Commonwealth charged Pastor José Luis Rivera-Santiago under Article 5.14 of Law 20, in effect at that time, for allegedly creating a false alarm over the WhatsApp messaging platform.  Id.  On May 7, 2020, the charges were dismissed.  Id. at p. 3.

Throughout their journalism career, plaintiffs have published numerous articles or participated in panels discussing states of emergencies in Puerto Rico.  Id. at pp. 3-5.  Ms. Rodríguez-Cotto is an independent journalist with over 30 years of experience in the media industry in Puerto Rico, the United States and Latin America (Docket No. 4-1, p. 1).  She currently hosts a radio program and has a blog where she features her own reporting and political analysis.  Id. at pp. 1-2.[4]  She has averred a continuing intent to engage in investigative reporting, which often focuses on emergencies in Puerto Rico.  Id. at p. 6.  Her current reporting focuses on the public health emergency caused by COVID-19, as well as the government's response to that crisis (Docket No. 48-1, p. 1).

---

[3] This Section is based on the parties' factual stipulations (Docket No. 55-1) and plaintiffs' verified statements under penalty of perjury (Docket Nos. 4-1 and 4-2).

[4] The blog is online at https://enblancoynegromedia.blogspot.com/.

Ms. Rodríguez-Cotto has expressed a serious concern of being targeted for prosecution under Article 5.14(a) (Docket No. 4-1, p. 6).  While she makes every effort to confirm the veracity of her reporting, she is worried of sometimes inadvertently publishing a story with inaccuracies, particularly when working on fast-developing stories about public emergencies.  Id.  She points out that the government might dispute the accuracy of her reporting even when she might not have reported falsities, as it occurred to her in the past while reporting on the death toll caused by Hurricane Maria.  Id.  Moreover, Ms. Rodríguez-Cotto has asserted that the fear of prosecution has chilled her own reporting and commentary, and her sources have refrained from sharing information with her due to the same fear.  Id. at pp. 6-7.

Mr. González-Cotto is an independent journalist with over 10 years of experience in the media industry in Puerto Rico (Docket No. 4-2, p. 1).  He has also reported about government actions and, more recently, about the COVID-19 pandemic and the government's response to it.  Id. at p. 2; Docket No. 48-2, p. 1.  He has expressed fear of prosecution under Article 5.14(a) of Law 20 due to his continuing reporting about emergency conditions in Puerto Rico (Docket Nos. 4-2, p. 3; 48-2, pp. 1-2).  Like Ms. Rodríguez-Cotto, Mr. González-Cotto has acknowledged the possibility of inadvertently publishing stories with inaccurate information, or with facts that could be disputed by the government (Docket Nos. 4-2, p. 4; 48-2, p. 3).  He has stated that his fear of prosecution has chilled his own reporting, as well as his sources.  Id.

## IV.     DISCUSSION

### A.  Introduction.

The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits laws that abridge freedom of speech and of the press.  U.S. Const., amend. 1.[5]  Even though Puerto Rico is not a state, the prohibition applies here.  See, Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico, 478 U.S. 328, 331 & n. 1 (1986)(so recognizing); Pérez-Guzmán v. Gracia, 346 F.3d 229, 232 n. 1 (1st Cir. 2003)(considering Puerto Rico the functional equivalent of a state for First Amendment purposes).  Along this line, freedom of speech serves and promotes various values and objectives, including self-government; the discovery and dissemination of truth; and individual autonomy, self-expression and self-fulfillment.  See, KATHLEEN M. SULLIVAN & GERALD GUNTHER, CONSTITUTIONAL LAW 744 (16th ed. 2007)(discussing topic); Steven G. Gey, *The First Amendment and the Dissemination of Socially Worthless Untruths*, 36 Fla. St. U. L. Rev. 1, 6 (2008)(similar); Thomas I. Emerson, *Toward a General Theory of the First Amendment*, 72 Yale L.J. 877, 878-879 (1963)(same).[6]

Given the First Amendment's importance to the polity, the protection that it accords is not limited to spoken, written, and printed words.  Rather, it extends to other categories of expression like: (1) pictures; films; drawings; paintings; engravings; and music (see, Bery v. City of New York, 97 F.3d 689, 694 (2nd Cir. 1996)(listing categories)); (2) symbolic speech, specifically, conduct intended to be communicative and that, in context, would reasonably be

---

[5] The court assumes that freedom of speech and freedom of the press lead to the same result in this case.

[6] For additional discussion of the same subject matter, see, ERWIN CHEMERINSKY, CONSTITUTIONAL LAW PRINCIPLES AND POLICIES 954-958 (4th ed. 2011); JOHN E. NOWAK & RONALD D. ROTUNDA, CONSTITUTIONAL LAW 1147-1149 (7th ed. 2004); LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 785-789 (2nd ed. 1988).

understood by the viewer to be communicative (see, e.g., Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 568-569 (1995)(parades); Texas v. Johnson, 491 U.S. 397, 399, 420 (1987)(burning United States flag as a means of political protest); Tinker v. Des Moines Indep. Community Sch. District, 393 U.S. 503, 505 (1969)(wearing armband to protest against United States' involvement in Vietnam War); Muchmore's Cafe, LLC v. City of New York, 2016 WL 11469539, *12 (E.D.N.Y. Sept. 29, 2016)(ballet and other expressions of performance dancing)); (3) "contribution and expenditure" of money to finance campaigns for political office, Buckley v. Valeo, 424 U.S. 1, 13-23 (1976); (4) "video games," Brown v. Ent. Merchants Ass'n, 564 U.S. 786, 790 (2011); and (5) "posting of information online." State v. Bishop, 787 S.E.2d 814, 818 (N.C. 2016).[7]  Despite its vast and privileged sphere, the First Amendment does not give "absolute protection to every individual to speak whenever or wherever he pleases or to use any form of addresses in any circumstances that he chooses." Cohen v. California, 403 U.S. 15, 19 (1971).  As discussed below, it permits governmental regulation of speech subject to different degrees of judicial scrutiny.

**B.  Standing.**

The Government claims plaintiffs lack standing to bring this action (Docket No. 62, pp. 5-15 and 37).  Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const., art. III, § 2.  The standing doctrine "gives meaning to these constitutional limits."  Susan B. Anthony List v. Driehaus ("SBA List"), 573 U.S. 149, 157 (2014.  The doctrine was developed "to ensure that federal courts do not exceed their authority as it has been traditionally understood," restricting the category of litigants empowered to

---

[7] As well, "[c]omputer code and computer programs constructed from code can constitute speech warranting First Amendment protection."  CDK Global LLC v. Brnovich, 461 F.Supp.3d 906, 925 (D. Ariz. 2020).  Robert Plotkin, *Fighting Keywords: Translating the First Amendment to Protect Software Speech*, 2003 U. Ill. J.L. Tech & Pol'y 329 (2003), discusses a number of issues raised by these means of communication.

60

maintain a lawsuit in federal court to seek redress for a legal wrong. <u>Spokeo, Inc.</u> v. <u>Robins</u>, 578 U.S. 330, 338 (2016). As applied, it has "constitutional" and "prudential" dimensions. <u>Mangual</u> v. <u>Rotger-Sabat</u>, 317 F.3d 45, 56 (1st Cir. 2003).

    1. <u>Constitutional Dimension</u>.

To establish Article III standing a plaintiff must show: (1) an "injury in fact," (2) fairly traceable to the challenged conduct, and (3) likely to be redressed by a favorable judicial decision. <u>Lujan</u> v. <u>Defenders of Wildlife</u>, 504 U.S. 555, 560-561 (1992). The party invoking federal jurisdiction "bears the burden of establishing these elements." <u>FW/PBS, Inc.</u> v. <u>City of Dallas</u>, 493 U.S. 215, 231 (1990). The only debatable question regarding plaintiffs' Article III standing involves the first element of the equation, that is, whether they have suffered an injury in fact, for there is a causal link between the alleged injury and the challenged statute, and a favorable court decision would redress that injury.

As for that element, an injury-in-fact consists of "an invasion of a legally protected interest that is concrete and particularized, and actual or imminent, not conjectural or hypothetical." <u>Lujan</u>, 504 U.S. at 560. For an injury to be particularized, "it must affect the plaintiff in a personal and individual way." <u>Spokeo, Inc.</u>, 578 U.S. at 339. A plaintiff satisfies the injury-in-fact requirement showing "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." <u>Babbitt</u> v. <u>United Farm Workers Nat'l Union</u>, 442 U.S. 289, 298 (1979). A plaintiff's "subjective and irrational fear of prosecution" is not enough to confer standing under Article III. <u>Mangual</u>, 317 F.3d at 57. An allegation of future injury may suffice "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will

occur."  SBA List, 573 U.S. at 158 (quoting Clapper v. Amnesty Int'l. USA, 568 U.S. 398, 409

& 414 n. 5 (2013)).

### a. Constitutional Interest.

Plaintiffs' intended speech is affected with a legitimate constitutional interest, for

reporting on emergency conditions, including about the COVID-19 pandemic, constitutes speech

on matters of public concern directly implicating the First Amendment.  See, Chappel v.

Montgomery County Fire Protection District No. 1, 131 F.3d 564, 578 (6th Cir. 1997)("Speech

"on matters directly affecting the health and safety of the public is obviously a matter of public

concern").  And as the Supreme Court recognized in Snyder v. Phelps, 562 U.S. 443 (2011),

speech on public issues "occupies the highest rung of the hierarchy of First Amendment values"

entitled to special protection.  Id. at 452.

