No. 23-1626

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

_____

SANDRA RODRÍGUEZ-COTTO; RAFELLI GONZÁLEZ-COTTO,

Plaintiffs-Appellees,

v.

JENNIFFER A. GONZÁLEZ-COLÓN, Governor of Puerto Rico; LOURDES
LYNNETTE GÓMEZ TORRES, Secretary of Department of Justice; ARTURO
GARFFER, Secretary of Puerto Rico Department of Public Safety; JOSEPH
GONZÁLEZ FALCÓN, Commissioner of the Puerto Rico Police Bureau,

Defendants-Appellants.

_____

On Appeal from the United States District Court for the District of Puerto Rico
Civil No. 20-1235, Hon. Pedro A. Delgado-Hernández, U.S. District Judge

---

**BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS AND OTHER NEWS AND MEDIA
ORGANIZATIONS IN SUPPORT OF PLAINTIFFS-APPELLEES**

---

Gabriel Rottman, No. 1193825
*Counsel of Record*
Mara Gassmann*
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
grottman@rcfp.org

*Counsel block continued on next page*

Ian Kalish*
UNIVERSITY OF VIRGINIA SCHOOL OF LAW
    FIRST AMENDMENT CLINIC
580 Massie Road
Charlottesville, VA 22903
(202) 795-9316

*Of counsel

Counsel for amici curiae

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1, proposed amici curiae hereby state:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The Center for Investigative Reporting, Inc. is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

Dow Jones & Company, Inc. ("Dow Jones") is an indirect subsidiary of News Corporation, a publicly held company, and is the publisher of The Wall Street Journal. Ruby Newco, LLC, an indirect subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. News Preferred Holdings, Inc., a subsidiary of News Corporation, is the direct parent of Ruby Newco, LLC. No publicly traded corporation currently owns ten percent or more of the stock of Dow Jones.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

Hearst Corporation is privately held and no publicly held corporation owns 10% or more of Hearst Corporation.

The Inter American Press Association (IAPA) is a not-for-profit organization with no corporate owners.

The Massachusetts Newspaper Publishers Association is a non-profit corporation. It has no parent, and no publicly held corporation owns 10% or more of its stock.

The McClatchy Company, LLC is privately owned by certain funds affiliated with Chatham Asset Management, LLC and does not have publicly traded stocks.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

The National Freedom of Information Coalition is a nonprofit organization that has not issued any shares or debt securities to the public, and has no parent companies, subsidiaries, or affiliates that have issued any shares or debt securities to the public.

National Newspaper Association is a non-stock nonprofit Florida corporation. It has no parent corporation and no subsidiaries.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

New England Newspaper and Press Association, Inc. is a non-profit corporation. It has no parent, and no publicly held corporation owns 10% or more of its stock.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization. It has no parent corporation and issues no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

Student Press Law Center is a 501(c)(3) not-for-profit corporation that has no parent and issues no stock.

Time USA, LLC is a privately held limited liability company. No publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ...................................................... iii

TABLE OF AUTHORITIES .................................................................... vii

SOURCE OF AUTHORITY TO FILE ..................................................... xi

FED. R. APP. P. 29(a)(4)(E) STATEMENT ........................................... xi

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ................. 1

SUMMARY OF THE ARGUMENT ...................................................... 8

ARGUMENT .................................................................................... 11

    I.    If permitted to stand, Article 5.14(a) would disrupt the provision of vital information in times of greatest need. ................................................. 11

    II.    Though ostensibly targeted at intentional or reckless false statements, Article 5.14(a) could be used to target the inevitable honest mistake in rapidly developing breaking news situations. ................ 17

    III.    Article 5.14(a) is not necessary to address the perceived problem and is far from the least restrictive alternative. .................................................. 21

CONCLUSION .................................................................................. 24

CERTIFICATE OF COMPLIANCE ...................................................... 26

CERTIFICATE OF SERVICE .............................................................. 27

# TABLE OF AUTHORITIES

## Cases

*Frese v. Formella,*
  53 F.4th 1 (1st Cir. 2022) ........................................................................ 16

*Garrison v. Louisiana,*
  379 U.S. 64 (1964) .................................................................................... 16

*Grisham v. Romero,*
  483 P.3d 545 (N.M. 2021) ....................................................................... 7, 8

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ...................................................................................... 9

*Neb. Press Ass'n v. Stuart,*
  427 U.S. 539 (1976) ..................................................................................... 5

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) .................................................................................. 16

*Rodriguez-Cotto v. Pierluisi-Urrutia,*
  668 F. Supp. 3d 77 (D.P.R. 2023) ........................................................ 15, 17

*Smith v. Daily Mail Publ'g Co.,*
  443 U.S. 97 (1979) ..................................................................................... 11

*Speiser v. Randall,*
  357 U.S. 513 (1958) ..................................................................................... 4

*Stern v. U.S. Gypsum, Inc.,*
  547 F.2d 1329 (7th Cir. 1977) ................................................................. 12