### b. Statutory Proscription.

The intended speech is arguably proscribed by the challenged statute.  Article 5.14(a)

makes it a crime to, after the Governor of Puerto Rico has decreed an emergency or disaster by

executive order, knowingly, purposely, or recklessly: (1) give a warning or false alarm, knowing

that the information is false, in relation to the imminent occurrence of a catastrophe in Puerto

Rico; or (2) disseminate, publish, transmit, transfer or circulate through any means of

communication, including the media, social networks, or any other means of dissemination,

publication or distribution of information, a notice or a false alarm, knowing that the information

is false, when as a result of that conduct, it puts the life, health, bodily integrity or safety of one

or more persons at imminent risk, or endangers public or private property (Docket No. 45-1, p.

2).  Article 5.14(a) expressly applies to speech distributed through the media and social networks

(id.), where the plaintiffs routinely broadcast their reports (Docket Nos. 4-1 and 4-2).  It does not

carve out exceptions. And, while plaintiffs have indicated that they do not intend to utter false statements, they do not have to assert otherwise to establish standing.

To illustrate, in <u>SBA List</u>, 573 U.S. 149, an advocacy group filed a pre-enforcement First Amendment challenge to a state statute that made it a crime to utter certain false statements about political candidates or public officials. The Sixth Circuit held that the plaintiff's fear of enforcement did not engender an Article III injury because it had not alleged that it planned to lie or recklessly disregard the veracity of its speech in the future, but rather maintained that the statements it intended to make were factually true. <u>Id</u>. at 156-157. The Supreme Court reversed, observing that a plaintiff who wishes to challenge the constitutionality of a law does not have to confess that he will in fact violate that law. <u>Id</u>. at 163.

As well, in <u>Babbitt</u>, 442 U.S. 289, the Supreme Court considered a pre-enforcement challenge to a statute that made it an unfair labor practice to encourage consumers to boycott an "agricultural product . . . by the use of dishonest, untruthful and deceptive publicity." <u>Id</u>. at 301 (quotations and citation omitted). The plaintiffs contended that the law unconstitutionally penalized inaccuracies inadvertently uttered in the course of consumer appeals. <u>Id</u>. The Court noted that the law on its face proscribed dishonest, untruthful, and deceptive publicity, and although plaintiffs did not plan to propagate untruths, erroneous statements were inevitable in free debate. <u>Id</u>. On this account, it concluded that plaintiffs had standing to pursue their challenge to the misrepresentation provision in question even though they had disavowed any intent to propagate untruths. <u>Id</u>.

Likewise, in <u>Speech First, Inc.</u> v. <u>Fenves</u>, 979 F.3d 319 (5th Cir. 2020), an organization advocating for free speech rights brought an action on behalf of state university students alleging that the university's policies concerning speech on its campus chilled free speech in violation of

63

the First Amendment.  Id. at 322-323, 326-327, and 330.  The District Court dismissed the case for lack of standing, ruling that plaintiff had failed to present specific evidence of the speech in which the students wished to engage, leaving the court unable to determine whether the students had an intention to engage in speech prohibited or arguably prohibited by the challenged policies.  Id. at 327.  Further, it discerned no evidence that any student had been disciplined, sanctioned, or investigated for his speech, and, thus, no credible threat of enforcement.  Id.

The Fifth Circuit reversed, noting that plaintiff's members declared that they wanted to engage in open and robust intellectual debate with fellow students on a wide array of sensitive and controversial topics involving free speech- a matter affected with a constitutional interest – but were afraid to voice their views out of fear that their speech may violate the university's policies.  Id. at 331-332.  Moreover, the Fifth Circuit observed that such constitutionally protected intended speech was arguably proscribed or at least arguably regulated by the university's speech policies, and even though a plaintiff did not intend to violate the policies, the intended speech could still be claimed to fall within the policies' regulation, e.g., of "false" statements, hence satisfying the standing inquiry.  Id. at 332 n. 10.

Similarly, in 281 Care Committee v. Arneson, 638 F.3d 621 (8th Cir. 2011), plaintiffs challenged a statue that made it a crime to knowingly or with reckless disregard for the truth make a false statement about a proposed ballot initiative.  Id. at 624.  The District Court dismissed the complaint in part because plaintiffs did not allege that they wished to engage in any conduct that would actually violate the statute.  Id. at 627-628.  The Eighth Circuit reversed, indicating that even though plaintiffs had not so alleged, they did allege that they wished to engage in conduct that could be interpreted as making false statements with reckless disregard for the truth of the statements, and that, therefore, they were reasonably concerned that state

64

officials would interpret their actions as violating the statute. Id. at 628-630. Thus, it concluded that plaintiffs had alleged injury in fact sufficient to support standing. Id. at 631.

Following the same line, reasonable speakers can accidentally engage in false speech and legitimately fear prosecution for an inadvertent inaccuracy based on an accusation that the false reporting was intentional. See, Frese v. MacDonald, 425 F.Supp.3d 64, 76 (D.N.H. 2019)("Even if Frese does not plan in the future to lie or recklessly disregard the veracity of his speech, his complaint sufficiently alleges that the State's prosecutorial arms . . . retain overly broad discretion to determine whether an individual knew his speech to be true or false"). A speaker can be concerned about being prosecuted for a careless false statement "even if he does not have the intent required to render him liable." U.S. v. Alvarez, 567 U.S. 709, 736 (2012)(Breyer, J., concurring).

People "may refrain from making statements that they *believe* to be true, for fear that the statement will turn out to be false and they will be unable to refute the government's claim that they *knew* it was false." Tompros, supra, at 107 (emphasis in original). And as most people "are frightened of violating criminal statutes," plaintiffs, as noted above, need only allege they wish to engage in activity that the challenged statute arguably covers. Majors v. Abell, 317 F.3d 719, 721 (7th Cir. 2003). [8] Plaintiffs have so shown.

---

[8] Medical, public health, and scientific knowledge rapidly evolves in times of crisis, as most recently seen in governments' response to COVID-19. During such times, there may be conflicting information about what constitutes the objective facts of a situation. Such in-flux, crisis circumstances, the setting where Article 5.14(a) applies, heighten the risk that a speaker, journalist, publisher or source will be accused of having known information to be false at the time it was communicated, even though the individual or entity did not know or made an honest mistake, or reasonable people could disagree about whether the information was actually false based on conflicting information. Although the prosecution may ultimately fail, the stressful experience of facing criminal charges and undergoing the risk, or worse, the reality of a wrongful conviction, by no means dispels the chilling effect on protected expression.

65

### c. *Risk of Prosecution.*

Plaintiffs face a credible threat of prosecution. In "assessing the risk of prosecution as to particular facts," weight must be given to various elements, including: (1) whether the government has disavowed any intention to prosecute; (2) the statute's history of enforcement; (3) the extent to which it contains explicit rules of construction protecting First Amendment rights; and (4) the universe of potential complainants. Blum v. Holder, 744 F.3d 790, 798 (1st Cir. 2014). Standing follows from these parameters.

First, the Government has not explicitly disavowed enforcing Article 5.14(a) in the future. See, Davison v. Randall, 912 F.3d 666, 677-679 (4th Cir. 2019)(standing found given that defendant had not disavowed future enforcement action); Green Party of Tennessee v. Hargett, 791 F.3d 684, 695-696 (6th Cir. 2015)(standing demonstrated because even though defendants had not enforced or threatened to enforce the statute, they had not explicitly disavowed enforcing it in the future). And, in the instant case, it is actively defending the constitutionality of the statute. See, Aptive Envtl., LLC v. Town of Castle Rock, Colorado, 959 F.3d 961, 976 (10th Cir. 2020)(standing shown in part by the town's efforts to uphold the ordinance at issue during pendency of litigation); New Hampshire Right to Life Pol. Action Committee v. Gardner, 99 F.3d 8, 15 (1st Cir. 1996)(similar).[9]

Second, Article 5.14(a) is of recent vintage, having been enacted in 2020. As mentioned earlier, its predecessor was enacted in 2017, reproducing a prohibition legislated in 1999 that first appeared in a 1976 statute. Still, Article 5.14(a) is broader in scope than the 2017, 1999, and 1976 provisions that preceded it. A finding of no threat of prosecution under a criminal

---

[9] This is not meant as criticism, but as part of the explanation of why plaintiffs have standing.

statute requires a long institutional history of disuse, "bordering on desuetude." Mangual, 317 F.3d at 57. That is not the case here, as a pastor faced criminal charges in 2020 under the 2017 provision for sharing information on WhatsApp about a rumored government curfew order related to the COVID-19 pandemic (Docket No. 23). Compare, Mangual, 317 F.3d at 57 (citing Poe v. Ullman, 367 U.S. 497, 501 & 507 (1961)(denying standing based on an eighty-year-old tacit agreement by the state not to prosecute)), with, R.I. Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 32 (1st Cir. 1999)(finding a credible threat of prosecution under a statute that had never been enforced in part because it was enacted "only twenty years" earlier).

Third, "the universe of potential complainants is not restricted to state officials constrained by explicit guidelines or ethical obligations." SBA List, 573 U.S. at 164. In Puerto Rico, a criminal action begins with a judicial determination of probable cause for arrest. See, Pueblo v. Rivera Martell, 173 D.P.R. 601, 622 (2008)(discussing topic); Pueblo v. Jiménez Cruz, 145 D.P.R. 803, 809-810 (1998)(similar). This determination is made when it appears from a sworn complaint, statements filed with the complaint, or the examination under oath of the complainant or witnesses, if any, that there is probable cause to believe that an offense has been committed by the person or the persons against whom the complaint is addressed. See, Rule 6 of Puerto Rico Rules of Criminal Procedure, P.R. Laws Ann. tit. 34, App. II, R. 6. That determination may even be grounded totally or partially on a statement made upon information or belief with sufficient circumstantial guarantee of reliability. Id.