*United States v. Alvarez,*
  567 U.S. 709 (2012) ........................................................................... *passim*

*United States v. Playboy Ent. Grp., Inc.,*
  529 U.S. 803 (2000) ................................................................................... 17

*Whitney v. California,*
  274 U.S. 357 (1927) .................................................................................. 14

**Statutes**

Law of the Puerto Rico Department of Public Safety,
Law No. 66 of 2020 ...........................................................................3, 16

P.R. Laws Ann. tit. 25, § 3654....................................................3, 15, 17

**Other Authorities**

Dakin Andone & Ella Nilsen, *Florida Dodged "Worst-Case Scenario,"*
*FEMA Director Says*, CNN (Oct. 10, 2024),
https://perma.cc/54GT-YDRX..............................................................14

Divya Ramjee et al., *Evolving Face Mask Guidance During a Pandemic and*
*Potential Harm to Public Perception*, J. Med. Internet Rsch., Feb. 2023,
https://www.jmir.org/2023/1/e40706/PDF ..........................................13

Eli Langer, *The Five-Year Anniversary of Twitter's Defining Moment*,
CNBC (Jan. 15, 2014),
https://perma.cc/E6EG-DXUT ............................................................10

Emily Mae Czachor, *St. Louis Tornado Sirens Didn't Sound in Deadly*
*Storm. Now a City Commissioner Has Been Placed on Leave*,
CBS News (May 21, 2025),
https://perma.cc/7CHP-38LT..................................................................7

*FEMA Drops 'Zero Access' Policy After CNN Wins Court Order*,
Reporters Comm. for Freedom of the Press (Sept. 13, 2005),
https://perma.cc/FW3B-UPVH.................................................................8

*How Rumors Spread on Social Media During Weather Disasters*,
U.S. Nat'l Sci. Found. (Sept. 18, 2018),
https://perma.cc/7PHY-8Z5Z ..........................................................9, 13

*How to Use Social Media for Newsgathering*,
NBCU Academy (Oct. 5, 2021),
https://perma.cc/PB3Z-4SS5...............................................................10

*Hurricane Rumor Response*, Fed. Emergency Mgmt. Agency,
https://perma.cc/8359-C6G4 (last updated Oct. 14, 2024)..................14

Jeffrey Gottfried et al., *Journalists Sense Turmoil in Their Industry Amid Continued Passion for Their Work*, Pew Rsch. Ctr. (June 14, 2022), https://perma.cc/46R7-PY2D ...................................................................10

Jenny Jarvie, *Investigation Into False Evacuation Alerts Sent During L.A. Fires Places Blame, Calls for More Regulation*, L.A. Times (May 12, 2025), https://perma.cc/4PLB-ZLBL ..................................................................6

John Raby & Gabriela Aoun Angueira, *FEMA Administrator Continues Pushback Against False Claims as Helene Death Toll Hits 230*, Associated Press (Oct. 7, 2024), http://bit.ly/47tt2kS ...........................................................................14

Juliana Kim et al., *Strong Winds Pick Up, Increasing Fire Danger as Firefighters Battle LA Blazes*, NPR (Jan. 12, 2025), https://perma.cc/FLD8-N9GW ..............................................................13

L. Darnell Weeden, *Hurricane Katrina: First Amendment Censorship and the News Media*, 31 T. Marshall L. Rev. 479 (2006) ..............................................................9

Liselotte Englund et al., *Reporting Under Extreme Conditions: Journalists' Experience of Disaster Coverage*, Frontiers in Commc'n, June 2023, https://doi.org/10.3389/fcomm.2023.1060169 ......................................5

Luke Kemp, *The 'Stomp Reflex': When Governments Abuse Emergency Powers*, BBC (Apr. 28, 2021), https://perma.cc/C53B-9RA9 ...............................................................8

Melissa Goldin & Brittany Peterson, *For LA Water Issues, Misinformation Spreads Nearly as Fast as the Wildfires*, Associated Press (Jan. 15, 2025), http://bit.ly/4mgwHXQ ........................................................................13

Nicola Bruno, Reuters Inst. for the Study of Journalism, *Tweet First, Verify Later? How Real-Time Information Is Changing the Coverage of Worldwide Crisis Events* (2011), https://perma.cc/RS57-H2EB .......................................................11, 12

Nicole Gaouette et al., *Put to Katrina's Test*, L.A. Times (Sept. 11, 2005), https://perma.cc/8V2F-ZZBW ..........................................................6, 7

PEN America, *Press Freedom Under Fire in Ferguson* (Oct. 27, 2014),
    https://perma.cc/8PRZ-STPD .................................................................8

Shira Ovide & Heather Kelly, *How Watch Duty Became the Go-To Wildfire
    App to Track L.A. Wildfires*, Wash. Post (Jan. 9, 2025),
    https://wapo.st/45ihJe1 ...............................................................12

*Social Media Guidelines for the Newsroom*, N.Y. Times (June 21, 2024),
    https://perma.cc/M2T9-J2DX .............................................................10

Susan Ashworth, *Washington Becomes 11th State With Formal First
    Informer Status*, Radio World (May 13, 2019),
    https://perma.cc/VH7G-3B96 .................................................................3

Yuliya Chernova, *News Services Like Voice of America Helped Save My
    Family*, Wall St. J. (Mar. 21, 2025),
    http://bit.ly/4mIgn1S ...................................................................3

## SOURCE OF AUTHORITY TO FILE

Consent to file this amici curiae brief has been given by Appellants and Appellees, and this brief is thus filed pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

The Reporters Committee for Freedom of the Press declares that:

1. no party's counsel authored the brief in whole or in part;

2. no party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3. no person, other than amici, their members or their counsel, contributed money intended to fund the preparation or submission of this brief.