A criminal complaint consists of a signed and sworn written statement charging one or several persons with the commission of an offense. See, Rule 5 of Puerto Rico Rules of Criminal Procedure, P.R. Laws Ann. tit. 34, App. II, R. 5. Any person having personal knowledge of the facts that constitute the offense charged in the complaint has standing to

67

present it.  Id.  Prosecutors and police officers in all cases, and other officers and public employees in cases related to the performance of their duties and functions, may sign and swear to complaints when the facts constituting the offense are known to them by information and belief.  Id.  Within these boundaries, virtually any person may file a criminal complaint with the police, or pro se, and hail another into court to face potential criminal charges.  Furthermore, Article 5.14(a) lacks explicit rules of construction protecting First Amendment rights.

The Government maintains that plaintiffs have not come about with "a single fact" that any of the defendants or any other public official threatened to prosecute them or any other journalist or that a prosecutorial process against them or a journalist has been initiated pursuant to the challenged provision (Docket No. 62, p. 10).  True enough.  But an actual or threatened prosecution is not a prerequisite to challenge the legality of a statute.  As the Supreme Court observed in SBA List, 573 U.S. 149, it is not necessary that a party first expose herself to actual arrest or prosecution to be entitled to challenge a statute that she claims deters the exercise of constitutional rights.  Id. at 158.  A plaintiff in a pre-enforcement challenge of a law's constitutionality "need not confess that he or she will in fact violate that law before filing suit." Frese, 425 F. Supp. 3d 64, 73.  And the court cannot overlook that another individual, the pastor, was prosecuted under the predecessor statute.

The Government posits that plaintiffs cannot rely on that supposed "unconnected event" because it is dissimilar to plaintiffs' claims in that it did not involve the prosecution of a journalist, specifically, for publishing articles adverse to the government and, the prosecution of the pastor was based on the now defunct language of the preceding iteration of Article 5.14(a) (Docket No. 62, p. 10).  Article 5.14(a) does not, however, carve out exceptions for journalists, and the version in effect when the pastor was prosecuted made it a crime to raise a false alarm

68

with respect to the imminent occurrences of catastrophes in Puerto Rico or spreading rumors or raising a false alarm regarding non-existing abnormalities under a state of emergency or disaster. On this account, while that version is defunct, it nonetheless shares important elements with the current version, such as false alarms, catastrophes, and states of emergency or disasters. Past enforcement of Article 5.14(a)'s statutory predecessor cuts in favor of a conclusion that the threat of enforcement of its current version "is specific and credible." California Trucking Ass'n. v. Bonta, 996 F.3d 644, 650, 652-654 (9th Cir. 2021)(so recognizing in context of past application of judicially created rule later codified, as expanded upon by state lawmakers, into statute).

There is more than enough in this record to support standing. As in Babbitt, 442 U.S. at 301-302, plaintiffs have in the past engaged, and intend in the future to engage, in speech that may run afoul of the challenged statute. As in Gardner, 99 F.3d at 17, the statute in question is not a dead letter; the Government has not disclaimed any intention to enforce it and is actively vouchsafing for its constitutionality. As in Mangual, 317 F.3d at 58, plaintiffs must either risk criminal prosecution or engage in self-censorship. There have not been prosecutions under the current version of the statute. Still, as in Doe v. Bolton, 410 U.S. 179, 188 (1973), the lack of prosecutions is largely irrelevant given the statute's recent origin. Further, contrary to Blum, 744 F.3d at 798, the provision lacks explicit rules of construction protecting First Amendment rights, and like in SBA List, 573 U.S. at 164, the universe of potential complainants is not restricted to state officials constrained by explicit guidelines or ethical obligations.

*d. Result.*

As Judge Selya observed in Gardner, when "a party launches a pre-enforcement challenge to a statute that provides for criminal penalties and claims that the statute on its face

abridges the First Amendment, two potential injuries must be considered."  99 F.3d at 13.  First, the injury which attends the threat of enforcement.  Id. at 13.  Second, when the plaintiff is chilled from exercising her right to free expression in order to avoid enforcement consequences.  In such situations, the vice of the statute is its pull toward self-censorship.  Id. at 13-14.  Both types of injury are present in this case, conferring standing on plaintiffs to mount a pre-enforcement challenge to the facial constitutionality of the statute "on the basis that [their] First Amendment rights arguably are being trammelled."  Id. at 14.

2.  Prudential Standing.

Prudential aspects of standing lead to the same result.  Those aspects include the requirement that "a plaintiff's complaint fall within the zone of interests protected by the law invoked;" the general prohibition on a litigant's raising another person's legal rights;" and "the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches."  Osediacz v. City of Cranston, 414 F.3d 136, 139 (1st Cir. 2005).  A credible threat of future exposure to a challenged policy is "sufficient to satisfy" prudential as well as constitutional standing concerns.  Mangual, 317 F.3d at 59.  To boot, the operative complaint falls comfortably within the zone of interests protected by the First Amendment; asserts plaintiffs' own rights; and presents a sufficiently particularized grievance instead of a generalized grievance pervasively shared and most appropriately addressed in the representative branches.  See, Gardner, 99 F.3d at 15-16 (applying those criteria to conclude that the dispute satisfied prudential prerequisites for a grant of standing).[10]  Having confirmed plaintiffs' standing to maintain the action, the court turns to the merits of the case.

---

[10] The Government refers to a comment the court made during a status conference, to the effect that it had read all cases plaintiffs cited in support of standing, confirmed that mere subjective fears are not enough, there must be a

C. **Merits of Claim**.

1. Basic Framework.

In general, the First Amendment precludes the State from restricting expression because of its "content." Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015).[11]  The proscription extends to restrictions of entire topics and particular viewpoints.  Id. at 169.[12]  Those restrictions are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.  Id.  This is the "most demanding test known to constitutional law." City of Boerne v. Flores, 521 U.S. 507, 534 (1997)(superseded by statute).  It calls upon the government to prove that alternate measures imposing lesser burdens on speech would fail to achieve the government's interests, "not simply that the chosen route was easier." McCullen v. Coakley, 573 U.S. 464, 495 (2014).  This burden "is not satisfied by mere speculation and conjecture." Edenfield v. Fane, 507 U.S. 761, 770 (1993).  A restriction that is content-neutral on its face is nevertheless content-based if it cannot be justified without reference to the content of the regulated speech or were adopted by the government because of disagreement with the speech's message.  Id.

By exception, content-based restrictions of speech are permitted in case of a "few historic and traditional categories of expression long familiar to the bar." Alvarez, 567 U.S. at 717 (plurality opinion)(internal quotations omitted).  Those categories include advocacy intended,

---

credible threat of prosecution, and the stipulations here do not reflect factual settings similar to the cases that plaintiffs cited (Docket No. 62, pp. 14-15).  In the process of studying authorities to issue a ruling, however, the court revisited relevant caselaw, and is persuaded that plaintiffs have standing to maintain this action.

[11] A comprehensive treatment of First Amendment doctrine is beyond the scope of this Opinion and Order.  The purpose of the discussion that follows is to provide a baseline for the analysis of the issue *sub judice*.  For a thorough discussion of modern free speech doctrine, see, R. Randall Kelso, *The Structure of Modern Free Speech Doctrine: Strict Scrutiny, Intermediate Review, and "Reasonableness" Balancing*, 8 Elon L. Rev. 291 (2016).

[12] In those latter cases, the government "targets not particular subject matter but particular views taken by speakers on a subject." Rosenburger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 828 (1995).

71

and likely, to incite imminent lawless action; obscenity; child pornography; defamation; insulting or fighting words; fraud; and speech presenting some grave and imminent threat that the government has the power to prevent, although a restriction under the last category is most difficult to sustain.  Id.

When speech restrictions are content-neutral, they are tested by what has been variously called intermediate scrutiny, proportionality review, and fit examination.  See, Alvarez, 567 U.S. at 730-731 (Breyer, J. concurring)(identifying varying nomenclature for content-neutral scrutiny).  To survive this type of scrutiny, the law must be "narrowly tailored" to serve an important or substantial governmental interest.  Rideout v. Gardner, 838 F.3d 65, 72 (1st Cir. 2016).  While the required tailoring need not be the least restrictive or least intrusive means of serving the government's interests, it demands a "close fit" between ends and means.  McCullen, 573 U.S. at 486.  The requirement prevents the government from too readily sacrificing speech for efficiency.  Id.

When speech and nonspeech elements are combined in the same course of conduct, "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."  Barnes v. Glen Theatre, Inc., 501 U.S. 560, 567 (1991).  In that case, a content-neutral government regulation is valid if "'it furthers an important or substantial governmental interest; if the interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'"  Turner Broad. System, Inc. v. F.C.C., 512 U.S. 622, 662 (1994)(quoting U.S. v. O'Brien, 391 U.S. 367, 377 (1968)).