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE

Amici curiae are the Reporters Committee for Freedom of the Press ("Reporters Committee"); The Center for Investigative Reporting; Dow Jones & Company, publisher of The Wall Street Journal; First Amendment Coalition; Hearst Corporation; Inter American Press Association; The Intercept Media, Inc.; Massachusetts Newspapers Publishers Association; The McClatchy Company; The Media Institute, National Freedom of Information Coalition; National Newspaper Association; National Press Photographers Association; New England Newspaper and Press Association; The New York Times Company; Online News Association; Radio Television Digital News Association; Society of Environmental Journalists; Society of Professional Journalists; Student Press Law Center; and TIME USA (collectively, "amici").

As representatives of the news media, amici have a strong interest in ensuring that journalists and news organizations can quickly and freely report on emergency situations.  Allowing the government to restrict and punish reporting during a declared emergency in the manner contemplated here could chill valuable and, indeed, life-saving journalism.  The challenged law is especially troubling when the government is more than able to effectively combat any perceived misinformation through its own speech.  Amici therefore have an abiding interest

in ensuring that the statute remains enjoined.  Statements of interest for individual amici are as follows:

Lead amicus the **Reporters Committee** is an unincorporated nonprofit association.  It was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.  In this and other federal courts, the Reporters Committee frequently serves as amicus curiae in cases involving the ability of the press to obtain the news.  *See, e.g.*, Br. of Amici Curiae Reporters Comm. for Freedom of the Press & 60 News Media Orgs., *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020) (No. 20-35739), 2020 WL 7063167; Br. of Amici Curiae Reporters Comm. for Freedom of the Press, et al., *Bean Maine Lobster, Inc. v. Monterey Bay Aquarium Found*, 25-8012 (1st Cir. May 2, 2025).

**The Center for Investigative Reporting, Inc.** is the nation's oldest nonprofit investigative newsroom in the country that runs the brands Mother Jones, Reveal, and CIR Studios. Mother Jones is a reader-supported news magazine and website known for ground-breaking investigative and in-depth journalism on issues of national and global significance. Reveal produces investigative journalism

for the Reveal national public radio show and podcast, and CIR Studios produces feature length documentaries distributed on Netflix, Hulu and other streaming channels. Reveal often works in collaboration with other newsrooms across the country.

**Dow Jones & Company** is the world's leading provider of news and business information. Through The Wall Street Journal, Barron's, MarketWatch, Dow Jones Newswires, and its other publications, Dow Jones has produced journalism of unrivaled quality for more than 130 years and today has one of the world's largest newsgathering operations. Dow Jones's professional information services, including the Factiva news database and Dow Jones Risk & Compliance, ensure that businesses worldwide have the data and facts they need to make intelligent decisions. Dow Jones is a News Corp company.

**First Amendment Coalition** ("FAC") is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. FAC advances this purpose by working to improve governmental compliance with state and federal open government laws. FAC's activities include free legal consultations on access to public records and First Amendment issues, educational programs, legislative

3

oversight of California bills affecting access to government records and free speech, and public advocacy, including extensive litigation and appellate work. FAC's members are news organizations, law firms, libraries, civic organizations, academics, freelance journalists, bloggers, activists, and ordinary citizens.

**Hearst** is one of the nation's largest diversified media, information and services companies with more than 360 businesses. Its major interests include ownership of 15 daily and more than 30 weekly newspapers, including the San Francisco Chronicle, Houston Chronicle, and Albany Times Union; hundreds of magazines around the world, including Cosmopolitan, Good Housekeeping, ELLE, Harper's BAZAAR and O, The Oprah Magazine; 31 television stations such as KCRA-TV in Sacramento, Calif. and KSBW-TV in Monterey/Salinas, CA, which reach a combined 19 percent of U.S. viewers; ownership in leading cable television networks such as A&E, HISTORY, Lifetime and ESPN; global ratings agency Fitch Group; Hearst Health; significant holdings in automotive, electronic and medical/pharmaceutical business information companies; Internet and marketing services businesses; television production; newspaper features distribution; and real estate.

**The Inter American Press Association** ("IAPA") is a not-for-profit organization dedicated to the defense and promotion of freedom of the press and of

expression in the Americas.  It is made up of more than 1,300 publications from throughout the Western Hemisphere and is based in Miami, Florida.