In public fora such as streets, the government may impose reasonable content-neutral restrictions on the time, place, or manner of protected speech provided they satisfy the criteria

referred to above and leave open ample "alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). The purpose of this latter requirement is "to ensure that government does not disguise what, in effect is a complete ban on speech as a mere time, place and matter restriction." Ass'n. of Community Organizations for Reform Now v. Town of East Greenwich, 453 F.Supp.2d 394, 407 (D.R.I. 2006). The mere fact that a regulation diminishes in some measure the total quantity of speech and simultaneously curtails a speaker's opportunity to communicate with some potential listeners does not, however, show absence of alternative channels of communication. Id. at 407-408. The critical inquiry is whether other modes of communication remain open through which the speaker can adequately convey his message. Id. at 408.

At the lower end of the scrutiny ladder are speech limitations in non-public fora and on inmates and school students. Those in a non-public forum are upheld if "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 46 (1983). Similarly, speech restrictions on school students and inmates have also been subjected to minimum rational-based review in some circumstances. See, Hazelwood Sch. District v. Kuhlmeier, 484 U.S. 260, 273 (1988)(pointing out that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns); Turner v. Safley, 482 U.S. 78 (1987)(observing that prison regulations that impinge on inmates' constitutional rights are valid under the First Amendment if they are reasonably related to legitimate penological objectives).

2.  <u>False Statements</u>.

Lies are considered speech not categorically excluded from First Amendment protection. See, Alvarez, 567 U.S. at 719 (plurality)("The Court has never endorsed the categorial rule . . . that false statements receive no First Amendment protection").  To understand why and what level of judicial scrutiny must be applied, the court turns to Alvarez.  There, the Supreme Court considered the constitutionality of the Stolen Valor Act, a federal statute that made it a crime for any person to state falsely that he or she had received a military decoration or medal.  Xavier Alvarez was convicted under that statute after he intentionally and falsely claimed to have received the Congressional Medal of Honor while introducing himself at a meeting as a newly elected water district board member.  He challenged the statute, and a divided Court struck it down under the First Amendment.  In three separate opinions, all of the Justices agreed that the First Amendment permits the government to punish at least some lies, but no majority approach emerged for determining specifically which lies can be prohibited.

In his plurality opinion, Justice Kennedy (joined by Chief Justice Roberts and Justices Ginsburg and Sotomayor) considered the statute a content-based restriction on speech calling on exacting scrutiny and concluded that the statute failed this test.  See, Alvarez, 567 U.S. at 715. He explained that the defendant's claim to hold the Congressional Medal of Honor was false, with no room to argue about interpretation or shades of meaning.  Id. at 715.  He surveyed examples of regulations on false speech that courts have found permissible, such as criminal prohibitions of false statements made to a government officer; laws punishing perjury; prohibitions on the false representation that one is speaking as a government official or on behalf of the government; and fraud.  Id. at 720 & 723.  He dismissed various quotations from prior Supreme Court opinions seeming to indicate that false statements do not deserve constitutional

protection, arguing that they were not properly understood as creating a First Amendment exemption for false statements, and found no historical foundation in the Supreme Court's free-speech tradition of excluding false statements from the protection of the First Amendment.  Id. at 717-719.

Justice Kennedy observed that the prohibition on false statements made to Government officials in communications concerning official matters do not lead to the broader proposition that false statements are unprotected when made to any person, at any time, in any context.  Id. at 720.  He pointed out that perjury undermines the function and province of the law and threatens the integrity of judgments that are the basis of the legal system.  Id. at 720-721.  He described statutes prohibiting a speaker from falsely representing himself to be a government official as punishing lies that inflict harms to the integrity of government processes and to the good repute and dignity of government service.  Id. at 721.  He indicated that when false claims are made for the purpose of effecting a fraud or other valuable considerations, the Government may restrict that speech without affronting the First Amendment.  Id. at 723.[13]  Having evaluated the treatment that falsehood had received in these varying settings, he concluded that the Stolen Valor Act was not similarly limited in its reach, and therefore, was invalid under the First Amendment.  Id.

In this light, Justice Kennedy explained that the government's chosen restriction on the speech at issue must be actually necessary to achieve its interests (id., p. 725); there must be a

---

[13] In addition, Justice Kennedy referred to the prohibition on recovery of damages for a defamatory falsehood made about a public official "unless the statement was made with knowledge that it was false or with reckless disregard of whether it was false or not," rejecting the proposition that it provided support to the government's attempt to criminalize speech by way of the Stolen Valor Act.  Alvarez, 567 U.S. at 719-720.  In his view, the requirements of knowing falsehood or reckless disregard for the truth as the condition for recovery exists to allow more speech, not less, and that a rule designed to tolerate certain speech ought not blossom to become a rationale for a rule restricting it.  Id. at 720.

direct causal link between the restriction imposed and the injury to be prevented (id.); the restriction must be the least restrictive means among available, effective alternatives (id., p. 729), and, yet, the government had not shown why counter-speech would not suffice as a viable alternative to achieve its interest.  Id. at 727.  Further, even though freedom of speech and thought flows not from the beneficence of the state, but from the inalienable rights of the person, suppression of false speech by the government could make exposure of its falsity more difficult, not less so.  Id. at 728.  As there was no clear showing of the necessity of the statute, as required by exacting scrutiny, Justice Kennedy concluded that the Stolen Valor Act infringed upon speech protected by the First Amendment.  Id. at 730.  In his words, truth needed "neither handcuffs nor a badge for its vindication."  Id. at 729.

Justice Breyer (joined by Justice Kagan) concurred in the judgment that the Stolen Valor Act violated the First Amendment.  Id. at 730.  He expressed that the case involved a false statement of an easily verifiable fact (id. at 732), but that false factual statements can serve useful human objectives.  Id. at 733.  As examples, he mentioned false factual statements in social contexts, where they may prevent embarrassment, protect privacy, shield a person from prejudice, provide the sick with comfort, or preserve a child's innocence; in public contexts, where they may stop a panic or otherwise preserve calm in the fact of danger; and in technical, philosophical, and scientific contexts, where (as Socrates' methods suggest) examination of a false statement (even if made deliberately to mislead) can promote a form of thought that ultimately helps realize the truth.  Id., at 735.[14]

---

[14] Consider also, government undercover operations and journalistic investigations.  For an introduction to those manifestations of falsehood, see, Dianne Leenheer Zimmerman, *I Spy: The Newsgatherer Under Cover*, 33 U. Rich. L. Rev. 1185(2000); Bernard W. Bell, *Secrets and Lies: News Media and Law Enforcement Use of Deception as an Investigative Tool*, 60 U. Pitt. L. Rev. 745 (1999); and Randall P. Bezanson, *Means and Ends and Food Lion: The Tension Between Exemption and Independence in Newsgathering by the Press*, 47 Emory L. J. 895 (1998).  As

From this recognition, Justice Breyer examined statutes and common-law doctrines that made the utterance of certain false statements unlawful, observing that prohibitions such as those found in fraud statutes, defamation statutes, perjury statutes, statutes forbidding lying to a government official (not under oath), statutes prohibiting false claims of terrorist attacks or other lies about the commission of crimes or catastrophes, statutes prohibiting trademark infringement, and statutes forbidding impersonation of a public official, all tended to be narrower than the Stolen Valor Act. Id. at 734-735. He explained that in determining whether a statute violates the First Amendment, the Supreme Court has often found it appropriate to examine the fit between statutory ends and means, and in so doing, has examined speech-related harms, justifications, and potential alternatives. Id. at 730. Applying what he referred to as intermediate scrutiny, he concluded that while the Stolen Valor Act had substantial justification, it was possible to achieve the government's objective in less burdensome ways by enacting a similar but more finely tailored statute. Id. at 739.

Professors Alan K. Chen & Justin Marceau, *High Value Lies, Ugly Truths, and the First Amendment*, 68 Vand. L. Rev. 1435 (2015) remind the reader, perhaps the most iconic example of using deception to uncover wrongdoing is Upton Sinclair's investigation of the Chicago meatpacking industry, which became the source and inspiration for his path-breaking novel, *The Jungle*. Id. at 1456-1457. To gather information for his work, which he hoped would expose the many unfortunate ways in which meatpacking companies treated their employees, Sinclair gained access to the facilities by disguising himself as a worker. Id. at 1457. Along the same line, see, U.S. v. Hugs, 109 F.3d 1375, 1377 (9th Cir. 1997)(involving an agent posing as a semiretired contractor interested in hunting, fishing, and purchasing trophy big game heads, who brought beer and participated in an illegal hunt in order to gain the evidence necessary for an arrest based on violations of hunting related laws); and Animal Legal Def. Fund v. Otter, 878 F.3d 1184, 1189-1190 (9th Cir. 2018)(undercover journalist's investigation of animal abuse in agricultural facilities). In all, "[n]ot all falsehoods are equal." Chen, supra, at 1443 & n. 40. This recognition comes not out of contemporary experience. Professor Helen Norton, *Lies and the Constitution*, 2012 Sup. Ct. Rev. 161 (2012), calls to mind that St. Augustine identified a hierarchy of lies, and St. Thomas Aquinas generated a taxonomy of lies according to their varying moral severity. Id. at 168 & n. 27 (quoting Charles Lewis Cornish, Henry Browne, and Charles Marriot, trans. St. Augustine, *On Lying* (Oxford, 1847) ¶ 25 (describing eight types of lies that vary in moral severity, including lies in religious teaching; lies that harm others and help no one; lies that harm others and help someone; lies told for the pleasure of lying; lies told to please others in smooth discourse; lies that harm no one and that help someone; lies that harm no one and that save someone's life; and lies that harm no one and that save someone's purity); and St. Thomas Aquinas, in Fathers of the English Dominican Province, trans, *The Summa Theologica* 89-90 (Benzinger Bros, 1922)("Now it is evident that the greater the good intended, the more is the sin of lying diminished in gravity)).