**The Intercept Media, Inc.** is a non-profit digital media venture committed to rigorous, adversarial journalism in the public interest.

**The Massachusetts Newspaper Publishers Association** is the legal and legislative organization representing newspapers in Massachusetts.

**The McClatchy Company, LLC** is a publisher of iconic brands such as the Miami Herald, The Kansas City Star, The Sacramento Bee, The Charlotte Observer, The (Raleigh) News & Observer, and the Fort Worth Star-Telegram. McClatchy operates media companies in 30 U.S. markets in 16 states, providing each of its communities with high-quality news and advertising services in a wide array of digital and print formats.  McClatchy is headquartered in Sacramento, California.

**The Media Institute** is a nonprofit foundation specializing in communications policy issues founded in 1979.  The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism.  Its program agenda encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

**The National Freedom of Information Coalition** is a national nonprofit, nonpartisan organization of state and regional affiliates representing 45 states and the District of Columbia.  Through its programs and services and national member network, NFOIC promotes press freedom, litigation and legislative and administrative reforms that ensure open, transparent and accessible state and local governments and public institutions.

**National Newspaper Association** is a 2,000 member organization of community newspapers founded in 1885.  Its members include weekly and small daily newspapers across the United States. It is based in Pensacola, FL.

**The National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution.  NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**New England Newspaper and Press Association, Inc.** ("NENPA") is the regional association for newspapers in the six New England States (including Massachusetts). NENPA's corporate office is in Dedham, Massachusetts.  Its

purpose is to promote the common interests of newspapers published in New England.  Consistent with its purposes, NENPA is committed to preserving and ensuring the open and free publication of news and events in an open society.

**The New York Times Company** is the publisher of The New York Times and operates the news website nytimes.com.

**Online News Association** is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**Radio Television Digital News Association** ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

**The Society of Environmental Journalists** is the only North-American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

**Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism.  It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior.  Founded in 1909 as Sigma Delta

Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**Student Press Law Center** ("SPLC") is a nonprofit, nonpartisan organization which, since 1974, has been the nation's only legal assistance agency devoted exclusively to educating high school and college journalists about the rights and responsibilities embodied in the First Amendment to the Constitution of the United States. SPLC provides free legal assistance, information and educational materials for student journalists on a variety of legal topics.

**TIME** is a global multimedia brand that reaches a combined audience of more than 100 million around the world. TIME's major franchises include the TIME 100 Most Influential People, Person of the Year, Firsts, Best Inventions, Genius Companies, World's Greatest Places and more. With 45 million digital visitors each month and 40 million social media followers, TIME is one of the most trusted and recognized sources of news and information in the world.

## SUMMARY OF THE ARGUMENT

During an emergency, journalists and news organizations fill at least two crucial roles. First, they provide timely, often life-saving information to the public—so much so that many states have adopted "first informer" protections in their emergency management laws that ensure that news outlets can get up and

running immediately after a disaster.  *See, e.g.*, Susan Ashworth, *Washington Becomes 11th State With Formal First Informer Status*, Radio World (May 13, 2019), https://perma.cc/VH7G-3B96.  Two, in addition to disseminating and supplementing information from emergency management personnel, journalists and news organizations can provide the public an alternative to the official narrative, especially in cases where authorities may have an incentive to avoid full transparency because of their own missteps.  *Cf.* Yuliya Chernova, *News Services Like Voice of America Helped Save My Family*, Wall St. J. (Mar. 21, 2025), http://bit.ly/4mIgn1S (describing how uncensored U.S. international broadcasting helped warn residents away from Chernobyl after the explosion).

Both of these roles are implicated by the law enjoined by the court below.  *See* Law of the Puerto Rico Department of Public Safety, Law No. 66 of 2020, P.R. Laws Ann. tit. 25, § 3654(a) (hereinafter "Article 5.14(a)").  Unless carefully cabined to intrinsically harmful false speech such as fraud or perjury, statutes like Article 5.14(a) that impose sweeping liability for false statements risk censoring true and valuable information.  This is so even with Article 5.14(a)'s knowing-or-reckless scienter provision and the requirement that the statement occur during a declared emergency.  The target of an investigation or prosecution in such cases is still subject to the government's often self-interested determination of what is false and, even if the speech is ultimately found to be true, the specter of liability will

lead speakers to self-censor and "steer far wider of the unlawful zone." *Speiser v. Randall*, 357 U.S. 513, 526 (1958).

Accordingly, amici offer three arguments in support of affirmance.

First, given the pivotal role the news media plays in getting accurate information quickly to the public during emergencies, Article 5.14(a)'s direct enforcement and chilling effect could harm public safety. The law's application to false statements over social media compounds that risk by potentially suppressing the flow of information on increasingly irreplaceable platforms for real-time collection and dissemination of news.