Justice Alito (joined by Justices Scalia and Thomas) dissented.  Id.  He stated that false factual statements possess no intrinsic First Amendment value and that many kinds of false factual statements have been proscribed without raising any constitutional problem.  Id. at 746-747.  He acknowledged that it is sometimes necessary to extend a measure of strategic protection to these statements in order to ensure sufficient breathing space for protected speech.  Id. at 750.  He recognized that there are circumstances in which false factual statements enjoy a degree of instrumental constitutional protection.  Id. at 751.  He explained that there are broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech, presenting as example laws restricting false statements about philosophy, religion, the social sciences, the arts, history and other matters of public concern.  Id.  Like Justice Breyer, he accepted that in those contexts, even a false factual statement may be deemed to make a valuable contribution to public debate by bringing about the clearer perception and livelier impression of truth produced by its collision with error.  Id. at 752.  As well, he voiced concern that allowing the state to proscribe false statements in these areas open the door for the state to use its power for political ends.  Id.

However, for Justice Alito, in contrast to laws prohibiting false statements about history, science and other matters, the Stolen Valor Act presented no risk that valuable speech would be suppressed.  Id.  He remarked that the statute applied to only a narrow category of false representations about objective facts that can be always be proved or disproved with near certainty; it concerned facts that are squarely within the speaker's personal knowledge; it applied only to statements that could reasonably be interpreted as actual facts, hence did not apply to dramatic performances, satire, parody, hyperbole and the like; it was viewpoint neutral; it was highly unlikely to be tied to any particular political or ideological message, and in the rare cases

78

where that were not so, it applied equally to all false statements, whether they tend to disparage or commend the government, the military, or the system of military honors.  Id. at 740.[15]

    3.  Article 5.14(a).

As stated earlier, Article 5.14(a) criminalizes, after the Governor of Puerto Rico has decreed by executive order an emergency or disaster, to knowingly, purposely or recklessly: (1) give a warning or false alarm, knowing that the information is false, in relation to the imminent occurrence of a catastrophe in Puerto Rico; or (2) disseminate, publish, transmit, transfers or circulate through any means of communication, including the media, social networks, or any other means of dissemination, publication or distribution of information, a notice or a false alarm, knowing that the information is false, when as a result of that conduct it puts the life, health, bodily integrity or safety of one or more persons at imminent risk, or endangers public or private property (Docket No. 45-1, p. 2).  Properly read, Article 5.14(a) does not survive strict or intermediate scrutiny.[16]

---

[15] For a discussion of Alvarez, see, Norton, supra; Rodney A. Smolla, *Categories, Tiers of Review, and the Rolling Sea of Free Speech Doctrine and Principle: A Methodological Critique of United States v. Alvarez*, 76 Alb. L. Rev. 499 (2012-2013); and Erwin Chemerinsky, *The First Amendment and the Right to Lie*, ABA Journal (Sept. 5, 2012, 1:57 PM), https://www.abajournal.com/news/article/the_first_amendment_and_the_right_to_lie.  For their part, Tompros, supra, discuss the application of Alvarez in various settings, including social media.

[16] When a majority of a fragmented Supreme Court agrees on a result but no majority consensus exists on the rationale for the result, the Court's holding is typically that of "those members who concurred in the judgment on the narrowest grounds."  Marks v. U.S., 430 U.S. 188, 193 (1977); U.S. v. Manubolu, 13 F.4th 57, 67 & n. 20 (1st Cir. 2021)(applying narrowest ground rule).  Yet, narrowness may be difficult to determine, especially where, as here, "the disagreement among Justices is one of kind –whether to apply strict or proportional scrutiny– not of breadth."  Animal Legal Def. Fund, 263 F.Supp.3d at 1210.  In these circumstances, the Supreme Court has historically deferred to interpretation by lower courts.  Id.  And, "in the wake of Alvarez, lower courts have generally applied strict scrutiny to laws implicating lies."  Id.; Chen, supra, at 1482 ("Notably, since Alvarez, a number of lower courts have held that strict scrutiny is the proper level of scrutiny for government actions prohibiting lies").  This said, to cover all material aspects of the issue, the court gauges the validity of Article 5.14(a) by reference to both Justice Kennedy's plurality opinion and Justice Breyer's concurrent opinion.  For a discussion of different aspects of the narrowest ground rule, see, Richard M. Re, *Beyond the Marks Rule*, 132 Harv. L. Rev. 1942 (2019); Justin Marceau, *Plurality Decisions: Upward-Flowing Precedent and Acoustic Separation*, 45 Conn. L. Rev. 933 (2013); and Linda Novak, *The Precedential Value of Supreme Court Plurality Decisions*, 80 Colum. L. Rev. 756 (1980).

a. *Level of Scrutiny.*

The first clause of Article 5.14(a) focuses on the content of speech, whereas the second clause focuses on the content of speech and the effect such speech has on persons and property. As the Supreme Court has previously noted, that is the quintessential hallmark of a "content-based regulation." <u>U.S.</u> v. <u>Playboy Ent. Group, Inc.</u>, 529 U.S. 803, 811-812 (2000)(considering regulation content-based, because it focused on the content of speech and its impact on persons or property); <u>Boos</u> v. <u>Barry</u>, 485 U.S. 312, 321 (1988)(restriction deemed content-based, for it was justified by the content of speech and the direct impact that speech had on its listeners). In consequence, Article 5.14(a) triggers strict scrutiny.

The Government disputes that Article 5.14(a) contains content-based restrictions on speech (Docket No. 62, pp. 26-27). It argues that it has the constitutional power to prohibit the dissemination of false representations; that its interest here is concerned solely with the act of disseminating a false alarm knowing that it is untrue regardless of its content; and because the challenged provision does not prevent the expression of any particular message or viewpoint, its interest in prohibiting dissemination of false information is unrelated to the suppression of free expression. <u>Id</u>. at 27.

That the Government has the constitutional power to prohibit dissemination of false representations under certain circumstances does not mean it may exercise that power without regard to constitutional restrictions, particularly those found in the First Amendment. Further, stating the obvious, the provision punishes false speech, not truthful speech. And for the law to distinguish between truthful and untrue speech "is to favor one form of content over another." Chen, <u>supra</u> at p. 1483. Consequently, there is no reasonable basis to claim that Article 5.14(a) is anything but a content-based restriction on speech. <u>See</u>, <u>Citizens United</u> v. <u>Fed. Election</u>

80

Commission, 558 U.S. 310, 340 (2010)(content-based restrictions include "restrictions distinguishing among different speakers, allowing speech by some but not others); Turner Broad. Sys., Inc., 512 U.S. at 658 (speaker-based laws are content-based when they reflect the government's preference for the substance of what the favored speakers have to say or aversion to what the disfavored speakers have to say).[17]

The Government argues that Article 5.14(a) is valid because it aims to protect people's lives, health, and private and public property during government-declared emergencies (Docket No. 62, p. 28). That interest may be compelling but does not save the statute. A law that is content-based on its face "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." Reed, 576 U.S. at 164 (internal quotations omitted).[18] So, the "mere assertion of a content-neutral purpose [is not] enough to save a law which, on its face, discriminates based on its content." Turner Broad. Sys., Inc., 512 U.S. at 642-643. The Government needs more than to show that its ends are "compelling." Sable Comm. of Cal., Inc. v. F.C.C., 492 U.S. 115, 126 (1989). It must demonstrate that the prohibition is "narrowly drawn" to serve those ends. Ent. Merch. Ass'n., 564 U.S. at 799. And, to succeed, it must identify an actual problem in need of solving and establish that the curtailment on speech is actually necessary to the solution. Id.

---

[17] Compare, Reed, 576 U.S. at 164 (town sign measure considered content based on its face because application of relevant restrictions depended entirely on the corresponding sign's communicative content), with, March v. Mills, 867 F.3d 46, 56 (1st Cir. 2017)(noise provision not content-based because it did not on its face give license to punish anyone because of what they were saying).

[18] See also, Aptive Envtl., LLC, 959 F.3d at 988 (the fact that the government's asserted interests are substantial in the abstract does not mean that a restriction on speech purporting to effectuate those interests is permissible).

For a statute to survive this degree of scrutiny, the record must present a "direct causal link" between the restriction imposed and the injury to be prevented. <u>Alvarez</u>, 567 U.S. at 725. This is a heavy burden, one calling for more than a rational connection between the restriction on speech and the wrong to which that restriction is purportedly addressed. For example, in <u>Alvarez</u>, Justice Kennedy recognized that when a pretender claims the Medal of Honor to be his own, the lie might harm the government by demeaning the high purpose of the award, diminishing the honor it confirms, and creating the appearance that the Medal is awarded more often than is true. <u>Id</u>. at 725-26. Furthermore, Justice Kennedy noted that the lie may offend the true holders of the Medal, insulting their bravery and high principles when falsehood puts them in the unworthy company of a pretender. <u>Id</u>. at 726. And yet, notwithstanding the rational link between the Stolen Valor Act and the harms that Justice Kennedy identified, the statute did not survive exacting scrutiny. Why not? Because at bottom, the government pointed to no evidence that the public's general perception of military awards was diluted by false claims such as those that Alvarez made. <u>Id</u>. at 726.