Second, while journalists have every incentive to report accurate information during a crisis, facts change quickly on the ground and honest mistakes will invariably occur. It is therefore essential that the law provide breathing room for those inadvertent errors. Article 5.14(a) would do the opposite. It would give the government a potent weapon to target news organizations based on reporting perceived as unfavorable and would operate to suppress truthful public discourse by striking the wrong balance.

Finally, false speech is not a category of historically unprotected speech. As such, a prohibition on false statements during a declared emergency is a content-based restriction subject to strict scrutiny and the prohibition must therefore be narrowly tailored and the least restrictive means of achieving the government's

purpose.  Because Article 5.14(a) sweeps too broadly, and because the far less

restrictive alternative of government counter-speech exists, Article 5.14(a) fails

such scrutiny.

## ARGUMENT

### I.    If permitted to stand, Article 5.14(a) would disrupt the provision of vital information in times of greatest need.

"Journalists and news organizations are essential actors in disaster

communication."  Liselotte Englund et al., *Reporting Under Extreme Conditions:*

*Journalists' Experience of Disaster Coverage*, Frontiers in Commc'n, June 2023,

at 2, https://doi.org/10.3389/fcomm.2023.1060169.  The press serves "[a]s the eyes

and ears of citizens . . . creating coherence and meaning," and timely reporting

"can prevent panic and anxiety."  *Id.*  As such, disaster reporting is of

quintessential public interest.  The public relies on the press to stay apprised of

developing situations and, indeed, to prevent the proliferation of inaccurate

information.  *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 567 (1976) ("[W]ithout

any news accounts being printed or broadcast, rumors would travel swiftly by word

of mouth.  One can only speculate on the accuracy of such reports, given the

generative propensities of rumors; they could well be more damaging than

reasonably accurate news accounts.").  Stifling this type of reporting would

contravene a core purpose of the First Amendment: to ensure that the public has

the information it needs to protect its own safety and to hold officials accountable

when they fail to do so.  Article 5.14(a) could impair public interest newsgathering and reporting in several ways.

For instance, the government itself may be the source of misinformation, and reporters must be able to correct the record.  During the Los Angeles wildfires this year, government evacuation alerts were mistakenly sent due to a technical glitch "urging people across a metropolitan region of 10 million to prepare to evacuate," which served to "stoke[] panic and confusion."  Jenny Jarvie, *Investigation Into False Evacuation Alerts Sent During L.A. Fires Places Blame, Calls for More Regulation*, L.A. Times (May 12, 2025), https://perma.cc/4PLB-ZLBL.  Similarly, during Hurricane Katrina, the Department of Homeland Security and the Federal Emergency Management Agency provided inaccurate information about the severity of the crisis to the public.  Nicole Gaouette et al., *Put to Katrina's Test*, L.A. Times (Sept. 11, 2005), https://perma.cc/8V2F-ZZBW.  While DHS Secretary Michael Chertoff stated that the disastrous conditions around New Orleans' convention center were "nothing more than a rumor," news reports contradicted his statements with "scenes of exhausted evacuees and images of dead bodies on the street."  *Id*.  Were it in force, Article 5.14(a) could stifle corrective news reports by, among other things, making journalists think twice about disseminating or contradicting the government's own inaccurate information.

Similarly, journalists both fill gaps in information from the government and often uncover government failures during emergencies.  *See, e.g.*, Emily Mae Czachor, *St. Louis Tornado Sirens Didn't Sound in Deadly Storm. Now a City Commissioner Has Been Placed on Leave*, CBS News (May 21, 2025), https://perma.cc/7CHP-38LT.  Laws like Article 5.14(a)—which ultimately give the government discretion in deciding what is true or false—could provide an avenue for the suppression of truthful information the government perceives as unfavorable.  *See United States v. Alvarez*, 567 U.S. 709, 751–52 (2012) (Alito, J., dissenting) (noting the peril in permitting the government to be the "arbiter of truth" in "history, science, and similar matters").  The statute's limited scope, targeting statements made during declared emergencies, does little to mitigate this risk.  In times of political tension, governors can often exercise the power to "describe[] [an] emergency, create[] the means to address it, and justif[y] that means in the same order that grants [them] the authority in the first place." *Grisham v. Romero*, 483 P.3d 545, 566 (N.M. 2021) (Thomson, J., concurring). This "closed loop of authority to regulate liberties" is facilitated by "broad and vague statutes that grant emergency powers," and can lead to "long-term consequences." *Id*. at 563, 566.  Such consequences can include inhibiting the press by stifling reporting that "could have created an objective record" and leading to "divergent stories" about important incidents.  PEN America, *Press

13

*Freedom Under Fire in Ferguson* 15–16 (Oct. 27, 2014), https://perma.cc/8PRZ-STPD (describing the effect of a curfew imposed after a declaration of emergency). Indeed, tethering the application of a statute to a declaration of emergency may even incentivize the government to make such a declaration in the first place.  *See* Luke Kemp, *The 'Stomp Reflex': When Governments Abuse Emergency Powers*, BBC (Apr. 28, 2021), https://perma.cc/C53B-9RA9 ("[C]ountries with already heavy suppression of media freedom tended to use the coronavirus as an opportunity to intensify their censorial efforts.").