Likewise, the Government here did not present evidence of a direct causal link connecting Article 5.14(a)'s prohibitions to the harm the Article attempts to assuage. According to the provision's Statement of Purpose, it was enacted to address "the need to prohibit people from using social media or mass media to disseminate false information, with the intention of creating confusion, panic or collective public hysteria . . . while a state of emergency, disaster, or curfew is in force." <u>See</u>, Statement of Purpose (Docket No. 45-1, p. 1). Assuming this was an actual problem in need of solving, what the Statement of Purpose reflects is not what Article 5.14(a) states. Even more, the Government did not present evidence to support the affirmation that a criminal prohibition against false warnings and alarms about the imminent occurrence of a

82

catastrophe in Puerto Rico is necessary to advance the Government's asserted interest. The connection may be rational, but is devoid of evidentiary support. And conjecture does not suffice to fill this gap.

On top of that, like in <u>Alvarez</u>, the lack of a direct causal link between the Government's stated interest and the proscription is not the only reason for why the prohibition falls short of qualifying as one actually necessary to achieve the Government's stated interest. This is so because the Government did not prove why counter-speech in the form of increased transparency, would fail to accomplish its interests. The Government states that during the state of emergency, a person caused disruption in the food supply chain by falsely announcing that the government would close the food markets, and that although the Government clarified that this was false, the damage was done. <u>Id</u>. (Docket No. 62, p. 35). But the Government did not submit evidence on who, when and how it sought to address the false message to which it has referred in order to allow the court to gauge the effectiveness of the response. Inversely, plaintiffs submitted clippings of articles about a message regarding closure of supermarkets on the island due to coronavirus, showing the Government has failed to demonstrate that increased transparency would not accomplish its objectives (Docket No. 10-3).

One of these articles states that on Friday (March 20, 2020), a person who identified himself as an active member of the church "Casa de Restauración," claimed that Governor Vázquez was preparing to announce a total closure of all businesses, as well as ports; and on March 21, thousands of people filled commercial outlets to buy supplies (Exhibit 3, p. 2).[19] The article quotes the Secretary of State of Puerto Rico as denying that supermarkets would close

---

[19] The story appears related to the Pastor incident mentioned earlier.

83

("Of course not.  How are we going to do that?")(Exhibit 3, p. 1).  Additionally, it quotes the Secretary of the Department of Public Safety as saying, among other things, "as for the WhatsAp message, we do not deny or confirm," and that the government kept an active page to report and evaluate complaints of people who used the media to commit crimes.  Id.  at 2.

If that is how events unfolded, rather than qualifying as transparent, the information originating in government sources was contradictory, e.g. denying, while at the same time, neither denying nor confirming.[20]  And the purpose of the page that the Secretary mentioned was to report and evaluate complaints, not to place accurate and reliable information before the public.[21]  The Government counters that when falseness travels fast, the truth will never be able to reach it on time (Docket No. 62, p. 28).  However, as Tompros, supra, point out, in the wake of the Boston Marathon bombing there was a good deal of false information spreading on various social media platforms, but using those very same platforms, the Boston Police Department ("BPD") quickly refuted and corrected the misinformation.  Id. at 106.  The BPD tweeted an accurate casualty number in response to inflated reports, refuted rumors that a fire at the John F. Kennedy Presidential Library was related to the bombing and corrected another rumor that a Saudi man had been arrested.  Id.[22]

---

[20] It bears noting that on March 30, 2020, among other things, the Governor limited food purchases between 5:00 a.m. and 7:00 p.m.; ordered that supermarkets and small grocery stores be closed on Sundays; and that the Department of Natural and Environmental Resources issue orders, guidelines, and circular letters for the closure of all marinas in Puerto Rico.  See, Executive Order 2020-029.  An article dated April 6, 2020, titled "Puerto Ricans crowd supermarkets as government ramps up restrictions," relates that Puerto Ricans flocked to grocery stores the morning of April 6th, after the Governor announced the previous night stricter regulations for the island's coronavirus lockdown during Holy Week, ordering almost all business including supermarkets and banks to close from Friday to Sunday (Docket No. 4-3, p. 12, n. 8).

[21] The use of a government web page to report and evaluate complaints is not illegal per se.  Properly used, it may be an effective tool to serve the public.

[22] See also, Jessica Stone-Erdman, *Just The (Alternative) Facts, Ma'am: The Status of Fake News under the First Amendment,* 16 First Amend. L. Rev. 410, 431 (2017)("[I]n the context of fake news, counterspeech can –and in fact

84

From this perspective, instead of criminalizing speech, the Legislature could simply have required the Government to use its multiple communications platforms and other means of communication to present a complete and accurate description of the facts.[23]   As Justice Kennedy pointed out in <u>Alvarez</u>, "[t]he remedy for speech that is false is speech that is true . . . [t]he response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth."  <u>Id</u>. at 727.  Justice Breyer agreed with Justice Kennedy that in this realm, "more accurate information will normally counteract the lie."  <u>Id</u>.  For Justice Breyer, it was likely that a more narrowly tailored statute combined with information-disseminating devices would effectively serve the statute's end.  <u>Id</u>.  So too with Article 5.14(a).  The dynamics of free speech, counter-speech, and refutation can effectively overcome lies.  Under these circumstances, there was no clear showing that Article 5.14(a) is necessary to accomplish its stated purpose.

    *b.  Contrast.*

This is not the end of this matter.  Like the Stolen Valor Act in <u>Alvarez</u>, Article 5.14(a) must be compared to the falsehood statutes that the Supreme Court considered acceptable.  To this end, as mentioned earlier, Justice Kennedy looked into 18 U.S.C. § 1001 (the criminal prohibition of a false statement made to a government official in communications concerning official matters); 18 U.S.C. § 1623 (the criminal prohibition against perjury); and 18 U.S.C. § 912 (the criminal prohibition against falsely representing that one is speaking on behalf of the government or impersonating a government officer), explaining these provisions' prohibitions.

---

does– play a crucial role in combatting the false statements coming from both social media and political figures themselves.  Journalists and netizens alike continuously call out lies, challenge false or questionable statements purported to be the truth, and make corrections where needed").

[23] A sample of the Government's communications platforms is included in Appendix I.

See, Alvarez, 567 U.S. at 720, 723 (plurality)(listing statutes). Justice Breyer's concurrence agreed with this line of thought. Id. at 734-736. Furthermore, he contrasted the Stolen Valor Act to trademark infringement statutes such as 15 U.S.C. § 1114(1)(a); fraud and defamation; and false claims of terrorist attacks or other lies about the commission of crimes or catastrophes in light of 18 U.S.C. § 1038(a)(1); and 47 C.F.R. § 73.1217 (2011)(the Federal Communications Commission's ("F.C.C.'s") broadcast hoaxes rule). See, Alvarez, 567 U.S. at 734-736 (Breyer, J., concurring).

From this survey, Justice Breyer concluded that these prohibitions limit the scope of their application, by requiring proof of specific harm to identifiable victims; specifying that the lies must be made in contexts in which a tangible harm to others is especially likely to occur; or limiting the prohibited lies to those that are particularly likely to produce harm. Id. at 734. Altogether, they are narrower and more focused than the Stolen Valor Act. These features set them apart from that statute. But Article 5.14(a) is not similarly circumscribed.

To begin, the first clause 's prohibition on giving a "warning or false alarm knowing that the information is false in relation to the imminent occurrence of a catastrophe in Puerto Rico" applies to speech made at any time during the period covered by an executive order, in any place, not just in public, including in whispered conversations within a home. Much like the Stolen Valor Act, this broad sweep is at odds with the First Amendment. Besides, it fails as being impermissibly underinclusive.

On its face, the first clause prohibits stating that a catastrophe is about to occur but not falsely reassuring the public that a situation is under control (Docket No. 50, p. 20). The distinction is unsustainable, considering that it exempts speech that potentially creates just as much of a threat to public safety as false alarms, and the Government did not show that

86

restricting false speech as to catastrophes was necessary to support its interests but that allowing false assurances on the same topic was not.  See, Reed, 576 U.S. at 171-172 (ruling distinctions in sign code underinclusive, because defendant could not claim that placing strict limits on temporary directional signs was necessary to beautify the town while at the same time allowing unlimited numbers of other types of signs that created the same problems; and town did not show that limiting temporary directional signs was necessary to eliminate threats to traffic safety but that limiting other types of signs was not); Ent. Merch. Ass'n, 564 U.S. at 802 (finding regulation underinclusive when judged against its asserted justification, which in the Court's view, was alone enough to defeat it.  To that end, "California … singled out the purveyors of video games for disfavored treatment- at least when compared to booksellers, cartoonists, and move producers – and has given no persuasive reason why).[24]

The second clause is more focused than the first, albeit not enough, for it is not bound by the limits that Justices Kennedy and Breyer identified in the falsehood statutes referred to above or by the common law doctrines and statutes that Justice Breyer mentioned but that Justice Kennedy did not.  In this review, Justice Breyer found in trademark infringement the closest analogy to the Stolen Valor Act.[25]  See, Alvarez, 567 U.S. at 735 (Justice Breyer, concurring).  The closest analogies to Article 5.14(a) may be found in 18 U.S.C. § 1038(a) and in the F.C.C.'s broadcast hoaxes rule.

---

[24] Underinclusiveness "raises serious doubts about whether the government is in fact pursuing the interest it invokes."  Ent. Merch. Ass'n., 564 U.S. at 802, and suggests or confirms that the government "has not met its burden to prove" that the restriction is narrowly tailored to further a compelling interest under the First Amendment.  Reed, 576 U.S. at 172.