Again, Hurricane Katrina provides an example.  Following the disaster, FEMA enacted a "zero-access" policy barring reporters from covering the recovery of victims.  *FEMA Drops 'Zero Access' Policy After CNN Wins Court Order*, Reporters Comm. for Freedom of the Press (Sept. 13, 2005), https://perma.cc/FW3B-UPVH.  Commentators noted that the policy had no apparent goals besides "suppress[ing] facts that tend to make the federal government appear to be rather incompetent" and controlling the media narrative about the disaster.  L. Darnell Weeden, *Hurricane Katrina: First Amendment Censorship and the News Media*, 31 T. Marshall L. Rev. 479, 489 (2006).  While FEMA reversed the policy a day after news organizations filed a lawsuit, the incident illustrates how the government faces a temptation to use its authority to

suppress information perceived to be unfavorable in times of crisis.  If allowed to stand, Article 5.14(a) would amplify that temptation.

Article 5.14(a)'s reference to communications over "social networks" raises special concern.  Social media has become a "leading source of news for many Americans," *Murthy v. Missouri*, 603 U.S. 43, 80 (2024) (Alito, J., dissenting), and when "disasters strike, people increasingly rely on social media to learn about the appropriate response and to inform their decisions," *How Rumors Spread on Social Media During Weather Disasters*, U.S. Nat'l Sci. Found. (Sept. 18, 2018), https://perma.cc/7PHY-8Z5Z.  By creating potentially sweeping liability for information shared on social media platforms, Article 5.14(a) could seriously hinder journalists' ability to share and gather information online.

As a source of news, social media is increasingly indispensable.  The New York Times explains, for instance, that social media "plays a vital role in our journalism" allowing "our reporters and editors . . . [to] harvest and curate information, cultivate sources, engage with readers and experiment with new forms of storytelling and voice."  *Social Media Guidelines for the Newsroom*, N.Y. Times (June 21, 2024), https://perma.cc/M2T9-J2DX.  NBC News has a dedicated "group of reporters who specialize in using social media to find, verify and report on different stories" and who serve "as digital first responders, sourcing and verifying videos and photos showing the news as it unfolded in real time."  *How to*

*Use Social Media for Newsgathering*, NBCU Academy (Oct. 5, 2021),

https://perma.cc/PB3Z-4SS5.  In a 2022 survey, 75 percent of polled journalists

said social media helped them find stories, 79 percent said that it helped them find

sources, and 49 percent specifically reported that it helped them verify information.

Jeffrey Gottfried et al., *Journalists Sense Turmoil in Their Industry Amid*

*Continued Passion for Their Work*, Pew Rsch. Ctr. (June 14, 2022),

https://perma.cc/46R7-PY2D.  Article 5.14(a) could diminish the value of social

media by discouraging both journalists and the public at large from freely sharing

information on these platforms.

   That danger is particularly acute during emergencies.  While facts can shift

during emergencies, and inaccurate information can circulate, the real-time,

unfettered flow of developing information on social media can be itself valuable.

In 2009, for instance, a Twitter user was the first to post pictures of the emergency

landing of U.S. Airways Flight 1549 in New York City, which quickly became

known as the Miracle on the Hudson.  Eli Langer, *The Five-Year Anniversary of*

*Twitter's Defining Moment*, CNBC (Jan. 15, 2014), https://perma.cc/E6EG-DXUT.

During the 2010 earthquake in Haiti, normal "communication channels [were] out

of order in the areas hit hardest by the earthquake" and "the major media outlets

which were still without correspondents on the ground quickly resorted to Twitter

as a reliable source for their news-gathering."  Nicola Bruno, Reuters Inst. for the

Study of Journalism, *Tweet First, Verify Later? How Real-Time Information Is Changing the Coverage of Worldwide Crisis Events* 14 (2011), https://perma.cc/RS57-H2EB.

In short, in the United States, a "free press cannot be made to rely solely upon the sufferance of government to supply it with information" and the press must retain its ability to independently and freely access information, especially as events occur. *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 104 (1979). The mere threat of an Article 5.14(a) investigation or prosecution could chill vital newsgathering and reporting at times when lives depend on that information.

**II.     Though ostensibly targeted at intentional or reckless false statements, Article 5.14(a) could be used to target the inevitable honest mistake in rapidly developing breaking news situations.**

Appellants argue that Article 5.14(a) is limited to knowing or reckless false statements and that this scienter requirement will adequately protect the press. This is incorrect. Journalists may naturally "still be worried about being *prosecuted* for a careless false statement, even if [they did] not have the intent" to circulate an inaccurate report. *Alvarez*, 567 U.S. at 736 (Breyer, J., concurring); *see also Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1345 (7th Cir. 1977) ("It is easy enough to allege knowing falsity . . . ."). That "spectre alone" could lead to "peripheral chill," especially for reporters operating under intense, rapidly developing emergency conditions. *Stern*, 547 F.2d at 1345.