[25] Justice Breyer observed that trademarks identify the source of a good, and infringement causes harm by causing confusion among potential customers about the source, thereby diluting the value of the mark to its owner, to customers and to the economy, and by the same token, a false claim of possession of a medal or other honor creates confusion about who is entitled to wear it, thus diluting its value to those who have earned it.  See, Alvarez, 567 U.S. at 735 (Breyer, J., concurring)(discussing topic).

Section 1038 prohibits engaging in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and the information indicates that an activity has taken, is taking, or will take place that would constitute a violation of certain enumerated statutes dealing with, among other things, destruction of aircraft and motor vehicles, biological and chemical weapons, improper use of explosives, improper use of firearms, destruction of shipping vessels, acts of terrorism, sabotage of nuclear facilities, and aircraft piracy.  <u>See</u>, 18 U.S.C. § 1038(a).  Such hoaxes are designed to instill fear in the public or other target and pose a serious threat to the public's safety.  <u>See</u>, H.R. Rep. 108-505 on "Anti-Hoax Terrorism Act of 2003," at 3-4, 7 (2004)(summarizing anti-hoax prohibitions and describing how the hoaxes threaten public safety).  In this context, the false statements "are very likely to bring about" the harm to be prevented.  <u>Alvarez</u>, 567 U.S. at 735 (Justice Breyer, concurring).

The F.C.C.'s broadcast hoaxes rule provides that no licensee or permittee of any broadcast station shall broadcast false information concerning a crime or a catastrophe if: (1) the licensee knows this information is false; (2) it is foreseeable that broadcast of the information will cause substantial public harm; and (3) broadcast of the information does in fact directly cause substantial public harm.  <u>See</u>, 47 C.F.R. § 73.1217 (so providing).  For purposes of this rule, "public harm" must begin immediately, and cause direct and actual damage to property or to the health and safety of the general public, or diversion of law enforcement or other public health and safety authorities from their duties.  <u>Id</u>.  The public harm will be deemed foreseeable if the licensee could expect with a significant degree of certainty that public harm would occur.  Meanwhile, a "catastrophe" is a disaster or imminent disaster involving a violent or sudden event affecting the public.  <u>Id</u>.

88

Contrary to Section 1038(a) and the F.C.C.'s broadcast hoaxes rule, which identify the events to which the false report must refer, the second clause is open-ended, prohibiting dissemination in a variety of ways of a notice or a false alarm knowing that the information is false if it puts life, health, bodily or safety of one or more person(s) at imminent risk or endangers public or private property. But it is silent as to the content of the alarm or notice. In other words, it leaves people wondering, a notice or false alarm of what? Furthermore, it does not require that speech be likely to result in injury or damages and that such harm be imminent, that is, begin immediately after the speech.[26] The Government did not show why a narrower statute would be insufficient to protect its interests. The level of generality hinders Article 5.14(a)'s ability to fall into one of the historical categories in which false speech has been held unprotected by the First Amendment.

The Government alleges that Article 5.14(a) is more narrowly tailored than the Stolen Valor Act because it proscribes the deceit of unscrupulous persons that knowingly disseminate false alarms of the imminent occurrence of a catastrophe in Puerto Rico during states of emergency with the intention to wreak chaos among the population (Docket No. 62, p. 26). Whatever else may be said about the Government's characterization of the provision, the

---

[26] On the last point, consider the scenario where: (1) Person A writes on social media that contrary to what the government announced, it is safe to swim on a beach; (2) Person B reads the message, decides to go to that beach, eventually gets there, and upon arrival dives into the ocean to swim. So doing, he has put his life at imminent risk of harm. That risk, however, has not come about immediately after the speech, for imminence does not simply mean "a tendency to lead to." Hess v. Indiana, 414 U.S. 105, 109 (1973). Instead, as the F.C.C.'s broadcast hoaxes rule states, it calls for an immediate result, not that at some point that result has come about. See, WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH (3rd ed.)(defining imminent as likely to happen without delay); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed.)(defining imminent as about to occur). Imminence of harm is not unknown in the realm of the First Amendment. See, Brandenburg v. Ohio, 395 U.S. 444, 447 (1969)(speech advocating use of force or illegal act can only be proscribed if: (1) it is "directed to inciting or producing imminent lawless action" –a requirement of intent; and (2) the statement is "likely to incite or produce such action."). Correspondingly, the requirement is found in, among other provisions, Section 250.3 of the Model Penal Code, which proscribes false reports or warnings of impending bombings or other crimes or catastrophes.

Legislature did not write the statute that way, and the court will not "revisit that choice." Consumer Data Indus. Ass'n v. Frey, 26 F.4th 1, 9 (1st Cir. 2022).[27]  As noted above, the only intent that Article 5.14(a) requires is in uttering a falsehood.  In that scenario, knowledge of falsehood alone would subject the speaker to criminal liability even though there was no likelihood that harm would result from the speech or that such harm be imminent.  As Tompros, supra at 103, have noted, such broad criminal liability "flies in the face of Alvarez."

The Government invokes Justice Holmes' observation in Schenck v. U.S., 249 U.S. 47, 52 (1919), to the effect that "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic" (Docket No. 62, p. 21).  It suggests the same formulation applies here because Article 5.14(a) deals with falsehoods and the power of the government to punish such speech involves careful consideration of proximity and degree of the harm.  Id. at 21-22.  The falsehood that Justice Holmes has in mind connects very closely, directly, and foreseeably to a highly particularized material harm.  But as discussed earlier, that is not the case with Article 5.14(a)

The Government argues that Article 5.14(a) is constitutional because the plurality in Alvarez noted that statutes that prohibit false speech in order to protect the integrity of Government processes and maintain the general good repute and dignity of government service itself were permissible (Docket No. 62, pp. 25-26).  While Justice Breyer's concurring opinion noted that those kinds of statutes were a constitutional restriction on speech, all things considered, the argument is not persuasive.

---

[27] A court should not rewrite a law to conform it to constitutional requirements, for doing so "would constitute a serious invasion of the legislative domain." U.S. v. Stevens, 559 U.S. 460, 481 (2010).

First, the plurality and Justice Breyer were referring to the criminal prohibition against impersonating a government officer.  See, Alvarez, 567 U.S. at 721 (plurality) & 735 (Justice Breyer, concurring).  Nowhere does Article 5.14(a) include or is limited to that modality of falsehood, even though the Legislature could easily have inserted it in the statute.  When legislators do not adopt obvious alternative language, "the natural implication is that they did not intend the alternative."  Consumer Data Indus. Ass'n, 26 F.4th at 8 (quoting Advoc. Health Care Network v. Stapleton, 581 U.S. 468, 477 (2017)).

Second, the plurality and Justice Breyer referred to the prohibition on false impersonation to explain why, in contrast to the Stolen Valor Act, it operated as a constitutionally permissible restriction.  In that sense, the prohibition was both narrower and more pointed than the Stolen Valor Act.  See, Alvarez, 567 U.S. at 721 (plurality)(describing the prohibitions under evaluation, including the one on false impersonation, as targeted prohibitions) & 734 (Justice Breyer, concurring)(noting that those prohibitions tended to be narrower that the Stolen Valor Act).  For that reason, the rationale the Justices put forward to explain the validity of the false impersonation statute does not have standalone relevance.  It cannot be dissociated from the prohibition to which it refers.[28]

---

[28] Professor Norton, supra, makes the point that prohibitions on falsely representing that one speaks on behalf of the government or from falsely impersonating a government official address the harms that those lies generate in creating "doubt in the public's mind about who speaks for the government and thus whether purported government officials can be trusted."  Id. at 195.  Similarly, Professors Chen and Marceau (Chen, supra), observe that "because government actors have the imprimatur of official authority, misrepresenting oneself as having such authority presents special dangers to third parties, who believe they are dealing with, and may yield to, one who has the backing and authority of the State."  Id. at 1446.  These are harms directly tied to those prohibitions, not harms isolated from them.  Beyond this, contrary to what the Government has asserted, it could not, consistently with the First Amendment, mandate or require expression from the public to, inter alia, maintain the general good repute of government.  While the State may at times prescribe what shall be orthodox in commercial advertising by requiring the dissemination of purely factual and uncontroversial information, outside that context "it may not compel affirmance of a belief with which the speaker disagrees."  Hurley, 515 U.S. at 573.  Government action "that stifles speech on account of its message, or that requires an utterance of a particular message favored by the Government," contravenes the First Amendment.  Turner Broad. Sys., Inc., 512 U.S. at 641.  As Justice Jackson stated in W. Va

Third, as Justice Kennedy remarked in the plurality, "a rule designed to tolerate certain speech ought not blossom to become a rationale for a rule restricting it." Alvarez, 567 U.S. at 720. Yet, that is what the Government attempts to do here, turning the explanation for the prohibition on false impersonation into a tool to criminalize, and hence, to restrict speech. And as Justice Breyer expressed, "forbidding impersonation of a public official typically focus on *acts* of impersonation, not mere speech." Id. at 735 (emphasis in original). Unlike with false impersonation, Article 5.14(a) focuses not on acts, but on speech. It does not criminalize the act of intentionally putting life, health, bodily integrity, or safety at imminent risk or of endangering private or public property after the Governor has decreed an emergency or disaster by executive order. Thus, the false impersonation statute does not serve to sustain the Article's restriction but to confirm that it is constitutionally untenable.