17

Due to the speed at which the press must uncover, corroborate, and disseminate information to the public, inadvertent inaccuracies can occur. The value of prompt information, however, far outweighs that risk. In crises, immediate information can help save lives by "provid[ing] visibility to threatened voices . . . [and] spread[ing] information regarding upcoming catastrophes [and] current health pandemics." Bruno, *supra*, at 9. As a recent example, a crowd-sourced app allowing individuals to share information about the location and spread of wildfires was reportedly "in every single firefighter's pocket," providing first responders with immediate insight into the developing wildfires in Los Angeles earlier this year. Shira Ovide & Heather Kelly, *How Watch Duty Became the Go-To Wildfire App to Track L.A. Wildfires*, Wash. Post (Jan. 9, 2025), https://wapo.st/45ihJe1. While false alarms or false warnings could proliferate on such an app, the flow of real-time, continually updated information helped the press, public, and first responders themselves.

The example of the California wildfires also demonstrates how quickly what is initially thought to be "true" can be revealed as inaccurate as emergency situations develop. *See, e.g.*, Juliana Kim et al., *Strong Winds Pick Up, Increasing Fire Danger as Firefighters Battle LA Blazes*, NPR (Jan. 12, 2025), https://perma.cc/FLD8-N9GW (describing how rapidly changing weather conditions threatened to undo efforts to contain several large fires). Similarly, the

18

federal government issued inconsistant guidance during the COVID-19 pandemic. "From February 2020 through May 2021, the CDC changed guidelines on face masks . . . multiple times, from initially discouraging mask use . . . to recommending mask use for all individuals."  *See* Divya Ramjee et al., *Evolving Face Mask Guidance During a Pandemic and Potential Harm to Public Perception*, J. Med. Internet Rsch., Feb. 2023, at 2, https://www.jmir.org/ 2023/1/e40706/PDF.  And even initially inaccurate reports can lead to valuable oversight.  Ultimately incorrect information reported during the L.A. wildfires spurred helpful public discussion of "[s]tate water distribution choices."  Melissa Goldin & Brittany Peterson, *For LA Water Issues, Misinformation Spreads Nearly as Fast as the Wildfires*, Associated Press (Jan. 15, 2025), http://bit.ly/4mgwHXQ.

Moreover, rather than damming the flow of information upstream, the government typically can—and does—engage in effective counter-speech to address inaccurate information.  *See How Rumors Spread on Social Media During Weather Disasters*, U.S. Nat'l Sci. Found., *supra* ("[O]ur research also shows that the Federal Emergency Management Agency and other official governmental accounts have the power to stop rumors, especially when these agencies act quickly."); *see also Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("If there be time to expose through discussion the falsehood and

fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.").

For instance, FEMA has developed a webpage dedicated to addressing false claims, directing visitors to trusted sources of information and providing a searchable collection of fact-checked responses to prevalent rumors. *Hurricane Rumor Response*, Fed. Emergency Mgmt. Agency, https://perma.cc/8359-C6G4 (last updated Oct. 14, 2024). FEMA officials also directly addressed misinformation regarding the agency's support of Hurricane Helene victims through agency interviews and other public statements. John Raby & Gabriela Aoun Angueira, *FEMA Administrator Continues Pushback Against False Claims as Helene Death Toll Hits 230*, Associated Press (Oct. 7, 2024), http://bit.ly/47tt2kS. These efforts, along with similar statements by "governors[,] congressional members, [and] local leaders," helped to "decrease" the level of misinformation accompanying future hurricanes. *See* Dakin Andone & Ella Nilsen, *Florida Dodged "Worst-Case Scenario," FEMA Director Says*, CNN (Oct. 10, 2024), https://perma.cc/54GT-YDRX.

The news media is already strongly incentivized to report information as accurately as possible during times of crisis. To add fear of prosecution would only inhibit the flow of valuable information, and, as the district court recognized, the government can counter perceived misinformation through its own speech.

*Rodriguez-Cotto v. Pierluisi-Urrutia*, 668 F. Supp. 3d 77, 104–05 (D.P.R. 2023) ("[I]nstead of criminalizing speech, the Legislature could simply have required the Government to use its multiple communications platforms and other means of communication to present a complete and accurate description of the facts.").  In that way, Article 5.14(a)'s inhibition of information is not only a threat to free speech, but to public safety as well.

### III.    Article 5.14(a) is not necessary to address the perceived problem and is far from the least restrictive alternative.

Article 5.14(a) penalizes giving a "warning or false alarm . . . in relation to the imminent occurrence of a catastrophe in Puerto Rico" or "disseminat[ing] . . . a [false] notice or a false alarm" that puts persons or property at risk, knowing, in both cases, the information to be false.  P.R. Laws Ann. tit. 25, § 3654(a).  Both of these restrictions are content-based because application of the statute is contingent on: (1) determining if the content of speech constitutes a warning, alarm, or notice; (2) with respect to the first provision, determining if the warning or false alarm is *about* a particular subject matter, *i.e.*, "the imminent occurrence of a catastrophe"; and (3) assessing if the information contained in the speech is true or not.  *Id*.