The Government posits that Article 5.14(a) proscribes conduct with an expressive element as distinct from pure speech, and therefore, the correct standard is intermediate scrutiny, under which, based on O'Brien, 391 U.S. at 367, the Government contends that the Article is valid (Docket No. 62, p. 26). The Government is wrong, for on its face, the provision directly targets and criminalizes speech; speech with which it disagrees. Compare this case with Turner Broad. Sys., Inc., 512 U.S. at 647, where the Supreme Court held that cable television must-carry rules were not content-based because they did not require or prohibit the carriage of particular ideas or points of view and did not penalize cable operators or programmers because of the

---

State Bd. of Educ. v. Barnette, 319 U.S. 624 (1943), "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by work of act their faith therein." Id. at 642. The Government's interest in promoting state pride falls under that category. See, Wooley v. Maynard, 430 U.S. 705, 716 (1977)(state cannot require people to display state motto on license plates even though part of its interest was to promote state pride, as it had other ways of serving that interest).

content of their programming, exactly the opposite of what Article 5.14(a) does with speakers subject to it.  And a content-based restriction on speech is "outside of O'Brien's test altogether." Johnson, 491 U.S. at 410.[29]

Even so, the Government's reference to intermediate scrutiny is unavailing.  As discussed earlier, Article 5.14(a) fails not only strict or exacting scrutiny but what Justice Breyer referred to as intermediate scrutiny.  Justice Breyer's remark about the Stolen Valor Act is apt here: "the statute as written risks significant First Amendment harm."  Alvarez, 567 U.S. at 737 (Breyer, J., concurring).  As drafted, it "fails intermediate scrutiny, and so violates the First Amendment." Id. at 739.

    *c.   Finishing Remarks.*

The three opinions in Alvarez essentially construed the Stolen Valor Act as applying only to false statements of fact.  See, Alvarez, 567 U.S. at 715 (plurality)("Respondent's claim to hold the Congressional Medal of Honor was false.  There is no room to argue about interpretation or shades of meaning"); at 732 ("I would read the statute favorably to the Government as criminalizing only false factual statements made with knowledge of their falsity and with the intent that they be taken as true")(Justice Breyer, concurring); and at 740 ("First, the [Stolen Valor] Act applies to only a narrow category of false representations about objective facts that can almost always be proved or disproved with near certainty.  Second, the Act concerns facts that are squarely within the speaker's personal knowledge.  Third . . . a conviction under the Act requires proof beyond a reasonable doubt that the speaker actually knew that the representation

---

[29] See also, Reno v. American Civil Liberties Union, 521 U.S. 844, 870 (1997)(a "time, place and manner" analysis would be inapplicable to evaluate statute that regulates speech on the basis of its content).

was false.  Fourth, the Act applies only to statements that could reasonably be interpreted as communicating actual facts")(Justice Alito, dissenting).

The Justices' views underpin an important principle.  As Professor Norton, <u>supra</u>, has noted, objectivity of information "makes it subject to official review without fear of partisan overreaching by the state."  <u>Id</u>. at p. 183 n. 99 (<u>citing</u> Nat Stern, *Implications of Libel Doctrine for Nondefamatory Falsehoods under the First Amendment,* 10 First Amend. L. Rev. 465, 503 (2012)).  Thus, limiting the prohibition to what is factually false lessens "the risk of erroneous liability findings, and thus, ameliorates chilling-effect concerns as well as the danger that the government will engage in partisan abuse or selective enforcement."  <u>Id</u>. at 183.[30]  Conversely, there is no such limitation in Article 5.14(a), and the court will not read one into it.  Courts must be vigilant to ensure the First Amendment is not weakened during periods of declared emergencies.  The watchdog function of speech is never more vital than during a large-scale crisis.

Lastly, Justice Kennedy and Justice Alito pointed out in <u>Alvarez</u> that the prohibition set in the Stolen Valor Act does not apply to theatrical or dramatic performances.  <u>See</u>, <u>Alvarez</u>, 567 U.S. at 722 (plurality); 740 & n. 2 (Justice Alito, dissenting).  Article 5.14(a) does not exempt these performances.  For the same reason the court does not construe the statute to include a factual falsehood requirement, it will not read into it an exemption for dramatic performances.

---

[30] Identifying a fact responds to a practical, not an abstract, metaphysical, or normative judgment.  As Justice Kennedy pointed out, there should be no room to argue about interpretations or shades of meaning.  And as Justice Alito expressed, the statute should only apply to a narrow category of false representations about objective facts that can almost always be proved or disproved with near certainty.  These standards may be difficult to meet in rapidly evolving scenarios where there may be conflicting information about what constitutes the objective facts of a situation.

      *d. Facial Attack.*

Plaintiffs challenge Article 5.14(a) on its face.  To succeed on a typical facial attack, they must establish "that no set of circumstances exists" under which the statute would be valid; that the statute "lacks any plainly legitimate sweep;" or that "a substantial number of its applications are unconstitutional judged in relation to the statute's plainly legitimate sweep."  <u>Stevens</u>, 559 U.S. at 472-473 (internal citations omitted).  By all of these parameters, plaintiffs have succeeded.  As discussed above, Article 5.14(a) cannot be enforced consistently with the First Amendment.

      *e. Effect of Ruling.*

This ruling does not affect the remaining provisions of Law 20 of 2017 and of Law 66 of 2020, which as stated earlier, amended Article 5.14(a).  To this effect, Section 2 of Law 66 of 2020 provides that if any cause, paragraph, sentence, word, letter, article, layout, section, subsection, title, in their collective "a part" of that law be annulled or declared unconstitutional, the decision, opinion or judgment given to that effect shall not affect, prejudice or invalidate the rest of the law, the effect of the judgment being limited only to the part which has thus been annulled or declared unconstitutional (Docket No. 45-1, p. 3).  The remaining provisions stand on their own.  In consequence, this ruling is limited to Article 5.14(a).

## V.   <u>CONCLUSION</u>

For the reasons stated, plaintiffs are entitled to prevail as a matter of law.  Therefore, judgment shall issue prohibiting enforcement of Article 5.14(a) of Law 20.[31]

---

[31] The Clerk shall withdraw Inés del C. Carrau-Martínez as party and substitute current Commissioner of the Puerto Rico Police Department Antonio López-Figueroa for Henry Escalera.

**SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2023.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge

96

```
MIME-Version:1.0
From:prd_docketing@prd.uscourts.gov
To:prd_docketing@prd.uscourts.gov
Bcc:
--Case Participants: Nora Vargas-Acosta (nvalawoffice@gmail.com, nvargasacosta@gmail.com),
Joel Torres-Ortiz (joeltorres@justicia.pr.gov, marperez@justicia.pr.gov,
martorres@justicia.pr.gov), Fermin Luis Arraiza-Navas (arraizanavasfermin@gmail.com,
farraiza@aclu.org, wramirez@aclu.org, yulibele@yahoo.com), Juan C. Ramirez-Ortiz
(jcramirezjusticia@gmail.com, juramirez@justicia.pr.gov, martorres@justicia.pr.gov,
spenagaricano@justicia.pr.gov), Brian Hauss (bhauss@aclu.org), Judge Pedro A. Delgado-
Hernandez (prd_pad@prd.uscourts.gov)
--Non Case Participants: Wandymar Burgos-Vargas (wbvfed2021@gmail.com)
--No Notice Sent:

Message-Id:<8102924@prd.uscourts.gov>
Subject:Activity in Case 3:20-cv-01235-PAD Rodriguez-Cotto et al v. Pierluisi-Urrutia et al
Order on Motion for Reconsideration
Content-Type: text/html
```

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### United States District Court

### District of Puerto Rico

#### Notice of Electronic Filing

The following transaction was entered on 6/16/2023 at 6:12 PM AST and filed on 6/14/2023

**Case Name:** Rodriguez-Cotto et al v. Pierluisi-Urrutia et al
**Case Number:** 3:20-cv-01235-PAD
**Filer:**
**WARNING: CASE CLOSED on 03/31/2023**
**Document Number:** 103(No document attached)

**Docket Text:**
**Minute Entry for Proceedings held before Judge Pedro A. Delgado-Hernandez: Motion Hearing held on 6/14/2023 re Docket No. [97]. Present: Attorneys Brian Hauss and Fermin Arraiza-Navas, for Plaintiffs; Attorneys Joel Torres-Ortiz and Juan C. Ramirez-Ortiz, for Defendants. All attorneys of record present in the courtroom. Arguments heard as to request for reconsideration at Docket No. 97. Having reviewed the motions filed and the arguments presented during the hearing, the court denied the motion for reconsideration at docket no. [97] and stated its basis for the record. (Court Reporter Cindy Brown.) Hearing set for 01:30. Hearing held at 01:46. Hearing ended at 03:09. (vso)**

**3:20-cv-01235-PAD Notice has been electronically mailed to:**

97

Nora Vargas-Acosta    nvargasacosta@gmail.com, nvalawoffice@gmail.com

Fermin Luis Arraiza-Navas    arraizanavasfermin@gmail.com, farraiza@aclu.org, wramirez@aclu.org, yulibele@yahoo.com

Joel Torres-Ortiz    joeltorres@justicia.pr.gov, marperez@justicia.pr.gov, martorres@justicia.pr.gov

Juan C. Ramirez-Ortiz    juramirez@justicia.pr.gov, jcramirezjusticia@gmail.com, martorres@justicia.pr.gov, spenagaricano@justicia.pr.gov

Brian Hauss    bhauss@aclu.org

**3:20-cv-01235-PAD Notice has been delivered by other means to:**