Article 5.14(a) is also not one of the "few historic and traditional categories [of expression] long familiar to the bar"—such as obscenity, defamation, or

incitement—where speech can be punished based expressly on its content.[1]
*Alvarez*, 567 U.S. at 717–18 (plurality opinion) (citations and internal quotation marks omitted) ("Absent from those few categories . . . is any general exception to the First Amendment for false statements.").  And, as a content-based restriction falling outside a historical category, Article 5.14(a) is "presumptively unconstitutional" and subject to strict scrutiny.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Alvarez*, 567 U.S. at 717 (plurality opinion).  The government must therefore establish that the law is narrowly tailored to serve a compelling state interest and is the least restrictive means of doing so.  *Reed*, 576 U.S. at 163.[2]

Article 5.14(a) cannot pass muster under strict scrutiny, for several reasons. First, the statute is clearly not tailored to address the government's stated interest in preventing "confusion, panic or collective public hysteria."  Appellees' Suppl. Add. 3 (quoting Statement of Purpose, Law No. 66 of 2020).  That is, a false alarm, warning, or notice, standing alone, is not likely to cause a panic in all instances.  *See Rodriguez-Cotto*, 668 F. Supp. 3d at 103.  Indeed, the provision of

---

[1]     Appellants fault the district court for failing to apply *Garrison v. Louisiana*, 379 U.S. 64 (1964) or *Frese v. Formella*, 53 F.4th 1 (1st Cir. 2022).  Appellants' Br. at 2.  Those are, however, criminal defamation cases.  Article 5.14(a), by contrast, imposes liability for falsehood-qua-falsehood, and therefore must be analyzed under *Alvarez*.

[2]     As the court below held and Appellees have correctly argued, Article 5.14(a) also fails under intermediate scrutiny.  *See* Appellees' Br. at 8, 40–41.

Article 5.14(a) criminalizing untrue "warning[s] or false alarm[s] . . . in relation to the imminent occurrence of a catastrophe in Puerto Rico," does not require any demonstration of harm at all, nor is it limited to forms of communications that are particularly likely to spur panic. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 819 (2000) (holding that courts should weigh "evidence of how widespread or how serious [a] problem" is, as "[t]he First Amendment requires a . . . careful assessment and characterization of an evil in order to justify" a corresponding speech restriction); *Alvarez*, 567 U.S. at 726 (plurality opinion) (noting that the government "points to no evidence to support its claim that the public's general perception of military awards is diluted by false claims such as those" criminalized by the Stolen Valor Act).

Article 5.14(a)'s second provision broadly prohibiting the knowing dissemination of a false notice or alarm that puts persons or property at risk is similarly flawed. This provision is not limited to particular speech that might pose a heightened risk, but instead broadly applies to any speech "disseminat[ed], publish[ed], broadcast[], transferr[ed], or circulat[ed]," including by social media. P.R. Laws Ann. tit. 25, § 3654(a). Further, the requirement that such speech puts at risk "the life, health, bodily integrity, or safety" of persons or "endangers public or private property" does not require that such harm be foreseeable, that it be "very likely" to occur, or that it, in fact, occur. *Id.*; *cf. Alvarez*, 567 U.S. at 735 (Breyer,

J., concurring) (citing the much narrower Federal Communications Commission's "broadcast hoax" rule and the federal hoax statute).

Finally, as described above, the government is well situated to engage in a far less restrictive means of addressing misinformation—that is, by using the bully pulpit. As described in Part II, *supra*, government counter-speech has repeatedly been found to be effective in addressing the spread of rumors and false information during emergencies. The availability of that non-invasive intervention is, alone, fatal to Article 5.14(a) as a less restrictive alternative.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to affirm the judgment below.

Dated: August 15, 2025

Respectfully submitted,

*/s/ Gabriel Rottman*
Gabriel Rottman
   *Counsel of Record*
Mara Gassmann*
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
grottman@rcfp.org

Ian Kalish*
UNIVERSITY OF VIRGINIA SCHOOL OF LAW

24

FIRST AMENDMENT CLINIC[3]
580 Massie Road
Charlottesville, VA 22903
(202) 795-9316

*Of counsel*

---

[3]    This amicus brief does not represent the views of the University of Virginia School of Law, which does not as an institution take a position in the litigation.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains 5,126 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated:   August 15, 2025                     */s/ Gabriel Rottman*
                                              Gabriel Rottman
                                             *Counsel of Record for Amici Curiae*

## CERTIFICATE OF SERVICE

I, Gabriel Rottman, hereby certify that I have filed the foregoing Brief of Amici Curiae electronically with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system.  All participants in this case are registered CM/ECF users, and service will be accomplished via the CM/ECF system.

Dated: August 15, 2025                    */s/ Gabriel Rottman*
                                          Gabriel Rottman
                                          *Counsel of Record for Amici Curiae*